**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

Bobby Kasolas, Esq.
Carl J. Soranno, Esq.
Brach Eichler LLC
101 Eisenhower Parkway
Roseland, New Jersey 07068-1067
(973) 228-5700
Attorneys for Plaintiffs John Clifford, Craig Clifford,
Scott Clifford, Paul Clifford, Kasolas Family & Friends VG Investment LLC,
Jersey Cord Cutters, LLC and Stephen Dazzo

**CHRISTINE C. CLIFFORD** (as Administrator of the Estate of John Clifford)**, CRAIG CLIFFORD, SCOTT CLIFFORD, PAUL CLIFFORD**, **STEPHEN DAZZO, JERSEY CORD CUTTERS, LLC** and **KASOLAS FAMILY & FRIENDS VG INVESTMENT, LLC**

Plaintiffs,

vs.

**RICHARD FEDERMAN, WINSTON JOHNSON, GOTHAM MEDIA CORPORATION, GOTHAM MEDIA SERVICES, INC., WINSONIC DIGITAL CABLE SYSTEMS NETWORK HOLDINGS, LTD., WINSONIC DIGITAL MEDIA GROUP, LTD., WINSONIC DIGITAL CABLE SYSTEMS NETWORK, LTD., JUSTIN SU, CASCADE NORTHWEST, INC., LORI POOLE, ROBERT KOSTENSKY, TODD GUTHRIE, TECH CXO, LLC, PATRICK SHAW, RICKSHAW PRODUCTIONS, LLC, DARYL ARTHUR, MEGATONE MUSIC, LLC, KRISTY THURMAN,**

CIVIL ACTION NO.: 1:18-cv-01953-AT

**FIRST AMENDED COMPLAINT**

**KT COMMUNICATIONS CONSULTING, INC., 2251 LAKE PARK INVESTMENT GROUP LLC, DOC MAANDI MOVIES LLC, DMM-EXPENDABLES 3 LLC, MAANDI MEDIA PRODUCTIONS DIGITAL LLC, MAANDI ENTERTAINMENT LLC, MAANDI MEDIA PRODUCTIONS LLC, MAANDI PARK MS LLC, MAANDI MEDIA HOLDINGS INTERNATIONAL LLC, KIMBERLYTE PRODUCTION SERVICES, INC., 2496 DIGITAL DISTRIBUTION LLC, 1094 DIGITAL DISTRIBUTION LLC, SST SWISS STERLING, INC., HEATHER CLIPPARD, ROBERT HALF INTERNATIONAL, INC. (**d/b/a **THE CREATIVE GROUP** and d/b/a **ROBERT HALF TECHNOLOGY), KATIE ASHCRAFT, BUSINESS CONSULTING, LLC** and **ASHCRAFT OPPERMAN & ASSOCATES, LLC**

Defendants.

**COMES NOW** Plaintiffs Christine C. Clifford (as Administrator of the Estate of John Clifford), Craig Clifford, Scott Clifford, Paul Clifford, Kasolas Family & Friends VG Investment LLC ("KFFVG"), Jersey Cord Cutters, LLC ("JCC") and Stephen Dazzo ("Dazzo") hereby state as follows by way of Complaint against defendants: (i) Richard Federman ("Federman"); (ii) Winston Johnson ("Johnson"); (iii) Gotham Media Corporation ("GMC"); (iv) Winsonic

Digital Media Cable Systems Holdings, Inc. ("Winsonic Holdings"); (v) Winsonic Digital Media Group, Ltd. ("WDMG"); (vi) Winsonic Digital Cable Systems Network Ltd. ("WDCSN"); (vii) Justin Su ("Su"); (viii) Cascade Northwest, Inc. ("Cascade"); (ix) Lori Poole ("Poole"); (x) Robert Kostensky ("Kostensky"); (xi) Todd Guthrie, CPA ("Guthrie"); (xii) Tech CXO, LLC ("Tech CXO"); (xiii) Patrick Shaw ("Shaw"); (xiv) Rickshaw Productions, LLC ("Rickshaw"); (xv) Daryl Arthur ("Arthur"); (xvi) Megatone Music, LLC ("Megatone"); (xvii) Kristy Thurman ("Thurman"); (xviii) KT Communications Consulting, Inc. ("KTC"); (xix) Gotham Media Services, Inc. ("GMS"); (xx) 2251 Lake Park Investment Group LLC ("2251 LPI"); (xxi) Doc Maandi Movies LLC ("Doc Movies"); (xxii) DMM Expendables 3 LLC ("DMM Expendables"); (xxiii) Maandi Media Productions Digital LLC ("Maandi MPD"); (xxiv) Maandi Entertainment LLC ("Maandi Entertainment"); (xxv) Maandi Media Productions LLC ("Maandi Media"); (xxvi) Maandi Park MS LLC ("Maandi Park"); (xxvii) Maandi Media Holdings International LLC ("Maandi International"); (xxviii) Kimberlyte Productions Services, Inc. ("Kimberlyte"); (xxix) 2496 Digital Distribution LLC ("2496 Digital"); (xxx); 1094 Digital Distribution LLC ("1094 Digital"); (xxxi) SST Swiss Sterling, Inc. ("SST Swiss"); (xxxii ) Heather Clippard ("Clippard"); (xxxiii) Robert Half International, Inc. d/b/a The Creative Group and d/b/a Robert Half Technology ("RHI"); (xxxiv) Katie Ashcraft ("Ashcraft"); (xxxv) Business

Consulting, LLC ("BC LLC"); and (xxxvi) Ashcraft Opperman & Associates, LLC ("AOA LLC").

**PRELIMINARY STATEMENT**

This case involves numerous cold-blooded, shameless and remarkable fraudulent schemes, artifices, devices and conspiracies to pathologically defraud the plaintiff investors using a completely fictitious business enterprise presented by defendants as Gotham Media Corporation ("GMC"). This fraudulent scheme and artifice was primarily orchestrated and perpetrated by defendants Richard Federman ("Federman"), Winston Johnson ("Johnson") and Robert Kostensky ("Kostensky") out of GMC's corporate campus office building purchased, funded and operated with plaintiffs' "investment" proceeds located at 2251 Lake Park Drive in Smyrna, Georgia (the "Georgia Campus"). The fraudulent schemes, artifices, devices and conspiracies were carried out using various levels of participation, assistance, conspiracy and aiding and abetting by specific "silos" of named defendant conspirators, perpetrators and partners. These defendant "silos" knowingly partnered with the primary defendant perpetrators to defraud and swindle plaintiffs of their hard earned money using the fictional GMC enterprise as a front to do so. In addition, Federman, Johnson and their "silos" of defendants utilized numerous other named defendant business entities that Federman and Johnson owned with various defendant "silos" to steal and divert millions of

dollars plaintiffs invested in the GMC fictitious enterprise to those defendant entities Federman and Johnson owned with other defendant co-conspirators, in order to fund and operate those defendants' own unrelated business interests, personal hobbies, personal expenses and lifestyles.

Defendants' fraudulent investment scheme centered upon their advertisement and marketing of a fictitious and non-existent "over the top" ("OTT") internet "cable" television service trademarked as "VIDGO." Through social media, press releases, high profile trade shows paid for with plaintiffs' funds and other intentionally misleading marketing platforms that included use of illegally and phony VIDGO product demonstrations to plaintiffs to induce investment, Federman, Johnson, Kostensky and their defendant conspirators advertised to the public, plaintiffs and other investors that GMC was imminently launching its state-of-the-art "over the top" ("OTT") internet "cable" television service – which if successful would disrupt/modernize the traditional cable television broadcast industry and related consumer marketplace. Using GMC as their front, Federman, Johnson and Kostensky publicly advertised to the world that GMC had content licensing rights falsely claimed to have been secured in the form of local channels and PBS in all local markets, the most popular "core" television cable channel programming demanded and/or required by the television viewing public (i.e. ESPN, AMC, USA Networks, TNT/TBS, cable news programming,

etc.), cloud DVR capabilities, video on demand ("VOD"), no annual contracts or credit checks, no equipment and (most notably) "a la carte" programming selection thereby allowing consumers to only purchase those popular cable channels they elect to pay for - all delivered directly through the internet to a subscriber's mobile device/digital device/internet stick without need for a set top box or cable company subscription.

By delivering television broadcasting content through an OTT delivery strategy rather than traditional cable delivery system, GMC and other companies could deliver broadcasting content directly to a subscribing viewer's tablet, cell phone, laptop and/or other portable media device directly through the internet – thereby bypassing cable companies' additional costs of service, annual contracts and credit checks, leasing of "set top box" equipment, taxes, fees and compelled "package" bundles associated with traditional cable service. While these technological capabilities are possible and were launched by other companies such as YouTube TV, Hulu, Direct TV Now and SlingTV/DISH Network, GMC and its officers/directors took absolutely no steps to establish such an OTT cable television business. Rather, they deceptively and pathologically diverted, and reckless expended, all of the over $11,000,000 in GMC investment contributions from plaintiffs and other investors on defendants' own personal side projects and unrelated businesses with the other "silo" defendants, on their personal living

expenses and lifestyles, on their own personal travel expenses and entertainment, on home improvements, on personal hobbies, on unrelated business and entertainment expenses and on their personal health and medical expenses – all having absolutely nothing to do with the VIDGO or any OTT television service. The result was the complete and unfettered theft of plaintiffs' investment proceeds using the GMC front as the instrument to do so.

Defendants' fictitious investment scheme was so pathological and abominable that Federman, Johnson and Kostensky even announced and presented the alleged VIDGO service and purported VIDGO network at the National Association of Broadcasters ("NAB") show's annual convention in Las Vegas on two (2) separate occasions, as well as the annual famed Consumer Electronics Show ("CES"). On those occasions, they pitched and publicized the non-existent VIDGO service to the plaintiff investors and others in the public, the "company's third-party "vendors" and business partners and the entire cable television industry as a legitimate, legal and ready to launch OTT cable television service that would challenge the existing traditional cable service structure.

Exacerbating matters, certain GMC executives stood by and allowed this incredible fraudulent scheme to be hatched and carried out uninterrupted. The fraudulent scheme was allowed to proposer, grow and be perpetrated without any obstruction or disclosure to plaintiffs due to the complete ignorance, gross

negligence and incompetence of Gotham's Chief Financial Officer – Todd Guthrie of Tech CXO. Specifically, Guthrie and Tech CXO completely abandoned even their most basic, rudimentary and fundamental fiduciary duties of care, loyalty and disclosure to plaintiffs as investors by failing to ever examine, inspect, review, question, monitor, review, audit and/or observe GMC's bank records, financial records, business records, financial activities, vendor invoices, business practices, contracts, money transfers, business agreements, the various defendants' bogus and unjustified invoices, inter-company and related third-party transfers/transactions of plaintiffs' monies to non-GMC defendants, GMC's alleged expenses, etc. Consequently, the obvious theft of plaintiffs' funds between December 2015 through August 2017 went totally undisclosed to a single investor- when the fraudulent scheme's existence finally came to light no thanks to Guthrie and Tech CXO. In fact, contemporaneously with defendants' thievery and fraud taking place beneath Guthrie's and Tech CXO's nose, Guthrie wrote inexcusable and unreasonably ignorant emails to plaintiffs contending every single dollar invested by plaintiffs' in GMC had been properly accounted for, efficiently and wisely spent and had created significant value for plaintiffs' investment.

Plaintiffs have therefore filed the instant action against the litany of all defendants involved in this incredible fraudulent scheme who all participated in its various levels to steal plaintiffs' approximately $6,000,000 invested. The

fraudulent scheme was so diabolical that it even involved a conspiracy between Federman/Johnson and the publicly traded staffing company, Robert Half, Inc.'s ("RHI"). Specifically, RHI’s management with Federman/Johnson conspired for RHI to staff completely unqualified and incompetent employees at GMC's Georgia Campus pretending to be GMC employees. Those RHI temporary staff employees were paid for by GMC so that when plaintiffs, investors and other vendors visited the Georgia Campus to determine GMC progress and status, the RHI temporary staff employees pretended to be GMC employees performing work for GMC on the VIDGO network and service.

Meanwhile, plaintiffs’ monies were actually used by Federman, Johnson and Kostensky to pay RHI and these RHI employees (with RHI’s and the employee’s knowledge) to work on and advance Johnson’s and Federman’s unrelated business ventures/projects that Johnson owns with famed “Hollywood” action movie star Wesley Snipes ("Snipes") – the original owner and builder of the Georgia Campus that Snipes formerly used as his center of business operations before begin indicted and convicted for tax evasion. Those unrelated businesses involve movie content creation, movie production, digital distribution and editing, video games and other television and Hollywood based content and services - all financed and re-kindled by Johnson and Snipes using plaintiffs’ money following Snipes infamous incarceration for tax fraud. These schemes in turn were assisted in their execution

by Johnson's finance staffers and controllers Ashcraft/her companies and Emmenegger, as well as Johnson’s wife Poole - all of whom were paid to book all of these expenses to GMC's books and records and to conceal Johnson’s and his defendant businesses’ misappropriation and theft of plaintiffs' funds to advance Johnson’s defendant "Hollywood" business ventures in partnership with Snipes.

Lastly, at all times during his tenure of GMC’s purported Chief Technology Officer ("CFO"), Johnson stole over $1,500,000 of plaintiffs’ money through GMC utilizing bogus check writing authority and forgery of GMC checks, and using authority Federman provided. This included Johnson’s attempts to re-activate and re-establish his defendant "Winsonic" business and “Maandi” business entities, and to attempt to build his own “Winsonic” OTT network and service. Johnson also expended plaintiffs’ absconded funds to build an unrelated “Winsonic” IPTV network for the gain of his own defendant “Winsonic” businesses, his defendant partners, the majority shareholders in those defendant ventures and for Johnsons’ own personal benefit, again with the help of his finance staff in Ashcraft and her defendant companies. Johnson even had his wife Poole receiving plaintiffs' funds on a monthly basis for purported accounting services she never provided to GMC, and that were provided by numerous other defendants such as Ashcraft already allegedly performing those services. Based upon the foregoing and the factual

details more specifically set forth below, plaintiffs institute this action to recover their entire approximately $6,000,000 investment from defendants.

**JURISDICTION**

1. This Court has original jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. 1330, because the action is brought under the laws of the United States, and in particular, Section 10(b) of the Securities & Exchange Act of 1934 as amended ("the Securities Act") and SEC Rule 10b-5.

2. This Court also has diversity jurisdiction over the subject matter of this civil action pursuant to 28 U.S.C. § 1332 because the action is between citizens of different states and the amount in controversy exceeds $75,000, with plaintiffs aggregate damages being approximately $6,000,0000. Specifically, plaintiffs are all citizens of the State of New Jersey or Florida, while almost all of the defendants are citizens of the State of Georgia, with the balance of defendants being citizens/headquartered/incorporated in states other than New Jersey or Florida - and no defendant is a citizen of the State of New Jersey or Florida.

**VENUE**

3. Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(a), (b) and (c) because plaintiffs consent to jurisdiction of the Northern District of Georgia, defendants currently conduct/conducted business directly in the State of Georgia continuously and systematically, certain defendants

solicited plaintiffs to invest approximately $6,000,000 into GMC that is headquartered and chartered in Georgia that defendants completely stole from plaintiffs using GMC as a fraudulent front and fictitious business enterprise, GMC is a Georgia corporation and a majority of the wrongful actions and conduct committed by defendants occurred in the Northern District of Georgia, defendants absconded and diverted plaintiffs' monies fraudulently and illegally within the State of Georgia and the Northern District of Georgia, defendants all have more than sufficient minimum contracts in the Northern District of Georgia and do business in the Northern District of Georgia, defendants have purposefully directed their activities into the Northern District of Georgia to defraud plaintiffs and steal plaintiffs' investment proceeds through the fictitious GMC front, this litigation results from the damages plaintiffs suffered arising from defendants' specific actions, activities, conduct, omissions and solicitations in the Northern District of Georgia, defendants purposeful availed themselves of the laws of Georgia by engaging in conduct towards plaintiffs while using the Northern District of Georgia as defendants' base of operations, and the facts giving rise to this controversy and/or a substantial portion of the events regarding defendants' wrongful conduct giving rise to the action occurred within the Northern District of Georgia. Venue is also proper pursuant to 12 U.S.C. §2614 since defendants'

wrongful conduct occurred in the Northern District of Georgia's jurisdiction within the State of Georgia.

**THE PARTIES**

4. Christine C. Clifford is the Administrator of the Estate of John Clifford ("the Estate") pursuant to Letters of Administrator issued by the Florida Probate Division on November 20, 2018. Christine C. Clifford is a citizen of the State of Florida having her principal residence located at 500 Beachview Drive, No. 4N, Vero Beach, Florida 32963. John Clifford was a citizen of the State of Florida at the time of the filing of this lawsuit and at all times regarding the actions that give rise to it, having his residence at all such times located at 500 Beachview Drive, No. 4N, Vero Beach, Florida 32963. John Clifford/the Estate is a common stock shareholder and convertible note debt holder in GMC whose aggregate "investment" in GMC totals $3,497,000. John Clifford/the Estate is by far the largest investor in GMC. John Clifford passed away on November 6, 2018.

5. Craig Clifford is a citizen of the State of New Jersey having his principal residence located at 90 Halifax Road, Mahwah, New Jersey 07430. Craig Clifford is common stock shareholder and convertible note debt holder in GMC whose aggregate "investment" in GMC totals $742,000.

6. Scott Clifford is a citizen of the State of New Jersey having his principal residence located at 599 Van Beuren Road, Morristown, New Jersey

07960. Scott Clifford is common stock shareholder and convertible note debt holder in GCM whose aggregate "investment" in GMC totals $300,000.

7. Paul Clifford is a citizen of the State of New Jersey having his principal residence located at 121 E. 22nd Street, Spray Beach, Long Beach Township, New Jersey 08008. Paul Clifford is a convertible note debt holder in GMC whose aggregate "investment" in GMC totals $50,000.

8. Stephen Dazzo ("Dazzo") is a citizen of the State of New Jersey having his principal residence located at 15 Brandeis Court, Basking Ridge, New Jersey 07920. Dazzo is a convertible note debt holder in GMC whose aggregate "investment" in GMC totals $28,000.

9. Jersey Cord Cutters, LLC ("JCC") is a New Jersey limited liability company having its principal address of business located at 8310 Sanctuary Blvd., Riverdale, New Jersey 07457. JCC is a convertible note debt holder in GMC whose aggregate "investment" in GMC totals $495,000. All members of JCC are citizens of the State of New Jersey.

10. Kasolas Family & Friends VG Investment, LLC ("KFFVG") is a New Jersey limited liability company having its principal address of business located at 8310 Sanctuary Blvd., Riverdale, New Jersey 07457. KFFVG is a common stock shareholder in GMC whose aggregate "investment" in GMC totals $450,000. All members of KFFVG are citizens of the State of New Jersey.

11. Federman is a citizen of the State of Georgia having his principal residence located at 3583 Parkside Way, Brookhaven, Georgia 30319-3833. At all relevant times discussed in this Complaint, Federman was the founder, Chief Executive Officer ("CEO") and sole director of GMC, as well as the CEO and sole director of GMS. In addition, Federman was the sole director for GMC from January 2016 until approximately July 2017 when Guthrie and Arnold also became GMC directors. Federman is the largest common stock shareholder in GMC but contributed no money to GMC in exchange for his shares.

12. Johnson is a citizen of the State of Georgia having his principal residence located at 1341 Audobon Court SW, Atlanta, Georgia 30311-2471. At all relevant times discussed in this Complaint, Johnson was the Chief Technology Officer ("CTO") of GMC. Johnson is also a large shareholder in GMC as a result of Federman's gifting of GMC common shares to Johnson for purposes of agreeing to continue and further their fraudulent schemes, devices and artifices perpetrated upon plaintiffs as detailed below.

13. GMC is an administratively dissolved Georgia corporation and a fictitious enterprise formerly having its principal place of business formerly located at 2251 Lake Park Drive, Smyrna, Georgia 30080.

14. GMS is an administratively dissolved Georgia corporation and fictitious entity formerly having its principal place of business formerly located at

2251 Lake Park Drive, Smyrna, Georgia 30080. At all relevant times discussed in this Complaint, Federman was the Chief Executive Officer ("CEO") and a director of GMS.

15. Winsonic Holdings is a Georgia corporation having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Johnson and Spellman are the largest shareholders of Winsonic Holdings, directors of Winsonic Holdings and co-CEOs of Winsonic Holdings.

16. WDMG is a Nevada corporation having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. WDMG is a publicly traded company "over the counter" under stock symbol "WDMG". Winsonic Holdings and Spellman are majority shareholders in WDMG, directors of WDMG and co-CEOs of WDMG.

17. WDCSN is a Maryland corporation having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. WDMG is the parent company and majority shareholder of WDMG, along with Spellman. WDCSN was spun off from WDMG. Johnson and Spellman are the directors and co-CEOs of WDCSN.

18. Cascade is a Nevada corporation having its principal place of business located at 526 Dawn Cove Drive, Henderson, Nevada 89052-2677.

19. Su is a citizen of the State of California having his principal residence located at 526 Dawn Cove Drive, Henderson, Nevada 89052-2677. Su is the 100% shareholder, President and CEO of Cascade. At all relevant times discussed in this Complaint, Su was an alleged consultant to GMC through his company Cascade, and held the title of Senior Director of Network Operations/Worldwide Operations for GMC.

20. Poole is the wife of Johnson and a citizen of the State of Georgia having her principal residence located at 1341 Audobon Court SW, Atlanta, Georgia 30311-2471.

21. Kostensky is a citizen of the State of Georgia having his principal residence located at 5977 Downington Ridge, Acworth, Georgia 30101. At all relevant times discussed in this Complaint, Kostensky held himself out as the President of GMC.

22. Guthrie is a citizen of the State of Georgia having his principal business address located at 75 5th Street, Suite No. 325, Atlanta, GA 30308. At all relevant times discussed in this Complaint, Guthrie/Tech CXO was the Chief Financial Officer ("CFO") of GMC and GMS.

23. Tech CXO is a Georgia limited liability company having its principal place of business located at 75 5th Street, Suite No. 325, Atlanta, GA 30308. At

all relevant times discussed in this Complaint, Guthrie was a Member of Tech CXO, and Guthrie/Tech CXO served as CFO of GMC for monetary compensation.

24. Shaw is a citizen of the State of Georgia having his principal residence located at 269 Goodson Way NW, Atlanta, Georgia 30309-1913. Shaw has also allowed Federman to reside at Shaw's residential address and to use it as Federman's mailing address.

25. Rickshaw is a Georgia limited liability company having its principal place of business located at 269 Goodson Way NW, Atlanta, Georgia 30309-1913. Shaw and Federman are each fifty percent (50%) members in Rickshaw respectively and co-Managing Members of Rickshaw.

26. Arthur is a citizen of the State of Georgia having his principal business address located at 1125 Concord Road SE No. 107, Atlanta, Georgia 30080.

27. Megatone is a Georgia limited liability company having its principal place of business located at 1125 Concord Road SE #107, Atlanta, Georgia 30080. Arthur is the 100% owner and Managing Member of Megatone.

28. Thurman is a citizen of the State of Missouri having her principal residence located at 13668 Osage Valley Road R, Boonville, Missouri 65233-3920.

29. KTC is a Delaware corporation having its principal place of business located at 2409 North Stadium Boulevard, Columbia, Missouri 65202. KTC is 100% owned by Thurman.

30. 2251 LPI is a Georgia limited liability company with a principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. 2251 LPI is 100% owned by Johnson.

31. Doc Movies is a Delaware limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Doc Movies is owned fifty percent (50%) by 2251 LPI and fifty percent (50%) owned by famed Hollywood actor Snipes.

32. DMM Expendables is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. DMM Expendables is 100% owned by Doc Movies.

33. Maandi MPD is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Maandi MPD is forty percent (40%) owned by Snipes, forty percent (40%) owned by Johnson and twenty percent (20%) owned by yet to be identified or ascertained third-parties.

34. Maandi Entertainment is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia

30080. Maandi Entertainment is forty percent (40%) owned by Snipes, forty percent (40%) owned by Johnson and twenty percent (20%) owned by yet to be identified or ascertained third-parties.

35. Maandi Media is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Maandi Media is forty percent (40%) owned by Snipes, forty percent (40%) owned by Johnson and twenty percent (20%) by yet to be identified or ascertained third-parties.

36. Maandi Park is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Maandi Park is forty percent (40%) owned by Snipes, forty percent (40%) owned by Johnson and twenty percent (20%) owned by yet to be identified or ascertained third-parties.

37. Maandi International is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Upon information and belief, Maandi International is forty percent (40%) owned by Johnson, and twenty percent (20%) by yet to be identified or ascertained third-parties.

38. Kimberlyte is a Nevada corporation having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Upon

information and belief, Maandi International is forty percent (40%) owned by Johnson, (40%) owned by Snipes and twenty percent (20%) owned by yet to be identified or ascertained third-parties.

39. 2496 Digital is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Johnson is the 100% owner of 2496 Digital.

40. 1094 Digital is a Georgia limited liability company having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Johnson is the 100% owner of 1094 Digital.

41. SST Swiss is a Nevada corporation having its principal place of business located at 2251 Lake Park Drive, Smyrna, Georgia 30080. Upon information and belief, Snipes is the 100% owned of SST.

42. RHI is a Delaware corporation and a publicly traded company having its national headquarters located at 2884 Sand Hill Road, Menlo Park, California 94025.

43. Clippard is a citizen of the State of Georgia having her principal residence located at 2228 Myra Lane, Snellville, Georgia 30078-6137.

44. Ashcraft is a Georgia licensed certified public accountant and citizen of the State of Georgia having her principal business addresses located at 1310 Lathene Drive, Alpharetta, Georgia 30004 and 1315 Summit Road, Alpharetta,

Georgia 30004. At all relevant times discussed in this Complaint, Ashcraft served as the CFO, Vice-President of Finance and Financial Controller for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1096 Digital and SST Swiss.

45. BC LLC is a Georgia limited liability company having its principal place of business located at 13150 Lathene Drive, Alpharetta, Georgia 30004. Ashcraft is the 100% owner and Managing Member of BC LLC.

46. AOA LLC is a Georgia limited liability company having its principal place of business located at 1315 Summit Road, Alpharetta, Georgia 30004. Ashcraft is member of AOA LLC and its President, CEO and Managing Member.

## THE FACTS

### The Origin and History of the Business and Friendship Relationships Between Federman, Guthrie & Kostensky That Led to GMC and the VIDGO Fraudulent Scheme

47. In or about 2007, Federman formed GothamPC, LLC ("Gotham PC") to engage in the manufacture, marketing and sale of very high end gaming computer systems targeting the personal computer video gaming market.

48. Upon information and belief, Federman invested a *de minims* amount of his own capital into Gotham PC.

49. Federman served as the Managing Member of Gotham PC.

50. On May 23, 2007, Federman (on behalf of Gotham PC") entered into a written contractual agreement with Guthrie and Tech CFO, LLC ("Tech CFO") whereby those parties contractually agreed for Guthrie to serve as Gotham PC's Chief Financial Officer. Notably, Tech C**F**O is a different company and entity from defendant Tech C**X**O. In addition, Gotham PC is not a named party in this action.

51. During the existence of Gotham PC, Federman and Guthrie formed a deep and trusting friendship whereby Guthrie mentored Federman and played an instrumental role in converting Federman to observing a new form of religion.

52. Gotham PC ultimately failed to succeed as a business venture.

53. Subsequently, Federman formed GMS for the purported purpose of manufacturing, marketing and selling digital media device services and technology that would allow consumers to portably take their paid for cable television programming content with them outside of their home, and broadcast it in hotels and other travel destinations through use of digital storage identification cards. These technology cards would integrate and interface with digital devices located in hotels and other tourist/travel destinations, and would allow customers the capability to carry their cable television programming with them at no additional cost.

54. It was during Federman's alleged business efforts regarding GMS that they met and began working with Kostensky, who was a former Vice-President of Sales for DirectTV.

55. Federman served as the President, CEO and Chairman of the Board for GMS, Guthrie served as the CFO for GMS as a member of Tech CXO during its existence and operation.

56. Guthrie was also a shareholder in GMS and contributed capital into GMS.

57. During Federman's and Kostensky's efforts to launch GMS, they met plaintiff Craig Clifford working on a project that GMS was also working on. While GMS was allegedly supplying content management and digital video

delivery to hotels for that client, Clifford was co-President of a highly reputable company engaged to supply the necessary digital storage key cards the client's business required.

58. GMS never launched its intended business and was unsuccessful.

59. Following GMS' failure in or about 2014, Federman claimed he was exploring the possibility of entering the "over the top" ("OTT") internet cable television marketplace. This OTT cable television space was rapidly emerging at the time and becoming a technological reality that posed a less costly and more flexible alternative to traditional cable television service.

60. OTT television involves the delivery of traditional "core" popular cable television network programming and "local channels" directly over the internet from broadcasters directly to paid subscribers' portable/mobile devices such as computer tablets, cell phones, laptops, internet sticks, video game consoles and/or other portable computer devices. The advantage of an OTT delivery model of distribution is that subscribers do not need to pay for and/or utilize a traditional "cable company" to subscribe for those "channels." Rather, subscribers can circumvent the cable companies directly "over" the internet and over the traditional cable company distribution network systems, to purchase that same cable programming for delivery directly to their computer devices for a more tailored, less expensive and/or more flexible alternative than traditional cable. In addition,

traditional "set top box" lease payments, along with fees and taxes associated with "traditional cable," are not incurred by the subscriber purchasing such cable content “over the top.” Moreover, OTT television programming does not require annual contracts or credit checks, and can be accessed by subscribers in areas having no available cable or satellite alternatives to access "traditional cable television" programming.

61. Furthermore, the "holy grail" of OTT television is the public's intense desire to only pay for the specific cable channels and content that they actually watch, rather than pay for pre-packaged channel "bundles" priced as "packaged" deals that cost subscribers far more to subscribe to than if they could only pay for channels the subscribers actually watch. Lastly, the attraction of OTT delivery of "cable" programming is the ability for the subscriber to watch and pay for only the programming they want "anywhere, anyplace and anytime."

62. Around this time, it was public knowledge in the industry that companies such as DISH Network, DirectTV, YouTube, Sony and/or Hulu, as well as channel broadcasters such as HBO, ESPN and CBS, were launching and/or planning to launch “OTT” alternatives to their traditional television distribution models, and that the television network industry was shifting to an OTT model of programming distribution to the public television viewing audience.

**Federman, Kostensky & Johnson Commence Their Fraudulent Scheme of Raising Capital for "Gotham" and its "VIDGO" Branded OTT Cable Television Service in 2015/Early 2016 By Making Intentionally and Materially False Statements to Plaintiffs, the Public and Investors About "Gotham's" VIDGO Service and Alleged Licensing/Content Rights to Broadcast Core Networks' OTT Signals to the Public**

63. In 2015, Federman, Kostensky and Johnson began soliciting investments from the public to fund Federman's latest business venture into the emerging OTT live cable television marketplace under the name "Gotham Media."

64. In particular, Federman, Kostensky and Johnson advised the public, while soliciting plaintiffs and other investors, that "Gotham" had the OTT content and licensing rights for many of the most popular "cable channel broadcasters." In addition, they advised the public, plaintiffs and other investors that "Gotham" had also secured and executed agreements, and implemented network and technology based solutions, capable of broadcasting all traditional local channels and the Public Broadcasting Network ("PBS") throughout all United States local markets. They further claimed this was the result of "Gotham's" business strategy, technology and specifically developed network, programming and network partnerships, computer encoding software programs alleged created by Federman, location of the "Gotham" networks integration into the most critical national network highway locations, classification of its network, existing contractual partnerships with third-party vendors, agreements with broadcast networks/studios and secured regulatory approvals and licensing.

65. The "pitch" of "Gotham" having the ability to "broadcast" local channels in all United State markets was represented to plaintiffs and investors as critical because the inability to broadcast those "local channels" via OTT presented an impediment to OTT becoming a mainstream and viable replacement for traditional cable television companies. This is because the top rated and most heavily watched channels on television are "local channels," and because the majority of subscribers that purchase cable service also watch programming exclusively broadcasted on local channels. The same is true regarding highly popular children's programming from PBS such as "Sesame Street," "Curious George", etc.

66. All representations that Federman, Kostensky and Johnson made to the public, to plaintiffs and to potential investors in writing, by email and in press releases at all times were knowingly and intentionally false, and were designed to fraudulently induce the plaintiffs, the public and other investors to invest into GMS/GMC to steal those investors' funds through the front of a non-existent OTT television service trademarked as "VIDGO."

67. In late 2015/early 2016, Federman announced to existing GMS investors and potential investors such as plaintiffs that GMS would be launching the VIDGO service to the viewing public. Federman, Johnson and Kostensky publicly claimed VIDGO would forever change the way the viewing public

watches and accesses live linear cable and local television content from national and leading broadcast studios.

68. In early January 2016, Federman, Johnson and Kostensky began disseminating knowlingly false intentionally misleading information to the public, the media, the television broadcast industry, plaintiffs and other prospective investors that "Gotham Media" would soon be introducing an OTT live linear television service that would include local channels, sports entertainment channels, video-on-demand and premium cable channels. They further intentionally and falsely advertised, disseminated and announced through the media that customers of the service would be able to "build [their] own programming packages."

69. Additionally, these defendants published, advertised and disseminated intentionally false claims that VIDGO service would: (i) contain all local channels such as CBS, ABC, NBC, Fox and PBS in all local U.S. markets; (ii) contain content from Disney/ABC, Discovery, ESPN and NFL Network; (iii) that the service packages would allow for multiple simultaneous device streams to a subscriber's various OTT devices; (iv) have a cloud DVR; and (v) be available on OTT-type platforms such as Roku, Amazon Fire TV, Apple TV, PCS, Apple iOS and Android devices. Moreover, they disseminated, advertised and published intentionally misleading statements to the media, the industry and potential investors like plaintiffs that the service would initially launch in major select U.S.

cities such as Los Angeles, New York City, Chicago, Atlanta, Miami and San Francisco.

70. In early January 2016, Federman, Johnson and Kostensky further announced, published and disseminated intentionally false and misleading statements to the public, the media, the television broadcast industry, plaintiffs and other prospective investors that "Gotham Media" would: (i) be launching this OTT pay television service in the first half of 2016; (ii) would not require annual contracts from subscribers; (iii) would be contract-free and self-installable; (iv) would be initially available in fifteen (15) total U.S. markets; and (v) that the service would be nationwide by the end of the year.

71. In early January 2016, Federman, Johnson and Kostensky further announced, published and disseminated intentionally false and misleading statements to the public, the media, the television broadcast industry, plaintiffs and other prospective investors over Business Wire that "Gotham Media" would brand the OTT live linear cable television service as “VIDGO,” that the service was in "beta testing," and that VIDGO would offer the most live OTT linear broadcasting content compared to any other OTT service. Specifically, they released the following intentionally false press release on Business Wire:

> Created by industry experts, VIDGO offers truly on-the-go live video. With no fees for equipment, no credit check and no contracts, everyone qualifies for VIDGO service.

> "VIDGO combines the best of existing online streaming services with live television and VOD," said Robert Kostensky, VIDGO president and co-founder. "VIDGO is the lowest cost solution to deliver the most expansive catalog of live linear television and VOD to all devices and connected televisions."
>
> VIDGO will be offered in three competitively priced packages, with no long-term contracts required. Each package includes multiple simultaneous device streams. Programming includes live linear premium, sports, movies, music, local and international content.
>
> VIDGO will launch in 15 markets in the US in the first half of 2016, with full coverage throughout the U.S. by Q4 2016. To sign-up to be alerted of more information on VIDGO and the launch in your area, visit VIDGO.com. Pricing and channel listings details for VIDGO will be released later in Q1.
>
> About VIDGO
>
> VIDGO is an over-the-top television streaming service offering next-gen TV with more channels of live linear programming than any other OTT service. VIDGO is the lowest cost solution for premium television services, providing live premium, sports, movies, music, local and international content at an affordable price. VIDGO will be available in 15 U.S. markets in the first half of 2016, with full national expansion by Q4 2016.

72. All of the above press releases and publicly disseminated statements were intentionally false and were designed to fraudulently induced plaintiffs and other investors to invest in GMC for Federman's, Johnson's and Kostensky's use of those proceeds for their own unrelated personal endeavors, business expenses and needs, personal expenses and personal lifestyles.

73. Contemporaneously with the above press releases in late 2015/January 2016, and to fraudulently induce plaintiffs and other investors to "invest" into the VIDGO fiction, Federman, Johnson, Su, Cascade, Thurman and KTC illegally utilized internet protocol cable television ("IPTV") temporary software licenses from Minerva Networks and/or Vubiquity issued by those aggregators/content providers. IPTV is not the same as OTT because IPTV licenses do not grant any license, legal rights and/or authorization to transmit or distribute any network studios' programming/channel content to an OTT type device (cell phone, computer tablet, internet stick, laptop, game console, etc.).

74. Using those temporary IPTV licenses (known as "trial keys") only authorized and licensed for transmitting IPTV cable programming content to specific limited geographic regions, multi-dwelling units and in-home television systems, Federmanm, Johnson, Su, Cascade, Thurman and KTC used their digital and technological expertise/knowhow to orchestrate and coordinated the deceptive illegal broadcasting of these IPTV signals interstate directly to plaintiffs (and other investors') mobile devices/phones/tablets containing all locals channels and the most popular cable channel programming. These defendants did so to fraudulently induce plaintiffs and other investors to "invest" in GMC and the VIDGO service.

75. This illegal transmission of IPTV cable and local television programming content was held out as a legitimate and licensed OTT service

demonstration of the VIDGO service and content/licensing rights by Federman, Kostensky and Johnson. Notably, the illegal interstate transmissions to plaintiffs' devices contained a television guide interface and the live broadcasting of the most popular and critical cable channels such as ESPN, AMC, USA Network, Fox News, HGTV, TBS, TNT, Discovery, History Channel, Nickelodeon, FX, CNN, Disney Channel, Bravo, Telemundo, NFL Network, etc., and all "local" channels such as CBS, NBC, ABC and Fox to plaintiffs' and other investors' cell phones and tablets.

76. Federman's, Johnson's, Su's, Cascade's, Thurman's and KTC's illegal interstate broadcasts of the Minerva and/or Vubiquity IPTV signals containing the most popular cable and local channels with a television user interface over the internet to plaintiffs' mobile devices, while falsely claiming these signals were licensed OTT signals transmitted over GMC's own privately built OTT network utilizing proprietary software and technology designed by Federman, was a fraudulent scheme, device and artifice designed to fraudulent induce plaintiffs to invest in GMC.

77. In addition, Federman, Johnson, Su and Cascade contemporaneously utilized Comcast Cable service that they personally received through "set top boxes," coupled with their technological knowhow, to illegally "demonstrate" VIDGO by re-transmitting that cable programming content signal digitally and

interstate to plaintiffs' and other investors' phones and tablets. They illegally did so to fraudulently induce them into believing GMC actually had the capability, licensing and content rights to broadcast these highly popular cable channels to the public, and that such content was the product of being broadcast over GMC's alleged own state-of-the art network specifically constructed for OTT broadcast.

78. In the above instances, Federman, Kostensky and Johnson represented to plaintiffs and other investors that the signals "Gotham" was broadcasting to plaintiffs' phone and devices was legal, authorized and properly licensed by "Gotham" for OTT application, and that these broadcast "demonstrations" were demonstrations of the VIDGO service.

79. Federman's, Johnson's, Su's, Cascade's, Kostensky's, Thurman's and KTC's above fraudulent schemes, artifices and devices created material misrepresentations to plaintiffs and other investors that plaintiffs reasonably relied upon to their detriment to invest their initial round of contributions into "Gotham's" OTT cable television service.

80. In reliance on the fraudulent VIDGO "demonstrations" that Federman, Johnson, Su, Cascade, Kostensky, KTC and Thurman orchestrated plaintiffs each executed their own respective Common Stock Purchase Agreements between themselves and Kostensky as GMC's President. The GMC stock that plaintiffs purchased were unregistered securities and were never registered under the

Securities Act of 1933 (the "1933 Act"), and GMC claimed to plaintiffs that GMC's common shares being sold were exempt from the 1933 Act.

81. Pursuant to those GMC Common Stock Purchase Agreements, plaintiffs purchased common stock in GMC at a purchase price of $2.00 per share.

82. In January 2016, Kostensky and Johnson attended the famous annual Consumer Electronics Show ("CES") in Las Vegas, Nevada to allegedly "showcase" the VIDGO service to industry leaders, the industry press, broadcasters and vendors/partners. They advised plaintiffs they would be doing so by way of meetings in GMC's private suite, by invitation only, to such industry leaders. They also intentionally and falsely told plaintiffs afterwards that both the event and meetings were a "huge success" since there was never a VIDGO service and GMC was never a real company.

83. After plaintiffs made their initial investments, and in or about March 2015, Kostensky and Federman advised investors that the two of them had been meeting over the previous week "finalizing our programming packages and launch strategies for 2nd quarter [2016]." They further advised Federman would soon be sending out an investor update in the coming week on the company's progress.

84. On March 25, 2016, Federman wrote an intentionally false and misleading "investor update" to plaintiffs and other GMC shareholders stating as follows:



BE:10320527.1/GOT053-273976

> VIDGO Investors,
>
> It has been well over a month since my last update and I want to reassure all of you we are making great progress. A more detailed update will come early April. **The great news is the needed programming has been validated with our preferred aggregator and will be loaded onto the VIDGO platform starting April 1 [2016]. We are green lighted to launch this by all the powers-that-be. The other exciting news was by partnering with this preferred aggregator, we are now able to support Apple TV.**
>
> We are also prepared to give the press an update from our CES announcements but want to make sure we don't give our competition too much information regarding our launch. **We are free now to release any details we see fit, including the offered channels and marks.**
>
> Also we have had many requests for Stock Certificates, we will get these documents to you no later than April 7th.
>
> We are **in the process of updating beta to include the remaining channels and the on screen guide (GUI) that will be used for our residential launch.** We will keep the press updated on our launch and make sure we have the needed coverage to assist our business development strategy.
>
> Let me reassure everyone **these milestones are just around the corner and we will be formally launching very shortly.**
>
> I want to congratulate you all again for your investment in Gotham. **VIDGO is the first product to fully take advantage of OTT television and nothing can prevent us from launching now.** (emphasis added).

85. Rather than have plaintiffs wire their investment proceeds into a new company formed ultimately constituting GMC, Federman and Kostensky

intentionally had plaintiffs wire their initial investment proceeds into the old GMS bank account. This despite that fact plaintiffs were investing in a new business entity and a new business venture involving live linear OTT cable television in the form of the VIDGO service.

86. Specifically, following plaintiffs' and other common stock investors' funds being wired to GMS, plaintiffs learned their funds had been wired to the improper and/or "older" "Gotham entity" that was GMS, and that a new entity had actually been formed to serve as the investment vehicle for the VIDGO venture. This resulted in approximately $3,000,000 of common stock investor proceeds, including plaintiffs' contributions, being wired into the old GMS account rather than GMC's account.

87. GMC then had its outside corporate counsel then prepared legal instruments and documents necessary to reflect that plaintiffs' investment proceeds were credited for plaintiffs' appropriate pro rata investment shares in GMC, so plaintiffs' funds would go toward infusing GMC rather than GMS to finance the VIDGO business endeavor.

88. Following plaintiffs' discovery that Federman and Kostensky had plaintiffs/other investors improperly (claimed by defendants as an "accident") wire their investment proceeds into GMS rather than GMC, Federman and Guthrie claimed to rectify the situation by transferring those funds to GMC's bank account,

and having all VIDGO investors execute necessary paperwork reflecting the VIDGO service and its related assets and technology be transferred to GMC as well.

89. Subsequently in April 2016, GMC's outside counsel prepared and forwarded Investment Transfer & Exchange Agreements (the "ITEA Agreements") for execution to plaintiffs and other investors to grant plaintiffs a 1:1 relationship between GMS's capital structure and GMC's proposed capital structure based upon plaintiffs' investments. The ITEA Agreements included a pro-forma stock register for GMC reflecting a 1:1 relationship between GMS's capital structure and GMC's proposed capital structure.

90. Plaintiffs executed the ITEA Agreement between themselves, GMS and GMC.

91. Despite plaintiffs' and other common stock investors 'execution of their respective ITEA Agreements, Federman and Guthrie failed and/or refused to transfer the entire approximately $3,000,000 in investor proceeds into GMC. Rather, they transferred only approximately $1,600,000 over to GMC. Federman and Arnold in turn kept $1,400,000 of those proceeds in GMS in violation of the governing shareholder agreements, PPM and ITEA Agreements. Federman then stole those funds for their own personal and unrelated use, including return their friends' and families' lost investments in GMS at plaintiffs' expense.

92. Federman also utilized plaintiffs' funds improperly wired to the GMS account to pay back previous GMS investors and Gotham PC investors comprised of their friends and family (including Arnold himself) in a manner typical of a "ponzi scheme."

93. Thereafter, Federman converted and spent the approximately $1,400,000 still in GMS on Federman's own personal expenses and lifestyle in a manner having nothing to do with the VIDGO television service and/or OTT network promised to investors.

94. Moreover, Federman took a three (3) month lavish vacation from GMC at the expense of plaintiffs during the first half of 2016 using plaintiffs' investment proceeds that included his enjoyment of luxury hotels, yachts, restaurants, vacation resorts, musical instruments, musical studio time, musical equipment, prostitutes and on dating a "porno star."

95. During Federman's theft and misappropriation of the approximately $1,400,000 in investor proceeds from the GMS account, Guthrie/Tech CXO committed material breaches of their fiduciary duties of care, loyalty and disclosure to plaintiffs as GMC shareholders by engaging in remarkable gross negligence via: (i) failing to discover that the approximately $3,000,000 had been improperly directed for wire to GMS; (ii) failing to discover that only approximately $1,600,000 of the investor funds were properly transferred over to

GMC from GMS; (iii) failing to discover that Federman was spending/spent the approximately $1,400,000 of common stock investor proceeds on returning their friends', families' and own investments in GMS; and (iv) failing to discover and disclose Federman's use of those funds for his own personal expenses and enjoyment rather the non-existent and fictional VIDGO service and network.

96. In February 2016/March 2016, Federman, Johnson, Su, Cascade, Thurman and KTC began creating another fraudulent VIDGO product "beta" demonstration for experience by plaintiffs and other third-parties claiming to demonstrate (but in reality seeking to deceive) GMC's "readiness" and "imminent product launch" of the VIDGO service.

97. Specifically, Johnson, Federman, Su, Cascade, Thurman and KTC again manipulated Minerva and/or Vubiquity IPTV temporary licenses and to activate IPTV cable television packages and television guide interfaces for interstate broadcast and transmission to plaintiffs' mobile devices, cell phones, computer tablets and laptops. They did so by creating and loading a VIDGO software application onto Amazon Fire Sticks, and thereafter forwarding those Fire Sticks to plaintiffs and other investors to plug into plaintiffs'/other investors HDMI inputs.

98. The Amazon Fire Sticks in reality only broadcast IPTV cable programming signals that were non-licensed for OTT use or distribution over

GMC's own private network to OTT-type devices. Rather, the Amazon Fire Sticks contained Minverva and/or Vubiquity IPTV live cable programming and local channel streams via "turn keys" that Federman, Johnson, Su, Cascade, Thurman and KTC paid for using plaintiffs' money. This fraudulent "beta" demonstration actually broadcasted Minerva and/or Vubiquity IPTV cable channel lineup broadcasts and user guides over Minerva's/Vubiquity's own network illegally to the Amazon Fire sticks.

99. When plaintiffs and other investor plugged the Amazon Fire sticks into their televisions' HDMI ports, they were able to view all of the traditional and most popular cable programming channels, coupled with all local channels described above, and as originally seen in the January 2016 "beta" demonstrations that originally induced plaintiffs' investments. Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC did so while Federman, Johnson and Kostensky represented to plaintiffs and other investors the Amazon Fire stick transmissions plaintiffs watched on their televisions were licensed and authorized OTT cable channel/local channel transmissions streaming over the VIDGO network.

100. This Fire Stick "beta" demonstration occurred over interstate lines, and was designed and intended to make plaintiffs and others believe the VIDGO service was a real live linear OTT cable television service with an actual dedicated network as Federman, Johnson and Kostensky had publicly advertised and stated

to plaintiffs and other third-parties, and to make plaintiffs believe GMC was an actual and legitimate business when it not.

**The Additional Fraudulent Summer 2016 Capital Raise for Common Stock Shareholders**

101. In June 2016, Federman, Kostensky and Johnson announced, advertised and disseminated to the public, the media, the television broadcast industry, plaintiffs and other prospective investors that the VIDGO service would include the following:

- Build your own programming packages;
- Live linear local channels in select initial markets;
- National content providers and many other networks;
- Sports - live premium sports content;
- Video on demand, including first-run movie titles;
- Automatic cloud DVR;
- Favorites menu bar for quickly accessing your most- watched channels;
- Access to full programming lineup on-the-go or at home via WiFi or 4G connection;
- Multiple simultaneous devices with each package;
- Local channels in select initials markets including New York, Los Angeles, Atlanta, Chicago, Miami and San Francisco

102. Additionally in June 2016, Federman, Kostensky and Johnson announced, advertised and disseminated to the public, the media, the television broadcast industry, plaintiffs and other prospective investors that the VIDGO service:

> is an over-the-top television OTT service with the most comprehensive offering of live local, sports, national and on-demand content at an affordable price. Hosting its service on its own private network, VIDGO offers live OTT direct to the consumer with no buffering. VIDGO will be available in select local U.S. markets at launch with full U.S. coverage coming soon. Follow VIDGO on Facebook, Twitter and LinkedIn.

103. Contemporaneously with these intentionally false press releases, these defendants created another fraudulent scheme to continue misleading plaintiffs and other investors about VIDGO so plaintiffs/other investors would continue investing in the GMC scheme.

104. Since these defendants were fully aware they would never launch the VIDGO service either "shortly" or "just around the corner" (or in fact ever) as Federman's March 25, 2016 update falsely contended, Federman, Johnson, Su, Cascade, Thurman and KTC began working on another fraudulent technological artifice, scheme and device to conceal their existing fraudulent VIDGO scheme, and to continue duping plaintiffs and others into investing additional funds into GMC.

105. In April 2016, Johnson, Kostensky and Federman initiated the following press release to the public, the media, the television broadcast industry, plaintiffs and other prospective investors through a paid for advertisement through Business Wire:

> ATLANTA--(BUSINESS WIRE)--Minerva Networks, the leading provider of software solutions for the delivery of connected entertainment services, today announced that Gotham Media Corporation and Winsonic Digital Cable Systems Network, Ltd. have deployed its new Minerva 10 platform to offer advanced television services. Gotham Media Corporation's next-generation VIDGO TV service will be offered to new subscribers in Atlanta, Los Angeles, and NYC, and will be made available in all remaining areas later this year.
>
> Partnering with Minerva, Gotham and WDCSN are able to offer a full range of premium features including network DVR, Video on Demand, Pay-per-View, Catch-Up TV, Restart TV and an extensive HD channel lineup across a multi-screen platform.
>
> "Working closely with Minerva and its eco-system partners, we intend to deliver an entertainment experience that will delight our customers," said Winston Johnson, Chief Technology Officer at Gotham Media Corporation. "The Minerva platform provides us with the stability and flexibility we need to quickly introduce new services that will keep us ahead of the competition."
>
> "Gotham Media Corporation had some very specific goals and milestones related to their unique business proposition," said Matt Cuson, Vice President of Marketing at Minerva. "Working closely with our partners, we created a solution that addresses all of Gotham Media Corporation's short term goals and provides a platform for future innovations that support the company's growth plans."

106. Contemporaneously in or around April/May 2016, Johnson, Federman, Su, Cascade, Thurman and KTC created yet another fraudulent VIDGO "beta" demonstration to fraudulent demonstrate (and to deceive) to plaintiffs and other investors GMC's" readiness" and "imminent product launch" regarding

VIDGO. To further that fraudulent scheme, Johnson, Federman, Su, Cascade, Thurman and KTC again manipulated Minerva and/or Vubiquity IPTV licenses and account setups to activate IPTV cable television packages for broadcast transmission to plaintiffs' HDMI port devices using additional Amazon Fire Sticks. Contemporaneously, Federman, Johnson and Kostensky represented to plaintiffs and other investors the transmissions plaintiffs were receiving and watching on their computer devices were live linear OTT cable programming transmissions streaming live over the “VIDGO network.”

107. These “beta” demonstrations were transmitted over interstate lines and again contained all of the leading and most popular cable channel programming typically found in traditional cable lineups such as ESPN, AMC, TNT, TBS, Fox News, NFL Network, Disney, FX, CNN, etc., as well as all local channels (ABC, NBC, CBS and Fox).

108. Johnson's, Federman's, Su’s, Cascade’s, KTC’s and Thurman’s creation of these Minerva/Vubiquity “beta” demonstrations fraudulently held out as licensed and authorized live OTT cable programming transmissions by Federman, Johnson and Kostensky to plaintiffs was invoiced to GMC through one of Johnson’s alter-ego defendant companies called 2496 Digital. On those 2496 Digital invoices to GMC, Johnson actually itemized the creation and setup of these fraudulent “beta” demonstrations by himself, Federman and 2496 Digital in the

amount of $182,000 total chargeable to GMC, which Federman, Johnson and Guthrie paid and/or allowed to be paid using plaintiffs' "investment" proceeds. In other words, plaintiffs' own funds were used by these defendants to defraud the plaintiffs themselves into believing the VIDGO service was real.

109. Contemporaneously, Kostensky travelled to New Jersey to meet Craig Clifford and other plaintiffs to demonstrate the VIDGO service on his Apple iPad. While in New Jersey, Kostensky proceeded at a restaurant to demonstrate the VIDGO "beta" demonstration to plaintiffs and a room full of other restaurant employees and patrons in the dining room – while holding out the "beta" demonstration as true OTT live linear cable/local television programming. This "beta" demonstration contained all local channels and core cable programming as the previous "betas", streamed brilliantly and clearly over interstate lines from the Georgia Campus on his iPad live. Kostensky held out this "beta" demonstration as licensed and authorized OTT "core" cable content streamed by GMC over its "VIDGO network", while also making other fraudulent misrepresentations to plaintiffs to continue these defendants' fraudulent scheme.

110. On or about July 1, 2016, and after plaintiffs and other investors again tested out this "beta" demonstration that broadcast high quality and "core" cable television with a user interface (television guide), Federman sent another

fraudulent investor update to plaintiffs and the other GMC common stock shareholders stating as follows:

> Esteemed Gotham Investors,
>
> Here is a status report regarding the launch of VIDGO. **As most of you have seen, the new program interface and premium channels have been launched as the BETA stage.** Over the next couple of weeks, the final build of the network will be done which will result in the launch to our TRIAL stage, followed by the company realizing our revenue stage in a CONTROLLED COMERCIAL Launch stage.
>
> BETA STAGE: **During the BETA stage Gotham Media Corp built, tested and launched an extremely consumer friendly user interface showcasing the Gotham technology, premium channels, programming delivery, and program selection experience**. As good as this interface is, it is version 5.7 of the software, whereas the trial is version 10.1 and even more feature rich. **The BETA was enabled by the programming agreements that were finalized and secured during the same period.**
>
> On a parallel track, a very comprehensive business development program has been developed and is ready to deploy, which include public relations, marketing and several unique sales channels.
>
> TRIAL STAGE: The trial phase incorporates the BETA and adds the required consumer transaction interface (subscription sign up, order processing, etc.) in addition to back end business operating protocols.
>
> During the TRIAL stage investors, channel partners, media and others will be enabled to sign up and use the VIDGO service. This will serve not only as a showcase of VIDGO, but also as a great test and validation of the end to end systems, procedures and processes from the

user interface, programming packages, billing platform and other back end functions. Once our parameters have tested it, the VIDGO service will go into CONTROLLED COMMERCIAL launch and revenue stage.

NEXT STEPS: Gotham is still capitalized thanks to the past investments, but based on the projected future capital needs and to ensure adequate funding to meet operating requirements a small additional capitalization round will occur. **The next steps towards the final launch of VIDGO entails the final investments in programming deposits, some additional hardware, marketing and operations. A quick round is being offered to current investors only. This will be the final raise to move through the trial phase to the CONTROLED COMMERCIAL launch and revenue stage.**

The company plans to raise $1 [million] during this round at $2 a share which will affect the cap table by only 500,000 shares. It is expected that this will be the last round. **This is a time sensitive round as we do not want to delay the launch or our distribution partners, so please contact Rob or myself as soon as possible in regards to interest in being part of this round and amount of potential investment.** This round is expected to close within a couple of weeks, and will be required by July 15th [2016] at the latest.

For those interested, **we will make the VIDGO Beta available for your review and enjoyment**. We look forward to getting the full VIDGO trial product in your homes and on your mobile devices as soon as possible, **but have one last build before this can happen.** (emphasis added).

111. Based upon all of the above intentional and material misrepresentations, plaintiffs made additional investment contributions into GMC.

112. Plaintiffs executed a new GMC Common Stock Purchase Agreement with Federman as CEO in and around late July 2016 to make their additional investments into GMC. The common stock purchased again constituted unregistered securities under the 1933 Act. Pursuant to that additional GMC Common Stock Purchase Agreement, plaintiffs purchased their additional common stock interest in GMC at $2.00 per share.

113. Plaintiffs never received the corresponding stock certificates from any GMC officers or director following any of their GMC common stock purchases.

114. Plaintiffs thereafter eagerly awaited the upcoming promised VIDGO "BETA Trial" for their "review and enjoyment" that was supposed to demonstrate the VIDGO service and OTT designed network to investors, third-party vendors and network studios.

115. In or around August/September 2016, Federman, Johnson, Su, Cascade, Thurman and KTC created yet another fraudulent “beta” demonstration for plaintiffs and other investors to view, in order to continuing making plaintiffs and other investors believe that VIDGO was a real product about to be launch, when in reality it was a fraudulent scheme. This time, Federman, Johnson, Su, Cascade, Thurman and KTC re-enacted the identical fraudulent scheme, artifice and device they utilized in January 2016 to fraudulently induce plaintiffs' initial investment in GMC.

116. Specifically, Federman, Johnson, Su, Cascade, Thurman and KTC again illegally utilized temporary IPTV software licenses from Minerva Networks and/or Vubiquity they had purchased using plaintiffs' money and transmitted those "cable signals" over interstate lines to plaintiffs' and other investors' OTT type devices (cell phones, computer tablets, internet sticks, laptops, game consoles, etc.).

117. This illegal transmission of IPTV television signal content over interstate lines was again held out by Federman, Johnson, Kostensky and Arnold to plaintiffs and other investors as a demonstration of the VIDGO service , and again included the broadcast of the most popular and critical cable channels watched by television viewers such as ESPN, AMC, USA Network, Fox News, HGTV, TBS, TNT, Discovery, History Channel, Nickelodeon, FX, CNN, Disney Channel, Bravo, Telemundo, NFL Network, etc., and all “local” channels such as CBS, NBC, ABC and Fox to plaintiffs’ (and other investors’) cell phones and tablets.

118. The above "beta" VIDGO demonstration was held out to plaintiffs and investors by Federman, Johnson and Kostensky as licensed, authorized and legitimate OTT cable and local programming broadcast over the alleged (but non-existent) "Gotham Network," and was activated via the download of an application, and use of a username and password, by plaintiffs and other investors provided to them by Federman, Johnson and Kostensky.

119. The above coordinated orchestration of broadcasting Minerva/Vubiquity IPTV signals illegally over interstate lines as alleged legal, licensed and legitimate "OTT" content signals to plaintiffs, while falsely claiming these signals were OTT content signals transmitted over GMC's own privately built OTT network utilizing software compression and encoding technology created by Federman, was an intentionally concocted and fraudulent scheme by Federman, Johnson, Kostensky, Su, Cascade, KTC, and Thurman to continue misleading plaintiffs and others into believing GMC was a real company with a real VIDGO service- when in fact it was a fabricated fiction designed to defraud plaintiffs.

**GMC's Late 2016 Fraudulent Marketing Materials and Press Releases, Additional Fraudulent Claims by Its Officers/Directors and Early 2017 Convertible Note Offering**

120. In October 2016, Federman, Johnson and Kostensky announced, advertised and disseminated to the public, the media, the television broadcast industry, plaintiffs and other GMC investors/prospective investors through a paid for advertisement in the Huffington Post touting the VIDGO service by continuing to make the above intentionally false and misleading statements about VIDGO, GMC's content rights for broadcast cable programming content and local channels OTT, VIDGO's launch date, GMC's network and the markets for VIDGO's purported launch.

121. In or around November 2016, Federman, Johnson and Kostensky began circulating marketing materials to plaintiffs and other GMC investors captioned "VIDGO Next Gen TV." The materials contained the following intentionally and knowingly false claims:

- "VIDGO offers truly on-the-go live video with live local and national channels, thousands of on-demand movie titles and high-definition music. VIDGO offers high-definition streaming of live local broadcast, national content and sports on streaming devices like Roku, Amazon Fire TV, iOS, Android and desktop. No credit check and no contracts means everyone qualifies for VIDGO service."

- "VIDGO will offer: (i) 3 packages under $49 per month; (ii) live linear local channels in select initial markets – ABC, CBS, FOX, NBC, PBS; (iii) national content providers - Scripps, Disney-ABC, Discovery; (iv) Sports – ESPN, NFL Network, live local content, MLB Network; (v) video on demand, including first-run title movies; (vi) button-less cloud DVR, which automatically records 30 days of content; (vii) favorites menu bar for quickly accessing your most watched channels; (viii) access to full programming lineup on-the-go or at home via WiFi or 4G connection; (ix) each package includes multiple simultaneous device streams; and (x) customers can sign up online "unassisted" or via call center;"

122. The marketing materials provided to plaintiffs also falsely claimed that GMC: (i) had 250-plus channels of live for delivery via OTT; (ii) had live locals; (iii) had live cable sports channels; (iv) had live cable news channels; (v) was Apple TV and iOS compatible; (vi) would have capability for five (5) viewers to simultaneously view different programming content under each account; (vii) allowed mobility of device use for subscribers; and (viii) had custom package building (a.k.a. "a la carte" or "build your own bundle").

123. The market materials further falsely claimed in a chart comparison of the VIDGO service to Sling TV, Playstation Vue, Hulu and DirectTV Now that



BE:10320527.1/GOT053-273976

VIDGO offered more OTT channels, full scale live locals, custom packaging (that the other OTT services allegedly did not) and other features that the other OTT services referenced above did not offer.

124. Furthermore, the marketing materials falsely claimed "VIDGO will be the first [OTT] provider to offer live local channels!," and that would possess the following content: (i) ABC, CBS, FOX, NBC & PBS 12 local markets; (ii) Expand 5-10 local markets each month; (iii) expand to 30+ local markets by end of September [2017]. The marketing materials further listed the following twelve (12) markets as the initial twelve markets for VIDGO's launch: New York City, Los Angeles, Chicago, Washington DC/Baltimore, Miami/Ft. Lauderdale/West Palm Beach, Dallas/Ft. Worth, San Francisco/San Jose/Oakland, Houston, Atlanta, Philadelphia, Cleveland and Raleigh/Durham.

125. The marketing materials also falsely claimed that VIDGO's "Programming" included: (i) "live linear local channels"; (ii) "national content providers (Scripps, Disney-ABC, Discovery); (iii) "premium services – HBO, Showtime, Starz"; (iv) "sports – professional, collegiate and live local content"; (v) "music – music videos and music channels; and (vi) "video on demand – including first run movie titles." Under that subheading, the marketing materials claimed that the VIDGO service would have the following packages:

| <u>Basic $29.99</u> | <u>Premium $49.99</u> |
|---|---|
| 30+ Channels | 100+ Channels |

| | |
|---|---|
| Local Channels | Movie Channels |
| ABC, NBC, FOX, CBS | HBO, Showtime, Cinemax, Starz |
| Sports Channels | Premium Sports |
| Kids Programming | NFL Red Zone, MLB Baseball |
| Entertainment | Western Channel, Golf Channel |
| News | Tennis Channel, IN Sports |
| Latino | International |
| Music | Premium Movies |

126. Furthermore, the marketing materials falsely claimed that VIDGO's OTT delivery service supported "all devices," including Smart TVs, streaming media players, game consoles, set top boxes, Blu-Ray players, smart phones and tablets and PCs/laptops.

127. Every single representation made in these marketing materials was intentionally false, and designed to mislead and defraud plaintiffs and other investors into continuing to believe and invest in GMC.

128. On November 9, 2016, Federman sent the following intentionally false "investor update" to plaintiffs and other GMC investors:

> Esteemed Gotham Investors,
>
> Here is an update concerning the launch and build out of the VIDGO Network.
>
> Since my last update Gotham has made great progress and achieved some significant milestones. We are officially recognized as a Managed Service Provider Network (MSPN)(touch base with Rob for further clarification). **This new designation will allow us to market an extremely comprehensive channel lineup with "local channels" at a very attractive price**, **and should be [sic] allow us to be the first to roll out OTT**

**locals in all markets.** Also, VIDGO is engaged in **a brand new technology, delivery** and pricing model for OTT being offered to MSPs and telecom carriers only. This also **gives VIDGO a unique competitive advantage to offer many of our customers discounts on wireless and internet services.**

Our network has achieved certification to begin testing virtually all the Hollywood channels, which is near completion and going extremely well. The long-standing goal of launching VIDGO as the best product and service within the OTT arena is now here.

As with any technology start-up some additional costs did materialize and the timelines need to be adjusted. In addition, decisions regarding **the purchase of needed equipment and middle-ware verses leasing** were made to establish the optimum platform. Live linear broadcast requires many approvals and verification from third-party sources. **Additional requirements were made by the content partners to enable VIDGO to deliver their programming to our consumers.**

With the aforementioned said, Gotham had an additional capital raise in September [2016]. Gotham secured the required capital to finish the build of the network in Los Angeles. With the forthcoming completion and final testing of the network ("soaking"), **we are estimating this will be complete by December. The heavy lifting has been done and we are now building our redundant network in Atlanta (required), implementing our billing system and launching a diversified business development program.**

We appreciate your patience as Gotham is staged to launch the OTT network that **will be a game changer within the content delivery arena.** VIDGO is the best alternative for a large portion of the 80 million customers dissatisfied with the current MVPD's (Traditional Cable Providers). In addition, there are another 20 million households that are not cable subscribers today that are

> ready for a better choice where on app (VIDGO) replaces the multiple apps they are using now.
>
> **With __our programming agreements secured__**, business development program in place, and a huge market screaming for our service, we are **__ready to launch our state of the art OTT engine__** and Managed Service Provider Network. The Gotham team is **working around the clock and __being fiscally responsible with capital invested__** to make sure VIDGO is the bet-in-class product in the marketplace.
>
> This is a massive enterprise, with a tremendous amount of legal and technological requirements from the studios. As you know, it is a multi-billion dollar opportunity. The market is huge, and there are **only a few players (the carriers) being allowed to enter and remain competitive in this space**. **VIDGO is one of them**. **__This is a miracle.__** **__We have no choice but to build and roll this out in accordance with our content partners, who are all extremely enthusiastic and supportive of VIDGO__**. **__I am extremely happy to report all road blocks to us launching VIDGO, and that your investment in Gotham is going to pan out.__**
>
> Best regards,
>
> Rick Federman (emphasis added).

129. Every single representation Federman made in the above November 9, 2016 “investor update” and above referenced marketing materials was intentional false, and designed to mislead plaintiffs and other investors to continue defrauding them and others into making additional investments into GMC for defendants’ theft and personal use.

130. In December 2016, Kostensky, Federman and Johnson continued to announce, advertise and disseminate to the public, the media, the television broadcast industry, plaintiffs and other investors/prospective investors the following press release for the VIDGO service:

> When can we expect VIDGO to be available?
>
> VIDGO is still in the beta phase, and they claimed at CES 2016 that they would release sometime in the first half of 2016. SInce back in January, when the conference was held, they have been little updates here and there, but recent news release remind anxious anticipators that the service should hit the market near the end of 2016 or early months of 2017.
>
> Most of the delays, according to VIDGO, are due to the fact that they are trying to secure strong relationships with programmers to ensure strong streaming experiences. An undertaking as large as incorporating live channels along with streaming channels would usually be susceptible to a wide array of bugs, buffering errors, and poor quality streams.
>
> It's solidarity with programmers will satisfy the desires of sports enthusiasts since they will be offering sports access stations such as NFL Network.
>
> The reasons why this new company could make such an impact is because of the potential it has to revolutionize the television industry.
>
> There is a movement called "cordcutters" in the television industry, which is geared to finding ways to completely eliminate cable and unnecessary wire piles behind televisions. Current proponents for "cordcutting" are providers such as Sling TV, but they still suffer from buffering issues that prevent people from completely switching.

The poor loading and regulations that make it too difficult for streaming providers to incorporate cable channels into their package also inhibit the ability for the cordcutter movement to come to fruition. Innovations are stymied by regulation and poor server maintenance.

VIDGO is venturing into territory for streaming services that have not been explored, and since they want a major success, they decided to focus all of their energy in making sure the streams are crisp and smooth. A service attempting so much content wise should try to avoid buggy streams and buffering issues.

VIDGO's solidarity with programmers will satisfy the desires of sports enthusiasts since they will be offering sports access stations such as NFL Network.

It is venturing into territory for streaming services that have not been explored, and since they want a major success, they decided to focus all of their energy in making sure the streams are crisp and smooth. A service attempting so much content wise should try to avoid buggy streams and buffering issues.

Delays until launch only build anticipation for the already much awaited product. As soon as the new streaming service hits the market, we could see a new up-and-comer challenge the likes of Netflix in access to content and even user growth.

VIDGO's innovative streaming layout will make it one of the hottest new services available in 2017. The potential for the new contender, with all of its strong programmers, streaming content, and unique features as a streaming service, is through the roof.

Read more at https://www.business2community.com/tech-gadgets/live-streaming-startup-vidgo-takes-netflix-hulu-01742427

131. In an effort to continue fraudulently inducing third-parties, existing shareholders and plaintiffs to contribute more capital investment into GMC based upon the fiction of VIDGO and GMC, Kostensky, Federman and Johnson authorized the plaintiffs and other GMC investors to show the above referenced marketing materials to friends and family on the representation that they were "confident in [GMC's] service and the OTT marketplace."

132. Shortly after the Trump Administration came into office, Federman, Kostensky and Johnson spoke on the telephone with plaintiffs in mid/late-December 2016 to discuss why the VIDGO service had not yet launched, despite these defendants' intentionally false representations previously made concerning VIDGO's launch dates.

133. During those phone calls, Johnson, Kostensky and Federman falsely stated that due to new changes in the Trump Administration's interpretation and enforcement of existing FCC laws and regulations, GMC was required in build out and install additional equipment and technology requirements for its network in order to broadcast the OTT content GMC had secured from the content providers. They claimed this additional "build out" required an additional capital raise in order to complete the necessary work. In addition, Federman, Kostensky and Johnson also forward documents and statutes/regulations to plaintiffs following those calls to support their false claims and pretexts for VIDGO's failure to launch

due to changes in the Trump Administration's enforcement of FCC statutes and regulations.

134. Every single representations made by Federman, Kostensky and Johnson regarding the "Trump Administration" excuse for the purported failure to launch VIDGO was intentionally false and designed to mislead plaintiffs and conceal defendants' fraudulent scheme.

135. Contemporaneously, to continue fraudulently raising money from plaintiffs and other investors, Federman, Johnson and Kostensky offered a convertible note round to existing common shareholders and/or their representatives. These convertible note offerings offered plaintiffs and other investors the "opportunity" to purchase convertible note interests whereby such convertible note holders would lend money to GMC for the purported purposes of completing GMC's alleged network "build out." In exchange, plaintiffs and other investors would receive an percent (8%) interest and conversion of those notes to common stock by a "conversion date" at $2.00 per share.

136. Based upon the above intentionally false and misleading statements made by Federman, Kostensky and Johnson using GMC as a front, and the previous fraudulent "beta" demonstrations perpetrated by these defendants and other defendants upon plaintiffs, plaintiffs purchased a portion of the convertible

note offering, which includes preferred rights and numerous protective covenants for plaintiffs in comparison to common stock shareholders.

137. To purchase their convertible note interests, plaintiffs executed a "Gotham Media Corporation Subscription Agreement" between themselves and Federman as CEO for GMC in late December 2016.

138. Around this time, the currently demonstrated “beta” that was on plaintiffs’ cell phones and mobile devices fraudulently delivered by Johnson, Federman, Su, Cascade, KTC and Thurman was deactivated by them based on the pretext that “licensing fees” for that robust cable programming and the local channels was an unnecessary expense for the GMC to continue incurring before launch.

139. In or about February 2017, based upon the same above fraudulent misrepresentations and additional ones from Federman, Johnson and Kostensky, plaintiffs purchased additional portions of the convertible note round made available to them.

140. All convertible notes purchased were unregistered securities under the 1933 Act.

**The April 2017 Fraudulent Investor Update, Provision of Phony Financial Statements and Content Rights Information, the Final GMC Convertible Note Raise and the "Failed" VIDGO Trial Launch**

141. In or about February 2017, Kostensky, Federman and Johnson advised plaintiffs and other investors in writing and verbally on the phone that, "It has been a huge week for [GMC] and I have seen our ABR 'adjusted bit rate' system working from both of our facilities. The product is awesome will get everyone updates soon." Kostensky even wrote to John Clifford stating, "I look forward to celebrating our launch on the golf course with you someday."

142. Due to the VIDGO launch delays and other prominent companies already coming out with their own competitive OTT live linear cable television service, plaintiffs asked Kostensky, Federman and Johnson about these other OTT services. Federman, Johnson and Kostensky all responded that those services were based upon older technology and architecture, had built their system upon older networks and infrastructure not tailored to OTT as the VIDGO network was, had paid exorbitant deposits and fees to access such content in a manner different than GMC's business and technology strategy, claimed those companies were using IPTV networks and/or dated network technology based upon older legacy systems that would have difficulty competing with "MSPN" OTT based services purportedly like GMC's VIDGO service and with other intentionally false statements.

143. In late March 2017 and with no VIDGO launch date in sight, Kostensky, Federman and Johnson verbally and in writing advised plaintiffs and other investors that GMC had twenty one (21) channels "up and running on the VIDGO network […] the studios are stress testing the network so far we are doing very well."

144. None of these twenty one (21) channels were channels previously represented as included in the VIDGO service. In addition, almost none of them were "core" or popular cable channels contained in any of the previous "beta" demonstrations and/or marketing materials. Rather, these channels were essentially comprised of unfamiliar and/or startup channels not contained in traditional cable service programming packages, and not commonly known to the public.

145. These bogus twenty one (21) channels were "white labeled" by Thurman and KTC to GMC at plaintiffs' expense and cost so Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC could continue duping plaintiffs into believing the VIDGO service was constructed and launching imminently, despite GMC having no such business or service whatsoever.

146. Contemporaneously, Federman, Kostensky, Johnson, Su, Cascade, Thurman and KTC coordinated yet another fraudulent "beta" demonstration for these twenty one (21) channels whereby they provided live streaming of these

channels to plaintiffs' cell phones, mobile devices and tablets with a user guide. They did so using a username and password for a "VIDGO" application downloaded from a link emailed to plaintiffs and other investors. They did so to fraudulent induce plaintiffs into believing GMC had somehow: (i) made progress on creating and launching VIDGO; (ii) had built out the "VIDGO network"; and/or (iii) had made progress on securing the necessary licensing and content rights for the most popular "core" cable channels and local channels promised and needed to launch a legitimate OTT company. In reality, defendants did none of those things and had accomplished none of those tasks.

147. These twenty one (21) channels were again either IPTV signal channels illegally broadcast to plaintiffs' mobile devices and/or free content never intended or represented at any point in time to be what plaintiffs were investing it and/or what the VIDGO service's programming lineup was to contain. The channels included unfamiliar and unheard of channels such as Cars TV, Pets TV and other unknown channels most televisions viewers have never heard of. Meanwhile, this latest "beta" demonstration did not contain a single local channel or a single popular "core" cable channel typically encompassed in a traditional cable service package, making the content totally non-viable to sustain any live linear OTT cable service business.

148. During the final week of April 2017, GMC's Kostensky, Johnson and Federman attended the NAB show in Las Vegas using plaintiffs' and other "investors" funds. At the event, they claimed to be promoting the non-existent and fictional VIDGO service to “studios and networks,” industry leaders, the press, network partners and other third-parties. They also advised plaintiffs they did so at a private event while spending plaintiffs' funds on expenses associated with travel, lodging, food and entertainment for their own entertainment.

149. Meanwhile, GMC had no actual OTT cable service to launch, no content rights, no licensing rights, no network, no billing or back-office infrastructure, no user interface, no service to offer and no business strategy to achieve any purported OTT live linear cable TV service.

150. Kostensky even claimed in a subsequent email to plaintiffs that the event was a “huge success,” despite GMC having no actual OTT service to offer and no capability to do so.

151. In April 2017, Federman, Johnson and Kostensky, with the assistance of Johnson’s co-conspirators Katie Ashcraft, BC LLC and AOA LLC, contemporaneously prepared and organized intentionally false and misleading financial statements for presentation to plaintiffs to fraudulently induce plaintiffs and other GMC investors to invest additional capital into GMC convertible notes.

152. On or about April 27, 2017, Federman, Johnson and Kostensky prepared and forwarded to plaintiffs by email an "Investor Pack" package of information. All of these “Investor Pack” materials were designed to continue the fiction of GMC and VIDGO, and to again fraudulently induce “investments” from plaintiffs and others into the VIDGO fiction.

153. These April 27, 2017 “Investor Pack” materials were digitized and sent to plaintiffs by way of an April 27, 2017 email that included: (i) the current GMC stock register; (ii) a declaration that an investment group known as the “Spellman Group” (who was a major investor in WDMG, Winsoninc Holdings and/or WDCSN never disclosed to plaintiffs in the update) would be investing $1,200,000 (600,000 shares at $2.00 per share) in that current proposed round; (iii) GMC’s purported financial statements for 2016 and 2017 (profit and loss and balance sheets) prepared and maintained by Ashcraft, BC LLC and AOA LLC falsely stated GMC had net total assets and liabilities of approximately $8,387,000 as of March 31, 2017, while omitting numerous material entries from these financial statements regarding Federman’s, and Johnson’s defendant companies’ (owned by Federman and Johnson) misappropriation of plaintiffs’ funds; (iv) a purported GMC cash requirements spreadsheet timeline and analysis through July 28, 2017 prepared by Ashcraft, BC LLC, AOA LLC and Guthrie/Tech CXO; (v) a completely fabricated, pathologically false and misleading investor update letter

from Federman to plaintiffs making intentionally false statements about GMCs balance sheet and net worth, the status of the VIDGO service, the viability of the VIDGO service, the purported imminent launch in coming weeks that would put the company into revenue and other intentional falsities about GMC and VIDGO; and (vi) a video of GMC's server cage allegedly located in Los Angeles at One Wilshire (a.k.a. Coresite) containing alleged equipment purchased with plaintiffs' funds that could allegedly support 10,000,000 customers when fully deployed and that was an alleged duplicate network of the network at GMC's Georgia Campus.

154. These "Investor Pack" materials were intentionally false and forwarded to plaintiffs on or about April 27, 2017 in an effort to fraudulent induce further investments from them into GMC for defendants personal use - despite GMC having: (i) no content/licensing rights to broadcast any OTT cable content or local channel content that it claimed to have; (ii) no subscriber interface to allow customers to sign up for the VIDGO service and/or pay for the service; (iii) no actual OTT network built out; and (iv) no billing or signup system to allow subscribers to even attempt to purchase the VIDGO service.

155. The April 27, 2017 Investor Update from Federman contained pervasive, pathological, fraudulent and utterly false statements to plaintiffs and other investors regarding GMC and the status of its purported VIDGO OTT live linear cable television service. Specifically, Federman's April 27, 2017 Investor

Update was coordinated and crafted with Johnson and Kostensky, and made the following intentionally false statements to plaintiffs and other investors:

> Esteemed Gotham stockholders –
>
> This letter and attached materials are intended as a detailed update on the status of Gotham, and are of the most confidential nature.
>
> As you know Gotham has been delayed in our launch of VIDGO. This is outlined in detail below. These are short delays relative to the magnitude of the launch, and there are no insurmountable obstacles between us and launch. We anticipate being to revenue with an initial offering in approximately six weeks. We have achieved a tremendous amount, greatly raised the value of the company, and are in a great position.
>
> Gotham is now doing our Series B investment, which was anticipated for launch and mentioned in the previous subscription agreement. From the outset of this enterprise, our partners in the private equity community who have also been instrumental in Gotham overcoming obstacles thus far (Carlyle Group and others), have planned to fund this Series B. This is in process now, the details are below. We are giving existing investors the opportunity to participate in this round, which will likely constitute the last investment into Gotham.
> While the delay is frustrating in the short term, the reasons for the delay (explained below) will be a great long term benefit to Gotham. The first and most impactful is the change in the enforcement of certain FCC regulations under the new administration. There was a regulation on the books which was not enforced yet, requiring companies who deliver content from the "cloud" (historically IPTV providers) to be certified as MVPDs or cable companies. Information on this regulation is attached. Instead of this, "cloud" or "internet" providers had MSP status (Managed Service Provider), which Gotham also has. In late February, the FCC started enforcing this rule, requiring anyone who delivers content from the cloud to have MVPD or cable company status. This is designed to lock out all competition but the largest companies who already have facilities and inroads in this space. This of course will be a long-term benefit to Gotham.

There is a much steeper barrier of entry to be a MVPD or cable company, and even moreso to be a “carrier” (telecom), and it is restrictive to all but the largest companies. Even large companies such as Google had trouble doing it, not only because of the cost, but the regulatory restrictions and absence of available space in key facilities. Gotham has avoided much of these costs due to the strength of our network, partnerships and political connections. For example, we avoided paying huge deposits to the networks, and were also able to position ourselves in certain facilities which are difficult or impossible to enter for all but LECs (Local Exchange Carriers, the major telecoms like Verizon and AT&T) and CLECs (Competitive Local Exchange Carriers, smaller “telecoms” which have certain benefits and less restrictions than LECs), enabling us to gain this status with greatly reduced cost. This is due to the support of the Carlyle Group, the Spellman group, the CEOs of various major networks, and our strong partnerships such as Level 3, described below. Also, to achieve the Gotham standard of quality and reliability, and also the ability to carry local channels over the “internet”, Gotham’s network was already build in a “closed loop”, much more like a cable company and very unlike any other “internet” provider or MSP. Finally, our strategic partnerships and cross-connect agreements with powerful companies like Level 3 have avoided millions in infrastructure costs. Because of Gotham’s status as a smaller, competitive company, Level 3 has the ability to partner with us in this way while being restricted from such partnerships with the larger companies and LECs.

This new enforcement of regulation has effectively locked out all MSPs from this space, and this combined with the planned rollback of Net Neutrality plus the enforcement of other carrier regulations (outlined below) has eliminated all potential competitors but 7: Verizon, AT&T, Dish, Sony, Hulu, Google and Facebook. Some of these are not direct competitors or have not entered this space yet. None of them are exclusively focused on this space as is Gotham, and all but Hulu have much greater restrictions than Gotham. More on competitive advantages below.

All channels except ESPN/Disney, FOX and Turner are currently approved to be carried on our network (attached is the list). In some cases, our network is already acceptable to be certified as an MVPD, as NBC Universal has recently approved us to carry them, a big

milestone. The final phase of the certification only needs to be passed for the aforementioned three networks. To validate and achieve this status, Gotham requires additional capital (detailed financials and timelines are attached and discussed below) in human resources for engineering, and some hardware. This includes greater redundancy on our network, greater load balancing, greater number of cross-connects to central nodes, in some cases increased storage capacity, and most importantly increased bandwidth on our network, requiring the installation of larger and more numerous/powerful internet routers.

To clarify the process, in order for Gotham to carry a channel on our network, we need three things:

1. the transport rights (secured with Vubiquity last year),
2. the license rights (secured through NTTC last year),
3. and finally, the network certification to carry that channel on our network (secured for all but three networks)

Gotham has the satisfied items 1 and 2. This final test of our network is being requested by the particular networks to show our network is capable of providing the quality and security to a large number of concurrent subscribers.
Again, we are expecting to be complete with our first paid subscriber in approximately six weeks. This can be viewed as a hard timeline now, as we are very close, almost complete and now see the clear and specific path to launch.
With this MVPD certification comes the ability to deliver content to our own STB (set top box, traditional “cable” box) via a closed loop – essentially what is called IPTV, and ideal for MDUs (Multi-Dwelling Units). The STB testing must also take place, and although we need not market this product, the opportunity now exists. Gotham’s business development team has been speaking to several large MDUs about this additional market opportunity.

In short, Gotham is the only smaller company being allowed to play in this space. Here is a brief list of our competitive advantages:

1. Huge market with limited number of players
2. Completely insulated from new or small competitors
3. Gotham is the only dedicated exclusively to this product

4. Cable and satellite companies are forced to compete with themselves in this space
5. Competitive and diversity status require that Gotham be allowed to carry all channels
6. Competitive status allows Gotham certain benefits while others are restricted:
a. Gotham can cross franchise lines
b. Gotham can carry local channels in all markets
c. Gotham can carry all channels via the aggregates (Vubiquity and NTTC)
d. Greatly reduced overhead on licensing, transport, bandwidth and infrastructure
7. Much more complete and comprehensive channel lineups (see 6b, 6c)
8. Substantially better quality and reliability
9. Delivery to all devices (some competitors such as Google are currently restricted from broadcasting to TVs and are limited to mobile devices)
10. Our GUI (graphic user interface) is more robust, attractive, reliable, faster and easier to use.
11. The first ala carte, "build your own package" channel lineup (to be strategically rolled out after initial launch)
12. Competitive pricing

It is important to note that although we are technically competitors, everyone must work together in this space and cross-connect to each other. Gotham is in an extremely desirable position now, with our network sitting in an enviable pole position at the key facility in LA (video attached), and our network the newest, most advanced and purpose built OTT network in existence. A short video of our caged racks at One Wiltshire (called Coresite) in LA is attached, which is the premier facility for content delivery in the nation. In short, everyone can benefit from and would love to use our network. In February, in preparation for the new regulations and rollback of Net Neutrality, Sony and especially Google stared buying up all the remaining space at key facilities. What little space was available is now taken up, further blocking any new competition. Google has already made informal overtures towards buying Gotham in the vicinity of $20 million (which of course we will not entertain, the goal being to sell for billions in a few years). As you know, Gotham works

directly with the ISPs to ensure quality of our delivery on their network (and in some cases, use their billing system). With the new Net Neutrality regulation, all future companies will be outright blocked from having these preferential lines with the ISPs.

In many cases, our “competitor’s” OTT offering is a bastardization of their existing business, and was done in a rushed and half-baked manor, largely due to the need of a public company to show growth in this space, as everyone knows this is the future of content delivery. Many of their rollouts have been extremely problematic and unreliable. They can benefit from the use of Gotham’s network, and this will be allowed in some cases with ISPs we work with such as AT&T and Verizon, to help them meet certain diversity and other requirements. It is important to note that when Gotham turns up a VIDGO subscriber in an AT&T franchise market for example, AT&T helps us turn up that customer on their network, and benefits from increased data usage of that subscriber on their network, which is their core business and where they really make money. OTT is often a loss leader for them, and it is quite likely they make more money from a VIDGO customer in their franchise than a DirecTV customer, with the marketing, customer retention and network costs on us, and greater customer retention. There also exists the possibility to bundle and resell wholesale AT&T or Verizon data packages with VIDGO, which we plan to explore once our core product is launched and solidified. Gotham is regarded by all as the premier OTT network now, the example of the future of television, and we were displayed as such at NAB this weekend (more on this below). In some cases, our competitors such as AT&T, Verizon and Comcast will actually be providing subscribers for us, for testing purposes, in markets they have trouble servicing and to meet certain requirements.

If it were not for our political connections, Gotham would not be here. The expression goes, it’s not what you know, it’s who you know. It is actually both. Were it not for the strength of our technology and network, we could not do this, but even with that, if it were not for a particular group of golf buddies including some very influential people in this space, it never would have happened for Gotham. Our CTO, Winston Johnson, who is a monster technologist and has built major networks for the major telecoms and Hollywood studios in the past. He has worked in this space for decades. In the past, Winston

founded a company called WDCSN (Winsonic Digital Cable Systems Network), which is now a shell company being used by Gotham to meet certain regulatory and diversity requirements. Winston has no active role in Winsonic, so there is no conflict of interest there. Gotham owns 30% of Winsonic, which was given to us to facilitate the launch of VIDGO. This gives Gotham the status of a diversity-owned CLEC carrier, and is one of the things which enabled us to get into key facilities, secure reduced pricing, and overcome obstacles. Please note, in the press release attached, Gotham is described as a "telecom" to meet these requirements as a carrier.

The chairman of WDCSN is Dr. Eric Spellman, a very influential investor and doctor from NYC with very high level connections in this pace. Dr. Spellman's patients and golf buddies include the CEOs of major Hollywood networks and LECs. We also have the support of the Carlyle Group, the largest private equity firm in the country, which owns and controls tremendous interest in this space, including the key facilities such as Coresite and many of the fiber optic lines. Dr. Spellman and these groups have known and worked with Winston for decades, and me for several years. Dr. Spellman invested in Winston's companies years ago. They have used Winston and Winsonic to meet certain diversity requirements, which Gotham gains the benefit of along with their carrier status. When Dr. Spellman showed the VIDGO app to various CEOs and power players last year, we gained their enthusiastic support. It is because of this support that Gotham was able to get prime real estate in core facilities (video attached) such as One Wiltshire. And when Gotham has encountered obstacles, of which there have been many, it was often a phone call from these influential players on our behalf which overcame them.

It was planned from the outset of this enterprise, over a year ago, that the Spellman group and possibly the Carlyle Group would provide investment funding near to the launch of VIDGO, to ensure our success, and certify to the Hollywood studios that we are well capitalized. To this end, the Spellman group has arranged for investment to be made into Winsonic up to $5 million in the coming weeks. Press releases and public disclosures on this will be made this week and next, and forwarded to Gotham investors. Of this investment, Winsonic will then invest the remainder of the Series B into Gotham at $2 per share. The projected cap table after this occurs

is attached, showing Winsonic investing $1.2 million. This will be less if the current investors participate in the Series B.
The exact capital need of Gotham to reach revenue launch and two months beyond is attached. Also attached is the projected Cap Table at the close of the Series B. On this chart, we have given ourselves more headroom for investment than we actually need. It shows a $1.5 million bridge round, and then additional $1.2 million Series B from the Spellman Group. Gotham will most likely be raising only $1.9 million total, so the dilution will be less than what is shown on this chart. Please note that as the founder and CEO, I do not have anti-dilution, so I am diluted the same as everyone else. I would like to add that the management team of Gotham is extremely loyal to the investors and those who have sacrificed to make this happen for us. We will never take any action which will substantially effect the investor's equity in Gotham without your knowledge and consent.
As stated, this is likely to be the last investment into Gotham, with future investment for expansion, etc., coming from revenue. Gotham will be earning substantial revenue quickly after launch, so we will most likely not have to do another investment round.

This week-end, Gotham was featured at NAB (National Association of Broadcasters) in Las Vegas as the premium OTT network, the first, shining example of new OTT technology and the future of television. It was very successful. Gotham's business development team attended, and met with Dr. Spellman, many of the broadcasters and key partners such as Level 3. Robert and Shane can attest to the strength of these powerful partnerships, Gotham's powerful position in this industry, and the fact that VIDGO will definitely be launching after this Series B.

Once the Series B is complete, it will be approximately 6 weeks before our first paid subscriber. This is a conservative estimate, and can be viewed as a hard timeline (attached). The networks are requiring that we launch first with a limited channel package and limited number of paid subscribers (provided by our industry partners plus friends and family) to test the full scope of our all our systems. It is expected this test will last one month, then Gotham will be free to market our chosen channel packages. We will simultaneously be testing the MVPD set-top-box delivery (with a greater number of channels), a requirement for certain channels including locals. We are

> exploring the potential of marketing this product to MDUs in addition to the VIDGO OTT product.
>
> We wish to have completely transparency with the investors. Please contact myself, Robert Kostensky, Todd Guthrie and/or [...] any time with any questions about this update, the attached materials or the Series B financing.
> I hope this provides a window into the recent activities at Gotham Media Corporation, the timeline to launch and the path to success. On behalf of myself and the entire Gotham team, I thank you for your patience and continued support.
>
> Best Regards,
> Richard Federman
> CEO | Gotham Media Corporation

156. Not a single statement or claim in the above April 27, 2017 "investor update" from Federman was even remotely true. To the contrary, all claims Federman made in his April 27, 2017 "Investor Pack" update were intentionally false and misleading, and were designed for plaintiffs and other investors to rely upon those intentional misrepresentations to invest additional monies into GMC to finance Federman's and Johnson's defendant business ventures, their partnerships and lifestyles, and Kostensky's position and pay.

157. The GMC balance sheet in the "Investor Pack" was as of March 31, 2017 and intentionally contained inaccurate, false and misleading information claiming GMC had $8,387,799.20 in total assets and liabilities. In reality though, GMC was insolvent and had liabilities far in excess of any GMC assets due to defendants' thievery and squandering of funds.

158. The balance sheet contained items booked as “assets” when such purported “assets” were merely operating expenses and/or non-existent assets. It also omitted third-party related transactions involving Federman and Johnson with specific third-party defendant entities and individuals to conceal all of these defendants’ misappropriation of millions in investor funds.

159. The balance sheet was prepared by Ashcraft and her defendant companies at Johnson's and Federman's request to intentionally mislead plaintiffs and other investors in believing GMC and its VIDGO service were real and had value, when in fact they were fictions.

160. The GMC profit and loss statement for GMC was also a complete falsehood and hoax, and was designed and prepared to conceal the incredible theft of plaintiffs’ funds by the various defendants.

161. Guthrie himself clearly never made any efforts to review or inspect GMC's bank statements, Quickbook records, general ledger, profit and loss statements and/or balance sheets at any relevant time from 2015 through 2017 to determine any aspect of GMC's finances, financial performance, financial accountability, accounting, use of investor proceeds and/or financial operations. The GMC profit and loss statement and balance sheet were so intentionally inaccurate and misleading that had Guthrie and/or Tech CXO reviewed, analyzed and investigated even a tiny portion of those financial records, they would have

immediately discovered their intentional falsity/inaccuracy, and consequently discovered GMC's fraudulent financial activity from the inception of the investor capital raises in January 2016.

162. Equally terrible, the "Investor Pack" also contained a "Channel Lineup" falsely claiming that GMC that secured all the rights and authorizations to broadcast approximately 300 channels of the most popular and watched cable channels via OTT to subscribers' various devices, including but not limited to critical "core" channels that are the most popular among viewers and necessary to obtain any volume of subscriber base in the cable television marketplace. These purported OTT channels included AMC, IFC, Sundance Channel, BBC America, WE TV, Hallmark channels, CBS Sports Network, Animal Planet, Discovery channels, the Weather Channel, A&E Networks channels, Univision, QVC, Home Shopping Network, Lifetime channels, History Channels, ESPN channels, Disney channels, Fox Sports, Fox News, BET channels, MTV channels, Nickelodeon channels, Comedy Central, VH1 channels, Bravo TV, CNBC, E! Network, MSNBC, NFL Networks, USA Network, Syfy Channel, Cooking Channel, Food Network, Travel Channel, Showtime channels, Starz channels, HGTV channels, Travel Channel, Turner Broadcasting Network and other highly popular "core" cable networks.

163. Based upon the Investors Pack" and multiple verbal communications between Federman/Johnson/Kostensky and plaintiffs thereafter to discuss the Investors Update information provided, plaintiffs and others participated in a First Amended & Restated Note Subscription Agreement. As a result, plaintiffs and other investors purchased an additional convertible note interest in GMC. The First Amended & Restated Note Subscription Agreement included the same preferences and covenants as the previous convertible note round, but also granted plaintiffs warrants to purchase/receive additional shares in GMC at a 1:1 conversion purchase rate at a penny a share. Once again, these additional convertible note purchases constituted unregistered securities under the 1933 Act.

164. Plaintiffs' execution of the above "Series B" convertible note round in April 2017/May 2017 constituting their final tranche investment into GMC. Had it not been for the intentionally false and materially misleading "beta" demonstrations, defendants' false verbal and written statements, the intentionally false and misleading materials presented to plaintiffs at various times from 2015 to 2017, the falsities disseminated through the above referenced calls, emails, investor updates and marketing materials - as well as Guthrie's/Tech CXO's total failure to monitor, observe and oversee any aspect of GMC's financial activities or perform the most basic scopes of a CFO's responsibilities - plaintiffs would never have contributed any additional monies to GMC.

165. Subsequently during the first week of May 2017, Kostensky, Federman and Johnson spoke with, and wrote to, plaintiffs advising them/other investors the target launch for the VIDGO service was the week of June 12, 2017. In addition, these defendants advised plaintiffs and other investors by email and phone that GMC did not need the entire $1,250,000 of the Series B convertible note offering in order to launch VIDGO.

166. The purported "Spellman Group" investor never invested a single dollar into GMC following the Series B raise, contrary to Federman's April 27, 2017 Investor Update.

167. During July 2017, Federman, Johnson and Kostensky had also advised plaintiffs and other investors that VIDGO would allegedly “soft launch” for investors and business partners, and that plaintiffs would be able to sign onto the VIGDO service as an ordinary consumer through GMC’s purported billings and signup system to begin using the VIDGO service on certain mobile devices, USB sticks and/or computers.

168. On or about July 29, 2017, Federman and Johnson disseminated via email an "Announcement of VIDGO Trial Launch" letter, a confidentiality and non-disclosure agreement captioned as a "Gotham/VIDGO Trial Evaluation Agreement" and a "Gotham Media Corporation Terms & Conditions Agreement "(collectively the "Trial Launch Agreement"). Pursuant to these documents, the

VIDGO Trial Launch would commence on July 31, 2017 and GMC would grant the investors a limited license to access the VIDGO service without payment. The Trial Launch Agreement also contained confidentiality requirements and imposed restrictions on the plaintiffs and other investors in using the VIDGO service.

169. In addition, the "Announcement" stated plaintiffs and other GMC stakeholders "will receive the Trial Launch instructions via email on Monday, and further instructions for providing feedback via online surveys which we will need from each participant. The feedback through Survey Monkey is an important requirement for VIDGO, the networks, and our technology partners to get us to the official launch."

170. The "Announcement" further stated, "We are excited that our investors will be part of this very important VIDGO network test. It is important to remember that we are still in a quiet period as we finalize network testing and certification. [...]." We are confident that with your support of the Trial Launch, our relationships with the networks, technology partners and distribution channels will allow us to experience a successful product launch."

171. After plaintiffs received the Trial Launch Agreement and executed it, they received activation information from Federman, Johnson, Kostensky and Su/Cascade allegedly necessary to activate and access the purported VIDGO Trial Launch.

172. When plaintiffs attempted to access the Trial Launch, it did not function, did not even have functional user interface and could not be signed up for.

173. Federman and Johnson blamed the failed launch on the "Minerva interface" not interacting well with the VIDGO service because it allegedly was an older version of "Minerva's middleware" and "interface," and that a newer version costing approximately $50,000 was required to install that newer version that GMC did not have – despite approximately $11,000,000 having been invested by all GMC investors to date.

174. In reality, the demonstration "failed" because there was no VIDGO service in existence. In other words, GMC had nothing, no live linear OTT cable television service and no business, service or product that could conceivable generate revenue.

175. The Trial Launch was in actuality a completely failed fraudulent scheme, artifice and device implemented by Federman, Johnson, their defendant companies, Su, Cascade, Thurman and KTC to conceal their fraud perpetrated on investors regarding the fictional VIDGO service. It was also another effort by these defendants to illegally integrate Minerva/Vubiquity IPTV signals containing the most popular cable programming channels and local channels into the

fraudulent Trial Launch to plaintiffs' mobile devices, without any licensing/content rights to broadcast such signals in an OTT delivery manner.

176. The purpose of the failed Trial Launch was to continue deceiving plaintiffs and others into believing they were watching the VIDGO live linear OTT cable service containing the most popular cable programming and local channels, while actually illegally broadcasting IPTV signals prohibited from broadcast to mobile devices, tablets, gaming consoles, etc.

177. By that time, GMC had also missed numerous promised launch dates and benchmarks throughout the 2017 year for launching VIDGO. As a result, plaintiff and other large stakeholders began pressing the Board and management for detailed answers. Missed deadlines and benchmarks included: (i) the failure to launch of the VIDGO OTT cable service earlier that year on two (2) promised separate occasions (ii) the inability to perform a "soft launch" for the largest investors to access and test the service contemporaneously with third-party vendors and partners, as if acting like consumers signing up for the VIDGO service online using credit cards; (iii); the failure to interface and integrate VIDGO into the distributors/call centers that had agreed to distribute the service (many owned by the largest investors) so they could commence selling and monetizing the VIDGO service to create revenue for the company; and (iv) the inability to meet deadlines for key opportunities regarding contracts and network interfacing with InComm

(specifically a deal with MetroPCS) and WalMart/Vudu to allow subscribers to sign up for VIDGO through a partnership with those companies.

178. These inquiries to defendants included questions regarding the company's licensing and content rights for OTT delivery and retransmission, management's performance and business strategy, the company's technology and related operating expenses, the company's financial performance and condition, the company's expenditure of significant capital and other concerning issues with no corresponding results or finished product.

179. In addition, certain information regarding the conduct and performance of Federman and Johnson began to come to light based upon certain stakeholders' initial inquiries and revelations from others involved in GMC and the VIDGO scheme. This included: (i) Federman's, Johnson's and Kostensky's intentional misrepresentations regarding the company's OTT content and licensing rights to retransmit and broadcast cable studio content via OTT to various forms of devices (iPhones, Chrome sticks, XBoxs, etc.) over the purported VIDGO network to specific DMAs (designated market areas); (ii) the failure of management and Johnson to properly construct a functioning "front end" system for the network, despite the availability of ample funds, so that subscribers could sign up for the VIDGO service and/or for third-party vendors to interface their systems for their own subscribers to sign onto the VIDGO service; (iii) unnecessary and

unexplained expenditures; (iv) improper advances by Federman and Johnson to themselves and their non-related defendant companies for expenses totally unrelated to Gotham/VIDGO; and (v) Federman's and Johnson's (along with other defendants) apparent misappropriation of significant funds that are still not accounted for.

180. Contemporaneously around this time in July 2017 after repeated demands, one other individual GMC investor other than Federman was able to obtain a seat on GMC's Board of Directors. Up until that point in time, Federman had been the sole GMC Board member.

181. The new Board was comprised of Federman, Guthrie, Federman's friend and GMC investor Mark Arnold and a large/independent third-party GMC shareholder and convertible note holder.

182. By having access to GMC's financial books and records and other business records, the third-party director and outside GMC corporate counsel immediately discovered GMC's entire purported business operations and alleged VIDGO service was a fraudulent scheme to defraud investors.

183. Specifically, the third-party director discovered GMC had never secured any of the content and licensing rights necessary to launch an OTT live linear cable television containing any of the promised popular and necessary "core" cable channels - including none of the allegedly secured "core" cable and

local channels in the list of 300 channels set forth in the "Investors Pack," and none of the cable channels broadcast in the "beta" demonstrations since January 2016.

184. In fact, GMC has not secured content rights for a single cable channel or local channel needed to launch a legitimate OTT live linear cable service and/or to meet GMC's contractually promised content requirements to third-party distributors and partners.

185. The third-party director also discovered that GMC has not paid any expenses for approximately three (3) months, had approximately $1,000,000 in accounts payable without a VIDGO service, was absurdly incurring approximately $300,000 in network leasing, mortgage and lease expenses without any need to do so since GMC had no OTT live linear service, and had engaged in numerous related third-party transaction with Federman, Johnson, Winsonic Holdings, WDMG, WDCSN and the other defendant entities without justification or reason.

186. Efforts by plaintiffs and other stakeholders to obtain answers to these questions and investigate them further were obstructed by Federman, Johnson, Guthrie and Arnold – with Federman and Arnold constituting half the GMC Board.

187. Contemporaneously, by having access to the Board of Directors and conducting a preliminary audit of GMC's business records, plaintiffs discovered GMC was a completely fictitious and fraudulent enterprise that defendants

pathologically used as a front to defraud plaintiffs and support defendants' lifestyles, defendants' unrelated businesses and their personal interests.

188. Specifically, plaintiffs discovered that GMC: (i) had no product development; (ii) had no VIDGO service to launch in order to generate any revenue; (iii) had no OTT content or digital distributions rights for OTT distribution of promised cable programming content for any of the major, popular and/or necessary cable channels and local channels originally broadcast on the various "beta" demonstrations to plaintiffs; (iv) had no network studio approval with respect to content handling and transmission; (v) could not even remotely satisfy "minimum guarantees" required by such studios ranging in the $30,000,000 to $40,000,000 range – something never disclosed to plaintiffs or any other GMC investor at any point in time; (vi) that GMC and various defendants owned/controlled by Federman and Johnson had been involved in authorized and senseless "related party transactions" with GMC underneath Guthrie's/Tech CXO's unsuspecting noses and supervision; (vii) had been paying hundreds of thousands of dollars per month for leasing high-speed capability networks and computer equipment when GMC had no service to launch, and had done so for the benefit of Johnson and his other defendant "digital content" and "Hollywood production" defendant entities; (viii) that GMC had not paid its vendors for many months due to a zero cash position and had approximately $1,000,000 in accounts payable; (ix)

had no ability to even come close to meeting key contractual deadlines for VIDGO service delivery to InComm/MetrosPCS and/or WalMart/Vudu as promised by defendants; and (x) had been utilized as a "personal piggy bank" by Federman, Johnson and numerous "silos" of their defendant businesses and partners.

189. Demonstrating Guthrie's/Tech CXO's absolute abandonment of their fiduciary duties of care, loyalty and disclosure to plaintiffs and other investors was a July 31, 2017 email exchange between plaintiff John Clifford and Guthrie in response to John Clifford's discovery that GMC/VIDGO was a fraudulent scheme and artifice designed to rob plaintiffs and other investors of their monies for defendants' personal use and benefit.

190. In particular, John Clifford discovered that Johnson, Federman, Ashcroft, BC LLC and AOA, LLC had improperly utilized $300,000 in investor funds to pay Winsonic Holdings', WDMG's and WDCSN's expenses for those “Winsonic” companies' business, network build outs and Coresite location unrelated to any GMC or VIDGO business operations.

191. In response to John Clifford demanding an immediate audit and confronting Federman, Kostensky and Guthrie regarding these revelations in a July 31, 2017 email identifying them as “serious legal and financial problems,” while inquiring why Jan Emmenegger as a Winsonic Holdings/WDMG employee was

paying those companies' expenses with plaintiffs' funds, Guthrie astonishingly wrote back by email on July 31, 2017 as follows:

> Thanks John. We did not want the day to close without a response to your questions.
>
> Irrespective of your source, we can clearly state your information in incorrect. Jan Emmenegger has always worked exclusively for [GMC] though she has done so through a contractor relationship. She only keeps our books and has no responsibility for any other business.
>
> We are providing advance disclosure from the Series B docs on the short list "related parties" tomorrow. We were finishing this piece and are still circulating.
>
> We have only a few such relationships and they are clear and appropriate, we can assure you. They are also very important and necessary to our success. In that disclosure, we document the business necessities and all amounts to and from. We have no relationships or contractors working for anyone else other than [GMC]. All expenditures have been for the benefit of [GMC]. And all amounts have been, to my knowledge, properly accounted for.
>
> We are happy to continue this discussion when we provide the disclosure document and appreciate your patience till then.
>
> Best, Todd Guthrie
> CFO/Gotham Media Corporaion/Tech CXO

192. Guthrie's entire July 31, 2017 email was completely and intentionally untrue, and confirmed Guthrie’s complete ignorance, cluelessness and complete unfamiliarity with any scope of GMC’s accounting, finances, financial activities, bank account activity, balance sheet, expenditures, financial obligations, cash flows, contracts, financial obligations and business operations. His July 31, 2017

email confirms Guthrie/Tech CXO paid absolutely no attention to any of the financial issues they were responsible for overseeing and monitoring as the CFO for GMC. Rather, they engaged in gross negligence and complete breach of their fiduciary duties of care, loyalty and disclosure to plaintiffs and other investors to ensure plaintiffs' funds were properly utilized and accounted for to launch VIDGO, rather than any improper purpose.

193. In response, John Clifford wrote an email back to Guthrie, Federman and Kostensky on August 1, 2017 stating that "someone is lying to me." In response, Federman then wrote his own August 1, 2017 email to John Clifford stating as follows:

> Your concerns are extremely important to us.
>
> It is because of WDCSN's status and relationships that the Gotham/VIDGO enterprise is possible. This relationship enabled Gotham to get facilities at Coresite (One Wilshire), which is a carrier class building and very difficult to get into. Facilities there are absolutely necessary for Gotham to carry and broadcast the Hollywood content. To do this independently is an insurmountable task – it would cost many millions, take many months, and even then probably would not be possible for us to obtain carrier status and a long-standing relationship with the studios enough to get into this facility. The money we loaned to WDCSN was extremely well spent. Also, it is WDSCN's relationships and introductions which enabled Gotham to obtain the cross-connect, transport and licensing agreements necessary to launch VIDGO. The small WDSCN network can act as an adjunct to the Gotham network for redundancy, whch is a studio requirement and a cost would be [sic] have had to incur anyway.
>
> Now that these agreements are in place, Gotham is no longer dependent on WDCSN in any way. However, it may be cheaper for us to backhaul the local channels through WDCSN, as they get discounts for their carrier and

diversity status. We are exploring this now, and if so, there will be a network services agreement between Gotham and WDCSN related specifically to these services. Our relationship with WDCSN has also enabled Gotham to negotiate lower fees on rent, cross-connects, transport and licensing.

WDCSN's sole purpose is to facilitate the launch of VIDGO – we have used their status and past relationships to get the required facilities and agreements. In the future, WDCSN will also act as a distributor of VIDGO, as they are entitled to a portion of the major networks as part of their diversity initiative.

Jan is a valued Gotham contractor. There are no WDCSN employees who work with Gotham or have access to any aspect of Gotham including our finances. Any money which has been spent by Gotham has been approved by me [ad] our CFO, Todd Guthrie, and we are the only one who can authorize payments. We have been extremely efficient with our spending, and have gotten tremendous value out of the investment into Gotham, as an enterprise like this typically costs $30-$35 million minimum to set up. Todd Guthrie [has] gone through our finances, past and future, our agreements, operations and strategy moving forward in great detail, and everything will be disclosed as part of our Series B offering.

To date, the Company has invested $479,412.52 into WDCSN recorded as a receivable from WDCSN in "Other Assets" in the Company balance sheet. Of this amount, $118,749.77 has been repaid by WDCSN and $360,662.75 remains outstanding.

Your concerns are extremely important to us. My sole purpose in life is to make good on this investment, and we are committed to you, to clarity and transparency in this enterprise. I have worked and sacrificed for many years to launch Gotham, and we are in the end zone now. Lack of money can only delay us, nothing can prevent the launch now, we have come way too far and are in too valuable a position. I have gathered some friends and family investment to help bridge us for the time being.

Todd […] and I look forward to speaking to you about this and any other concerns as soon as possible.

Best regards,

Richard Federman
CEO/Gotham Media Corp.

194. Subsequently during the first week of August 2017, John Clifford and the third-party director continued identifying major issues, contradictory statements by Federman and Guthrie, and inconsistencies in representations made to them by Federman and Guthrie as to Johnson's, WDMG's and WDCSN's involvement and role, the amount of plaintiffs' funds allegedly "borrowed" by WDCSN from GMC investors and material misrepresentations included in Federman's entire April 27, 2017 bogus "Investor Update."

195. After John Clifford threatened litigation against Federman, Guthrie, GMC, Kostensky, the "Winsonic" defendants and Johnson, and after the newly appointed third-party director began conducting his own audit of GMC's operations, financial history, the status of GMC's content rights and potential launch date and the VIDGO network allegedly all established and constructed with plaintiffs' investment proceeds, Federman wrote an August 6, 2017 email to John Clifford making further intentionally false statements to him. These continued written false statements were made to conceal the sensational fraudulent scheme and artifice by Federman, Johnson, their defendant business entities and conspirators, Arnold and Kostensky carried out since the inception of the GMC fiction:

We had a big weekend with [the third-party investor/Board director] – I thought you were waiting for validation from him, and I apologize for the delay. We have been very busy preparing all the validation for this informal audit. […]. It is our top priority to rectify these misconceptions, provide full disclosure and validation on everything, and we are working with [the third-party investor/director] on this informal audit […].

Winston is not a WDCSN employee, he has been Gotham's CTO since he joined the enterprise, and he is vital to it. […]. Jan is a Gotham contractor, soon to be full-time employee. She is just a bookkeeping clerk, with no authority over anything. She is excellent, really top-notch. She reports to Todd Guthrie, our CFO. The books have been meticulously kept from go, they are very straightforward. Todd has shown it during our meetings, and will provide full disclosure of our books and finances, past, current and future, tomorrow if you like. Every dime spent is approved by me and Todd, and we are the only [ones] who have access to the books aside from Jan. Not a dime has ever been spent in Gotham without my approval, and this has always been the case since before you invested. Unless directed by me, or Todd with my approval, Jan does not disclose financial information to anyone. As I mentioned, we have been very efficient with our spending, as launching an enterprise like this can easily cost $50 million or much more. I will send a separate email about the relationship with WDCSN, of which Orkan has learned a lot, and the agreements between us were discussed in our meetings and will be disclosed this week. These will clarify the roles of the companies and protect against any conflict of interest. I can certainly understand why you would be extremely disturbed under the misconceptions you had, and considering that, you have been extremely disturbed under the misconceptions you had, and considering that, you have been extremely patient and tolerant with us.

> Please hold your fire on legal action. I think [the GMC third-party director] can now see that this opportunity is real and can launch this year, and we ask the opportunity to validate everything and make this clear for you.

196. After John Clifford spoke for over two (2) hours with the newly appointed third-party Board director and GMC investor, John Clifford emailed Federman on August 7, 2017 stating that during those over two (2) hours, the director and investor informed John Clifford that Johnson and the defendants responsible or accounting, bookkeeping, financials, etc. (Johnson, Guthrie/Tech CXO, Jan Emmenegger and Ashcraft/her companies) had denied access to any and all GMC business and financial records, and provided no answers or explanations to the issues John Clifford had raised. In addition, the third-party director discovered Johnson was completely incompetent, incapable and unknowledgeable about any aspects regarding the requirements to establish a live linear OTT cable service or infrastructure, and that Johnson had been given a large bogus stock position from Federman's shares in GMC by Federman around late 2016/early 2017 to continue their conspiracy.

197. Around this time, plaintiffs learned that GMC had allegedly purchased 4,500,000 shares of WDCSN common stock on or about June 1, 2016 for $4,500. This transaction was executed by a Common Stock Purchase Agreement between GMC and WDCSN, with signatures for the two companies by Federman and

Johnson respectfully as CEOs of each company. This senseless transaction occurred despite the fact Johnson was in conflict as the CTO of GMC at that time.

198. By August 7, 2017, plaintiffs had also learned from the audit that WDCSN/WDMG did not have "CLEC" status, and had not had such status since 2008. This contradicted the false statement Federman had been telling plaintiffs and other investors during the relevant time period that: (i) WDCSN's/WDMG's purported "CLEC" status was the reason for approximately $480,000 in "loans" from GMC to WDCSN/WDMG without any evidence of promissory notes or contractual agreements to justify such use of plaintiffs' funds; (ii) the need to spend money on GMC's purported redundant "network" Coresite location at One Wilshire in Los Angeles, which turned out was solely established and built by Johnson for his "Winsonic" defendant companies, as well as for the benefit of WDMG/WDCSN/Winsonic Holdings and Johnson's/Snipes other defendant companies – and was totally unnecessary for the establishment of a live linear OTT network; and (iii) the partnering with Johnson and his defendant companies and his role as CTO of GMC.

199. Worse, the audit revealed that Federman, Johnson, Su, Cascade and WDCSN/WDMG had not been developing an OTT cable service as promised to plaintiff, but rather a traditional and outdated IPTV cable television service signal whose signals could not legally be disseminated to OTT devices such as cell

phones, tablets, laptops or internet sticks - since the content licensing needed for authorization to do so is separate and distinct from IPTV content licensing rights.

200. Specifically, plaintiffs discovered defendants never established any OTT live linear television cable service, never built any "OTT" tailored "VIDGO" network, never needed to build any VIDGO network to launch an OTT live linear cable service (it could simply have been leased) and had no OTT cable programming content rights necessary to broadcast the promised cable and local channels to OTT devices. In addition, no such VIDGO network had been built out at the Georgia Campus, no interface or back-office sign up and billing system had been built for VIDGO and no steps had been taken to create any OTT live linear cable service.

201. In addition, plaintiffs learned there was no backbone infrastructure for any purported GMC network. Rather, Federman, Johnson, Su, Cascade, Thurman, KTC and Kostensky had utilized an IPTV middleware software platform from Minerva and/or Vubiquity to run the entire alleged "business operation" and to repeatedly "beta" demonstrate the non-existent VIDGO service to plaintiffs.

202. Plaintiffs further learned GMC, Federman and Johnson had secured no OTT content rights of any kind for either local channels or any of the most popular cable channels that Federman and Johnson promised to plaintiffs such as ESPN, AMC, TNT, TBS, USA Networks, FX, History Channel, CBS, ABC, Fox

and/or NBC. They further learned that Johnson made efforts with GMC's aggregators and vendors supplying the IPTV cable content rights to conceal these facts from plaintiffs.

203. Plaintiffs further learned there were absolutely no contractual agreements of any kind in place for GMC to broadcast any local networks or cable networks in an OTT fashion. In addition, plaintiffs learned GMC had no such contractual agreements with any network consortium. Essentially, GMC therefore had no content rights agreements to broadcast any popular cable content programming via OTT to any OTT device - despite spending approximately $6,000,000 of plaintiffs monies and over $11,000,000 overall from all GMC investors and convertible note holders. In other words, GMC had nothing to show for the expenditure and theft of those approximately $11,000,000 in funds.

204. Plaintiffs further learned the cable and local networks owning the necessary cable programming were demanding tens of millions of dollars in "minimum guaranties" upfront in order to even consider providing content rights to GMC and/or any other company interested in broadcasting those networks' programming content through an OTT model. At no time did Federman, Kostensky, Guthrie or Johnson ever disclose these material facts to plaintiffs or other GMC investors.

205. Worse, plaintiffs discovered GMC had approximately $300,000 per month in unjustified operating expenses to senselessly maintain the duplicative Coresite facility in Los Angeles, and a Level 3 Tier 1 network for the benefit of Johnson and his various defendant companies – all of which were completely unnecessary and senseless expenses for GMC since it had absolutely no OTT cable service for subscribers to sign up for and pay for.

206. Plaintiffs further learned that Johnson had unnecessarily directed Federman to purchase the Georgia Campus, and to pay for its related mortgage for that purchase, under the pretext that the ownership of that building: (i) would allow GMC to immediately access the "Zero Mile" network infrastructure of the Atlanta area for rapid deployment of the VIDGO signals; and (ii) reduce GMC's monthly operating costs.

207. In reality, plaintiffs learned that Johnson had actually worked out of the Georgia Campus previously with Snipes for their multiple defendant partnerships and business endeavors in LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss. In addition, plaintiffs learned that Snipes was actually once the owner and developer of the Georgia Campus that Snipes used with Johnson to operate and manage their various defendant businesses and endeavors. Plaintiffs further learned that because

Snipes had so many business and personal items, trailers, vehicles, etc. located in and on the Georgia Campus along with his and Johnson's defendant entities' business infrastructure, Johnson and Snipes desperately wanted to keep possession and control of the Georgia Campus at all costs.

208. As a result, GMC paid a down payment for a corresponding mortgage using plaintiffs' funds for the GMC Georgia Campus for the rent-free and beneficial use of Johnson, Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST.

209. Plaintiffs further learned that Poole, Ashcraft, BC LLC and AOA LLC substantially assisted Johnson, Winsonic Holdings, WDMG, WDCSN, Snipes, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST in carrying out the theft and use of plaintiffs' funds designated for GMC for use by the above defendant entities.

210. Equally astonishing, plaintiffs discovered that Johnson and Federman – through WDMG, Winsonic Holdings and WDCSN - clandestinely only pursued the establishment of an IPTV television service and corresponding construction of two (2) separate locations for that IPTV service in Los Angeles/Coresite and the

Georgia Campus to advance their own business interests in WDMG, WDCSN and Winsonic Holdings to plaintiffs' detriment.

211. On August 8, 2017, and having learned that the entire GMC and VIDGO narrative was completely fraudulent scheme and fiction, plaintiffs began writing to Federman, Arnold and Guthrie demanding these defendants resign as GMC officers and directors, and allow plaintiffs and other shareholders to elect a new Board and new officers. Federman, Guthrie and Arnold refused to do so at an August 8, 2017 Board meeting over the objection of the sole third-party director who assisted in conducting necessary audits on the above issues.

212. During the entire above factual sequence of events, Federman, Johnson and Kostensky had advised plaintiffs repeatedly by telephone and in person that GMC had employees working "around the clock," "24//7" and "during all holidays" in order to get the VIDGO service launched in a timely manner. In actuality, none of this was true – and those alleged employees were actually RHI temporary staffers used by Johnons, Federman, Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss to advance those defendants' business interests, while pretending those temporary RHI employees worked for GMC to

defraud plaintiffs of plaintiffs' money in order to finance those defendants' businesses.

213. Guthrie's/Tech CXO's total ignorance and gross negligence as the CFO for GMC was evidenced by their inexcusable actions and/or lack thereof on or about August 8, 2017. On August 8, 2017, GMC conducted a four (4) hour Board meeting. On that date, Guthrie ignorantly and unreasonably executed a Payment Agreement in favor of Level 3 Communications, Inc. when GMC had no existing live linear OTT cable service that could possibly use the Level 3 network.

214. Guthrie executed and delivered that Payment Agreement despite that issue not being a topic at the August 8, 2017 Board meeting, and despite GMC's Board never approving Guthrie's execution and delivery of the Payment Agreement.

215. In addition, GMC had no financial means to satisfy the terms of the Payment Agreement at the time Guthrie entered into the Payment Agreement on August 8, 2017, and no service or product to generate any revenue for GMC.

216. To the contrary the primary topic of discussion at the August 8, 2017 Board meeting (which Mr. Guthrie attended as a Board member) was related to GMC's financial distress and certain related party transactions involving Johnson's and Federman's unrelated defendant entities, including all entities bearing the name

"Winsonic." Guthrie/Tech CXO took no action in response to the raising of these issues of fraud and theft by Federman, Johnson and their defendant entities.

217. On August 9, 2017, plaintiffs received a letter from the telecommunications boutique law firm Cinnamon Mueller, which had actually been partially draftd and written by Johnson and Thurman. That letter confirmed GMC had no OTT content rights, but rather only IPTV content rights because those were the only rights Federman and Johnson had pursued. This revelation was directly contrary to the false representations Federman, Arnold, Kostensky and Johnson had been making to plaintiffs since late 2015.

218. On August 18, 2017, and after the Board fired GMC's outside corporate counsel for raising all of the above fraudulent activities to the Board's and the shareholders' attention, certain plaintiffs wrote to the Board demanding Arnold, Guthrie and Federman immediately resign and dissolve the GMC Board, but they still refused to step down.

219. Rather on that date, Federman, Arnold and Guthrie as Board members (over the objection of the fourth third-party director and GMC investor) amazingly granted new employment contracts to Federman and Johnson, and also agreed to grant Johnson and the "Winsonic" defendants contractual rights regarding GMC and VIDGO to service the non-existent "VIDGO network," despite the fact GMC was insolvent, has not made one step of progress in launching any OTT cable

service and had no service capable of generating any revenue. Arnold and Guthrie cluelessly voted for those resolutions despite the fact GMC had absolutely no VIDGO service and no funds to pay for any further payments to anyone.

220. Subsequently under additional pressure from plaintiffs and other investors, Federman and Guthrie resigned from the Board.

221. Thereafter, a new Board elected by the GMC shareholders was elected. The new Board performed an audit of GMC's content and licensing rights, and its overall business. The audit revealed GMC had no content or licensing rights to broadcast cable programming or local channel content via OTT.

222. The new Board performed an audit of GMC's "VIDGO network" and discovered it was a fraudulent charade comprised of leased equipment and network carrier capacity, which was a completely unnecessary expenditure by GMC made solely to advance Johnson's, Federman's and their other defendant entity business interests.

223. The new Board performed a review and audit of GMC's financial books, records and accounting. These efforts revealed the GMC's financial books, records, balance sheet and accounting were completely fabricated and a total fraud. The new Board also discovered the general ledger and other financial records had been fraudulently and inaccurately maintained on purpose to conceal the various'

defendants' theft of plaintiffs' funds for defendants' personal use rather than for GMC or VIDGO service.

224. The new Board further discovered that defendants stole millions of dollars from plaintiffs for defendants use and enjoyment, even at critical times when these defendants claimed GMC required cash infusions to continue operations and build out its final technology requirements.

225. Ultimately, it was confirmed the entire GMC business and purported VIDGO service advertised since 2015 by defendants was a fraudulent scheme and artifice designed to defraud plaintiffs and other investors for defendants' benefit and use of those invested proceeds.

**Guthrie's/Tech CXO's Abandonment and Gross Negligence as CFO**

226. At some time in 2015, Federman hired Guthrie and Tech CXO (different from Tech CFO) to serve as CFO for "Gotham Media," and to perform the fiduciary obligations and responsibilities attributable to a CFO of a corporation, such as GMC.

227. At that time, Guthrie and Tech CXO also served as the CFO for GMS.

228. At all times from late 2015 through August 2017, Guthrie/Tech CXO disclosed and identified themselves in Guthrie's written correspondence and emails with plaintiffs and other GMC investors as the CFO of GMC. Guthrie also spoke to plaintiffs on the phone on numerous occasions representing he was the CFO of

GMC, and assuring them their "investment" proceeds were being spent properly, meticulously, carefully and efficiently to maximize plaintiffs' investment with the utmost care.

229. Federman hired Guthrie due to their previous relationship whereby Guthrie mentored and converted Federman to another religion. This made them close friends, fellow parishioners and confidants contemporaneously with Guthrie serving as CFO for GMC and GMS from 2015 to 2017. In doing so, Federman correctly assumed Guthrie would possess so much trust in Federman's actions and conduct as sole director of GMC that Guthrie would not bother performing the most basic functions of a CFO to ensure investor funds were being properly utilized only for appropriate GMC business purposes.

230. During their tenure as CFO of GMC, Guthrie/Tech CXO failed to even remotely review, inspect, observe, audit, scrutinize, investigate, audit and/or question GMC's financial books, records, transactions, bookkeeping, general ledger and accounting so as to learn and understand the most basic level GMC's financial activities and expenditure of investors dollars.

231. During their tenure as CFO of GMC, Guthrie/Tech CXO completely failed to review any of Gotham's bank accounts or operating accounts to familiarize themselves with GMC's financial activities, financial actions, capital structure, use of investor proceeds, corporate officer expenditures and purchases,

corporate salaries, employee salaries and/or independent contractor agreements. By failing to do so, Guthrie/Tech CXO remained completely ignorant and uninformed about Gotham's illegally financial activities and GMC's officers' and directors' misuse and theft of investors' proceeds.

232. During their tenure as CFO of GMC, Guthrie/Tech CXO completely failed to review any of Gotham's bank accounts or operating accounts to determine whether or not GMC's management, officers and/or directors were appropriately using investors proceeds for legitimate business purposes towards the VIDGO endeavor, as opposed to the personal non-Gotham related expenditures of Gotham's officers and directors such as Federman, Winston, those two defendants' other defendant companies, other defendant conspirators and/or Arnold.

233. During their tenure as CFO of GMC and GMS, Guthrie/Tech CXO completely failed to register and establish payroll for GMC with the Georgia Department of Labor.

234. During their tenure as CFO of GMC and GMS, Guthrie/Tech CXO failed to ensure GMC and GMS filed state and federal tax returns for the 2015 and 2016 tax years.

235. During their tenure as CFO, Guthrie/Tech CXO failed to have a single purported GMC employee complete a W-4 form to ensure appropriate withholdings for such purported employee's salaries.

236. Had Guthrie/Tech CXO paid even the remotest attention to the GMS and GMC financial activity during his purported tenure as their CFO, they would have immediately discovered that:

(a) Federman stole over $1,000,000 of plaintiffs' money for his personal use in the form of paying for vacations and leisure travel, restaurants, entertainment, yachts, the dating and purchase of prostitutes, the purchase of musical instruments and equipment, recording equipment, payment of health insurance, payment of dental work, the establishment of certain other defendant businesses with certain individual defendants and other personal expenses unrelated to GMC or VIDGO;

(b) Johnson and Poole stole approximately $1,200,000 for their own personal use to build a computer lab in their home, to upgrade and renovate their home, to make repairs to their home, to ride limousines and Uber livery services to neighborhood locations for basic errands such trips to supermarkets, stores and the Georgia Campus, to build out and finance an IPTV cable network and purchase IPTV cable content rights for Johnson's formerly bankrupt WDCSN/WDMG businesses owned by him and his investors such as Ashcraft, Poole and Spellman having no relationship to Gotham's OTT cable business;

(c) Johnson, Winsonic Holdings, WDMG, WDCSN, Su, Cascade, KTC and Thurman were constructing an IPTV cable network with IPTV

cable/local programming content rights to launch that business for their own benefit under WDCSN/WDMG by using plaintiffs' monies to finance those unrelated businesses, and booked those expenses to GMC's financial books and records rather than these defendants' own financial books and records;

(d) Federman stole hundreds of thousands of dollars from plaintiffs' investment proceeds to capitalize and finance Rickshaw, which was a musical recording and production business founded by Shaw and Federman having nothing to do with GMC;

(e) Federman stole plaintiffs' investment proceeds to pay rent to Bishop Street Properties, LLC for Rickshaw's use of Bishop Street's premises to operate Rickshaw;

(f) Federman stole plaintiffs' investment proceeds to pay for and purchase very expensive and very high-end musical equipment and instruments from Daryl Arthur and Megatone for use in the Rickshaw business, and for Federman's own personal use;

(g) Federman failed to transfer approximately $3,000,000 from GMS to GMC in late 2015 and early 2016 following Federman's intentionally misleading investors into wiring their investments into GMS so he could steal those funds for his personal use rather than GMC's business - despite plaintiffs executing the ITEA Agreements ;

(h) Johnson's and Poole's use of plaintiffs’ investment proceeds for numerous purchases of personal items through online retailers useof PayPal having nothing to do with GMC;

(i) Johnson's use of plaintiffs' monies to pay for all registration and reinstatement annual fees for all defendant companies Johnson and Snipes have ownership interests in, including not limited to Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss;

(j) Johnson's theft and diversion of plaintiffs' monies to finance, capitalize and conduct the business operations for 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss;

(k) Johnson's and Poole's theft of plaintiffs' monies to finance, capitalize and conduct the business operations of Winsonic Holdings, WDMG and WDCSN out of the Georgia Campus and GMC’s own (and completely unnecessary) Los Angeles Coresite location, including but not limited to building out these companies' IPTV networks in Los Angeles and the Georgia Campus that were paid for, financed and leased using plaintiffs' funds for no legitimate GMC

business purposes, and to advance these defendants' unrelated business interests in the form of the defendant entities;

(l) Federman's and Johnson's deceptive payments to RHI from plaintiffs proceeds deposited into GMC to staff unqualified and completely inexperienced temporary RHI workers at GMC's Georgia Campus to pretend these staffers worked for GMC in building out the VIDGO service when investors/potential investors such as plaintiffs visited the Georgia Campus, when in reality these RHI temporary staffers here performing work for Winsonic Holdings, WDMG, WDCSN 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss using plaintiffs' monies to finance this staffing;

(m) Ashcraft's, BC LLC's and AOA LLC's preparation and maintenance of completely false, inaccurate and deceptive financial books and records for GMC concealing the frauds and thefts perpetrated by Federman, Johnson and Poole by booking false entries and expenses to GMC that were being generated by the unrelated business activities of Federman, Johnson, Snipes, Poole, Winsonic Holdings, WDMG, WDCSN 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss;

(n) Ashcraft's, BC LLC's and AOA LLC's preparation and maintenance of completely false, inaccurate and deceptive financial statements that these defendants knew would be presented to plaintiffs and other investors in the April 2017 Investor Pack for purposes of plaintiffs' relying on those phony financial statements to make additional investments into GMC/to conceal defendants' fraudulent schemes;

(o) Poole's receipt of approximately $5,000 per month from the GMC account for performing alleged bookkeeping and accounting functions when she performed absolutely no such work of any kind for GMC; and

(p) other thefts of plaintiffs funds by defendants.

237. During his tenure as CFO, Guthrie/Tech CXO executed horrific and senseless contracts with third-party networks on GMC's behalf without authority, forcing GMC to pay hundreds of thousands of dollars per month for networking and computer services GMC did not need and was not using since it had no OTT live linear cable service.

238. During his tenure as CFO, Guthrie/Tech CXO failed to warn plaintiffs or any other GMC investors of the above outrageous, wrongful, disloyal, reckless, ultra vires and deceitful actions by the aforementioned defendants set forth in this Complaint above and below, and completely failed to discover the above illegalities due to their abandonment of their fiduciary duties of care, loyalty

and disclosure, their complete ignorance concerning any aspect of GMC's finances and financial recordkeeping and their gross negligence.

239. Had Guthrie/Tech CXO performed even the most rudimentary tasks and fiduciary responsibilities of a standard CFO, they would have discovered the illegal and outrageous theft of investor funds by defendants from early 2016 all the way through Guthrie's resignation from the GMC Board in August 2017 - and could have/would have been obligated to immediately inform plaintiffs and other investors about these illegal and ultra vires activities to preclude plaintiffs from making any further investments into GMC and/or saved all or a portion of plaintiffs' investments before stolen by the various defendants.

240. In his August 22, 2017 resignation letter on Tech CXO letterhead, Guthrie/Tech CXO made the following statements to Federman in an effort to insulate themselves from their gross negligence and abandonment of their fiduciary obligations to plaintiffs: (i) their "time serving Gotham [as CFO] has been extremely limited"; (ii) that they "worked only 20.25 hours in 2016 serving on very limited matters at [Federman's] direction" (iii) that they were "a little more involved [in 2017]" at "106.25 hours,"; and (iv) that their "service was still very limited to matters as directed." Guthrie/Tech CXO further admitted they never performed any review, scrutiny or supervision of GMC's bank statements, expenditures, tax returns, operational accounting and/or personnel related matters.

241. Guthrie's/Tech CXO's August 22, 2017 revealed just how clueless Guthrie was concerning the financial and operational activities of GMC by stating that Johnson "had wonderfully negotiated numerous deferral arrangements," when Johnson had actually been pillaging plaintiffs' investment proceeds for his own personal use and the use of his unrelated defendant entities.

242. In his August 22, 2017 resignation letter, Guthrie/Tech CXO admitted to "publishing" GMC financial statements as of May 31, 2017, but being "not sufficiently confident to refresh these without a lot of time and effort, more than I can offer [GMC] at this time."

243. In his August 22, 2017 resignation letter, Guthrie/Tech CXO further demonstrated his bias towards Federman and Guthrie's/Tech CXO's abandonment of their fiduciary duties by stating he "genuinely believe[s] in Gotham, your leadership and the opportunity," when GMC and VIDGO were actually total fictions, and when Federman had stolen millions from plaintiffs through Federman's fraudulent schemes and artifices without resistance, discovery or disclosure from Guthrie/Tech CXO.

**Winston Johnson Engages in Relentless, Shameless and Systematic Fraudulent Actions and Theft of Plaintiffs' Funds to Construct His "Winsonic" IPTV Network and to Finance His Other Business Partnerships with Wesley Snipes**

244. In January 2016/February 2016, Johnson presented a proposal and scope of work to Federman and other Gotham officers contending that he, through

his companies WDMG, WDCSN and Winsonic Holdings, had: (i) digital rights to core cable television network content; (ii) their own Computer Data Network (“CDN”); (iii) CLEC status that would assist in a more cost efficient build out of an OTT service and network; and (iv) other critical services and capabilities necessary to legally and effectively deliver OTT cable television programming to subscribers viewing such content on their cell phones, tablets, laptops and other internet devices.

245. Johnson also intentionally made false statements to Federman and other GMC officers that through WDMG, WDCSN and Winsonic Holdings, he had diversity status with the Hollywood studios to access and broadcast local and cable programming in a manner that would be less costly and restrictive due to such diversity status.

246. Johnson also intentionally made false statements to Federman and other GMC officers that through WDMG, WDCSN and Winsonic Holdings that WDMG and WDCSN had "CLEC" status with the FCC, and that such CLEC status would allow WDMG, WDCSN and Winsonic Holdings to broadcast and transmit OTT cable content over networks for a significantly less cost than the ordinary cost for such services.

247. During his entire tenure as CTO, Johnson clandestinely forged numerous checks and contracts with the signature(s) of Federman to pay for

expenses for Winsonic Holdings, WDMG and WDCSN, despite the fact Johnson did not have such check writing authority or permission at the time to enter into those transactions. Johnson did so to: (i) finance his own personal lifestyle; (ii) to pay for his own personal expenses; (iii) to pay for his wife Poole's personal expenses and lifestyle; and (iv) to finance and advance his unrelated defendant business interests in WDMG, WDCSN, Winsonic Holdings, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss - all operated out of GMC's Georgia Campus without paying a penny of rent to GMC, and while fully financing those companies with plaintiffs' and other investors' funds invested in GMC.

248. Johnson did the same after he received check writing authority from Federman as well in his own name as CTO of GMC.

249. Johnson also illegally used plaintiffs' funds to pay for RHI staffing employees to staff WDMG, WDCSN, Winsonic Holdings, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss, and to pay all expenses associated with the RHI staffing employees.

250. Johnson illegally paid RHI to staff employees at GMC's expense to work for Johnson's other defendant entities, and had those employees

contemporaneously pretend to work on the VIDGO endeavor for GMC whenever any plaintiff visited the Georgia Campus to determine the status of VIDGO, or to determine whether to invest in GMC.

251. During his entire tenure as CTO, Johnson paid himself a "salary" while performing absolutely no work to advance GMC or the VIDGO service, but rather only performed work to advance the interests of his named defendant company interests. He did so despite not being registered as a GMC employee or consultant, never filing a W-4 or issuing a loss to himself, and despite no withholdings being made from those payments since GMC was not even registered for payroll.

252. Johnson and Poole paid for their weekly expenses on GMC's Visa card, and then used plaintiffs' proceeds to pay those expenses while Johnson and Poole only performed work for Johnson's named defendant businesses since GMC and VIDGO were fictions.

253. All of the above thefts of plaintiffs' investment proceeds by Johnson were done with the assistance of Ashcraft, AOA LLC and BC LLC – who booked all of these improper charges to GMC's financial books and records.

254. During his entire tenure as CTO, Johnson expended approximately $500,000 of plaintiffs' monies to build out network infrastructure and to lease networking space at One Wilshire (a.k.a. Coresite) in Los Angeles, California for

WDCSN, WDMG and Winsonic Holdings. He did so in order to construct and launch an IPTV cable television network that would partner with KTC and Thurman. At least $479,412.52 of plaintiffs funds were converted by Johnson towards this fraudulent scheme, and Johnson converted hundreds of thousands more from plaintiffs' investment proceeds to pay for the monthly rent for Winsonic Holdings, WDMG's and WDCSN's network infrastructure at the Coresite facility. No such equipment or network space was required for the VIDGO service though.

255. While CTO of GMC, Johnson immediately began diverting and spending plaintiffs' and other investors' proceeds to obtain the licensing necessary to broadcast approximately 300 core cable and local IPTV channels for broadcast and subscribed distribution over WDMG's/WDCSN's IPTV network.

256. Johnson also had GMC pay for the operating/fixed costs and expenses associated with building out the "Winsonic" IPTV network and business operations, including for vendors such as Minerva, Vubiquity and Verimatrix, computer networking technology leases with companies such as Level No. 3 and computer/network equipment suppliers.

257. Johnson was so pathological in his deception and thievery hat he even prepared a detailed itemized capital expenditure spreadsheet and itemized budget setting forth the costs for constructing an IPTV cable network, and to obtain IPTV content licensing rights to launch a "Winsonic" IPTV network operation on or

about May 17, 2017. Contemporaneously with these fraudulent actions, Johnson drew a “salary” from GMC for allegedly serving as its CTO.

258. During his entire tenure as CTO, Johnson deceptively partnered with Federman to purchase the Georgia Campus on the pretext of the building's proximity to a "zero mile" networking connections into the heart of Atlanta's most critical networking systems.

259. In reality, Johnson compelled the purchase with Federman to continue using the property to advance Johnson's business interests in WDMG, WDCSN, Winsonic Holdings, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss - all of which Johnson previously operated out of GMC's Georgia Campus without paying a penny of rent to GMC.

260. Contemporaneously, Johnson financed those defendant companies and their RHI temporary staff employees using plaintiffs' funds. In fact, these defendants previously operated all of those defendant businesses out of the Georgia Campus since before Snipes' was sentenced/incarcerated for tax evasion, and since the Georgia Campus’ purchase by GMC. At the same time, these defendants used plaintiffs’ investment proceeds to rekindle and re-register those named defendant businesses that Johnson and Snipes were partners in.

261. Contemporaneously with his clandestine and fraudulent actions, Johnson converted investor funds in the amount of approximately $5,000 per month and diverted those funds to his wife Poole, who performed absolutely no services for Gotham – under the falsehood and pretext that she served as the bookkeeper and the "accounting department" for GMC. Poole had no such skills and performed no such services.

262. During his tenure as CTO, Johnson converted investor funds to pay for WDMG's/WDCSN's/Winsonic Holdings' IPTV content licensing rights to broadcast core cable and local television network programming via the "Winsonic" IPTV network. For example, he fraudulently entered into a contract with Bloomberg for IPTV rights to broadcast Bloomberg over Winsonic’s IPTV Network, but paid for such IPTV content rights using plaintiffs' investment proceeds, despite those content rights having nothing to do with GMC’s OTT business made.

263. Johnson also converted plaintiffs' funds to pay for WDMG's/WDCSN's/Winsonic Holdings' network vendors such as Level 3, to finance Winsonic’s networking facility at Coresite in Los Angeles for the monthly rent and other ancillary fees and to purchase computer and network gear for his "Winsonic" defendant companies.

264. Johnson also converted plaintiffs' funds by executing agreements between WDMG/WDCSN and GMC for services, products, furniture, equipment and products that WDMG/WDCSN allegedly provided to GMC, but never did – thereby converting hundreds of thousands of additional dollars from plaintiffs for these defendants personal use.

265. Once the above referenced fraudulent schemes and artifices came to revelation in the Summer 2017 regarding the fiction of GMC and the VIDGO service, Johnson continued advancing pathologically false and misleading statements to justify his actions and conduct, while attempting to conceal his theft of plaintiffs' funds and the existence of his other defendant businesses that Johnson operated out of the Georgia Campus with and without Snipes.

266. Once the above referenced fraudulent schemes and artifices came to revelation, Johnson attempted to conceal GMC's business records and financial records, and also attempted to conceal all records pertaining to the role and existence of WDMG, WDCSN, Winsonic Holdings, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss.

**KT Communications and Kristy Thurman's Role in the Fraud Perpetrated Upon Investors Through Winsonic Holdings, WDMG and WDCSN**

267. KTC is an internet protocol television (IPTV) provider with a current subscriber base of approximately 60,000 subscribers in the United States.

268. IPTV is a dated technology that is utilized primarily in hotels and multi-dwelling units in lieu of traditional cable distribution systems and signals. An IPTV signal cannot legally be broadcast to OTT type devices such as tablets, cell phones, internet sticks, etc.

269. Contemporaneously in Fall 2015 through January 2016, Thurman/KTC solicited Federman, Johnson, Winsonic Holdings, WDMG and WDCSN with KTC's IPTV programming content and backend technology system.

270. In a January 21, 2016 letter to Johnson (as GMC's CTO) from Thurman on KTC letterhead, Thurman wrote that KT Communications had an OTT platform, content licensing middleware and software that KTC could license to GMC to deliver OTT programming.

271. In addition, Thurman's January 21, 2016 letter stated that she wanted to make it "clear" that KTC "has content licensing rights for core cable television networks, ethnic channels and specialty channels for special markets."

272. In her January 21, 2016 letter, Thurman wrote that she was launching KTC's OTT platform in the second quarter of 2016 and that her platform could be "white labeled" and/or broadcast to traditional "set top boxes," as well as OTT devices utilizing the Google Android or Apple IOS operating systems.

273. Thurman's January 21, 2016 letter further advised that her OTT platform could be easily modified to interface with existing billing systems, and allowed for web based management for both clients and subscribers.

274. Around the same time, Thurman was listed as an executive of GMS and GMC according to the business records of both companies, and subsequently held herself out as the CEO of Winsonic, WDMG and WDCSN.

275. Between January 2016 and August 2017, KTC and Thurman conspired with Federman, Johnson, Aschcraft, BC LLC, OAO LLC, Winsonic Holdings, WDMG and WDCSN to have Johnson and his "Winsonic" companies use plaintiffs' funds to build out expanded IPTV network capacity for KTC and WDMG/WDCSN using plaintiffs' investment proceeds, so that Winsonic Holdings, WDMG, WDCSN and KTC could merge and take advantage of this new and expanded IPTV network, their consolidated subscriber base and the related IPTV cable programming content.

276. During this time, Johnson claimed to plaintiffs that: (i) Winsonic Holdings would be buying out KTC for $6,000,000; (ii) that Thurman was the actual CEO of WDCSN and WDMG when Thurman herself told plaintiffs much later she did not know what she was a CEO of and/or what exactly WDMG and WDCSN did; and (iii) that Thurman was working on GMC's behalf (while being paid using plaintiffs' funds) with the National Telco Television Consortium

("NTTC") that she/KTC is a member of to secure OTT content rights for the purported VIDGO service. Thurman confirmed these intentionally false statements to plaintiffs on the telephone after Johnson made them to plaintiffs.

277. In reality, KTC and Thurman negotiated with NTTC using plaintiffs' funds for her own/KTC's and Johnson's personal use to obtain additional IPTV cable channel programming for their respective companies - and not OTT cable content rights - so as to combine/merge her company and network with WDMG/WDSCN for an expanded customer base and IPTV network capacity, and for the monetary benefit of both her companies and Johnson's companies. She did so while allegedly serving as a consultant for GMC.

278. Moreover, in early 2016, mid-2016, late 2016 and early 2017, KTC and Thurman deceptively and intentionally provided her "white label" OTT content channels to Johnson, Federman, Sue and Cascade for their use in some and/or all of the "beta" demonstration that led up to the April 27, 2017 Investor Pack and plaintiffs subsequent investment. This is noted on 2496 Digital’s invoices to GMC for those “services” rendered. KTC and Thurman concocted that scheme intentionally with Federman, Johnson, Su and Cascade in order to ensure and induce continued investment by plaintiffs and other third-party investors into GMC – which would allow additional financing and expansion of Thurman's/KTC's and Johnsons’/WDCSN’s/WDMG’s IPTV network and business endeavor.

279. Johnson's 2496 Digital invoice to GMC for preparing the fraudulent "beta" demonstrations contains specific itemizations for services rendered by KTC in the preparation and assistance of creating and displaying those fraudulent "beta" demonstrations, thereby evidencing KTC's and Thurman's involvement in those fraudulent schemes and artifices.

280. KTC and Thurman intended for use of the “beta” to induce plaintiffs to invest funds into GMC, and those betas did in fact reasonable induce plaintiffs to invest their funds into GMC.

281. Had those illegal "beta" demonstrations not been broadcast to plaintiffs using KTC's "white label" content in order to make plaintiffs believe GMC had an actual VIDGO service broadcasting live linear OTT cable and local programming plaintiffs would never have contributed their investments into GMC.

**Johnson’s Theft and Use of Plaintiffs’ Funds to Finance and Operate His "Hollywood" Entertainment and Digital Media Businesses Out of the Georgia Campus**

282. During Johnson’s tenure as CTO for GMC, Johnson paid, and arranged to pay, for RHI employees using plaintiffs’ funds to finance and operate all of his defendant businesses, and that he operated out of the Georgia Campus since before GMC's purchase of that property and before Snipes was sentenced for tax evasion.

283. Johnson used plaintiffs funds to pay for all outstanding annual registration fees and re-instatement fees for all of the defendant companies they own and operate.

284. Tellingly, Snipes kept his vehicles, trailers and personal property at the Georgia Campus at all times during the fraudulent scheme perpetrated by Johnson on plaintiffs regarding GMC and VIDGO.

285. During Johnsons's tenure as CTO, Johnson did not finance the operations of 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss with any of his own personal funds or the personal funds of Snipes. Rather, all such funds were converted from plaintiffs and used to operate and finance these named defendant companies, with even the RHI employees working for these companies being paid for using plaintiffs' stolen monies. Johnson and Snipes also did not pay any rent to GMC for any of these defendant businesses.

286. During Johnsons's tenure as CTO, Johnson operated 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss to create websites and programming content for broadcast television and OTT live linear broadcast. This included Snipes' concept for a series/OTT

channel coined "The Next Action Star" that would equate to an "American Idol" broadcast for aspiring action hero actors, and an "Action Channel" that would broadcast older action content OTT over the purported VIDGO service.

287. The above fraudulent scheme and conversion of plaintiffs' funds is memorialized in emails and memoranda between Johnson, Clippard and other RHI employees, where they discuss all of these defendant business' operations at the expense of plaintiffs' investment funds deposited into GMC.

**Justin Su's and Cascade's Fraud Perpetrated Upon Plaintiffs**

288. Federman, Johnson, KTC abd Thurman paid Su/Cascade approximately $250,000 from plaintiffs' funds in exchange for Su and Cascade to assist in the creation and perpetration of the above referenced fraudulent "beta" demonstrations.

289. Contemporaneously, Su and Cascade were aware at all times that GMC was not a real company and that VIDGO was not a real OTT live linear cable programming service. Rather at all times, Su and Cascade knew GMC and the alleged VIDGO service were fictions.

290. At all relevant times in this Complaint, Su and Cascade were knowingly paid by Federman, Johnson and Arnold using plaintiffs' funds. Su and Cascade though actually performed networking, digital video and related consulting services for Johnson, Winsonic Holdings, WDMG, WDCSN, 2251 LPI,

Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss – while performing no work for GMC. Su and Cascade also built out WDMG's/WDCSN's network at GMC's purported Coresite facility in Los Angeles while Johnson and Federman paid him and Cascade with plaintiffs' funds, and while they also paid for the hardware and software installed by these defendants and unrelated to GMC's business with plaintiffs' funds.

**Federman's and Shaw's Theft and Misuse of Plaintiffs' Funds to Finance Rickshaw**

291. While CEO and sole director, Federman stole plaintiffs' funds for use in establishing a musical production partnership with Shaw through their 50/50 partnership in Rickshaw.

292. Federman and Shaw stole hundreds of thousands of dollars of plaintiffs' funds and used those funds to rent studio production space at Bishop Street, to purchase musical equipment, instruments and recording gear, to purchase other ancillary musical and equipment items to finance all aspects of Rickshaw.

293. At all times, Shaw was fully aware Federman was removing plaintiffs' funds from the GMC fiction and depositing those funds into the Rickshaw account for Rickshaw"s illegal use, yet never ceased this practice, never disclosed it to plaintiffs or anyone else at GMC and was part of this conspiracy to steal plaintiffs' investment proceeds to finance Rickshaw's business.

**Federman's and Arthur's Theft and Misuse of Plaintiffs' Funds to Purchase Musical Equipment and Musical Gear From Arthur and Megatone**

294. Arthur is friends with Federman. Through his company Megatone, Arthur sold hundreds of thousands of dollars in musical equipment, instruments and gear to Federman.

295. At all times, Arthur knew that Federman was paying Arthur/Megatone with plaintiffs' funds since Federman used GMC checks and funds to pay Arthur/Megatone for the musical equipment and musical gear.

296. At all times, Arthur/Megatone were fully aware Federman was removing plaintiffs' funds from the GMC fiction and depositing those funds into the Megatone account for sales, yet never ceased this practice and never disclosed it to plaintiffs or anyone else at GMC, and was part of this conspiracy to steal plaintiffs' investment proceeds to generate profits for themselves.

## COUNT I

**(Breach of Fiduciary Duty of Loyalty as to Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC)**

297. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 13, 18, 19, 21, 22, 23 and Paragraph 47 through Paragraph 296 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

298. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su and Cascade were at all times of plaintiffs' investments corporate officers and/or directors of GMC charged with specific duties to plainiffs, including a duty of loyalty.

299. Federman's, Johnson's, GMC's, Guthrie's, Tech CXO's Kostensky's, Su's and Cascade's actions, conduct, inactions and omissions alleged in this Count constitute breach of their fiduciary duties of loyalty to plaintiffs as GMC shareholders, convertible note holders and investors.

300. Specifically, these defendants were all fully aware of the facts alleged in this Count, yet failed and/or refused to bring any of the facts alleged in this Count to any of the plaintiffs' attention at any time until plaintiffs discovered these facts for themselves, thereby resulting in plaintiffs continuing to invest in GMC and losing their entire investment.

301. Federman's, Johnson's, GMC's, Guthrie's, Tech CXO's Kostensky's, Su's and Cascade's failures and/or refusal to disclose any of the wrongful conduct by defendants outlined herein constitutes a material breach of these defendants' duty of loyalty to plainitffs.

302. As a result, plaintiffs have been and will continue to be damaged.

## COUNT II

**(Breach of Fiduciary Duty of Care as to Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC)**

303. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 13, 18, 19, 21, 22, 23 and Paragraph 47 through Paragraph 296 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

304. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su and Cascade were at all times of plaintiffs' investment corporate officers and/or directors of GMC charged with specific duties to plainiffs, including a duty of care.

305. Federman's, Johnson's, GMC's, Guthrie's, Tech CXO's, Kostensky's, Su's and Cascade's actions, conduct, inactions and omissions set forth above constitute breach of their fiduciary duties of care to plaintiffs as GMC shareholders, convertible note holders and investors.

306. Specifically, these defendants were all fully aware of the facts alleged in this Count as officers of GMC, yet failed and/or refused to discover, address, protect against, disclose and/or rectify any of the facts and wrondoing alleged in this Count in order to protect plaintiffs' investments and/or future investments, thereby resulting in plaintiffs continuing to invest in GMC and losing their entire investment.

307. Federman's, Johnson's, GMC’s, Guthrie's, Tech CXO's Kostensky's, Su’s and Cascade’s failures and/or refusal to disclose or reasonably address any of the wrongful conduct by defendants outlined herein constitutes a material breach of these defendants’ duty of care to plainitffs.

308. As a result, plaintiffs have been and will continue to be damaged.

**COUNT III**

**(Breach of Fiduciary Duty of Disclosure as to Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC)**

309. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 13, 18, 19, 21, 22, 23 and Paragraph 47 through Paragraph 296 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

310. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su and Cascade were at all times of plaintiffs’ investment corporate officers and/or directors of GMC charged with specific duties to plainiffs, incuding a duty of disclosure.

311. Federman's, Johnson's, GMC’s, Guthrie's, Tech CXO's, Kostensky's, Su’s and Cascade’s actions, conduct, inactions and omissions set forth above constitute breach of their fiduciary duties of disclosure to plaintiffs as GMC shareholders, convertible note holders and investors.

312. Specifically, these defendants were all fully aware of the facts alleged in this Count, yet failed and/or refused to disclose any of the facts alleged in this

Count to any of the plaintiffs' attention at any time until plaintiffs discovered these facts for themselves, thereby resulting in plaintiffs continuing to invest in GMC and losing their entire investment.

313. Federman's, Johnson's, GMC's, Guthrie's, Tech CXO's Kostensky's, Su's and Cascade's failures and/or refusal to disclose any of the wrongful conduct by defendants outlined herein constitutes a material breach of these defendants' duty of disclosure to plainitffs.

314. As a result, plaintiffs have been and will continue to be damaged.

**<u>COUNT IV</u>**

**(Conspiracy to Commit Breach of Fiduciary Duty as to Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC)**

315. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 13, 18, 19, 21, 22, 23, Paragraph 47 through Paragraph 296 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

316. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su and Cascade were at all times of plaintiffs' investment corporate officers and/or directors of GMC charged with specific duties to plainiffs, including a duty of loyalty, care and disclosure.

317. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC knowingly engaged in/enterd into an agreement amongst all of themselves

and with one another for a common objective, and undertook actions in furtherance of the objective with full knowledge, to ignore and abandon their fiduciary duties of care, loyalty and disclosure to plaintiffs as corporate officers, representatives and/or directors of GMC.

318. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC engaged in an agreement amongst two or more of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to ignore and abandon their fiduciary duties of care, loyalty and disclosure to plaintiffs as corporate officers, representatives and/or directors of GMC.

319. These defendants' common objective was to utilize plainitffs' investment proceeds and/or continued investment proceeds to finance and enhance these defendants' personal unrelated businesses and personal financial benefit respectively, while these defendants were contemporanelusly providing absoluley no services, benefit, expertise or products of value to GMC or plaintiffs since these defendants knew at all times that GMC was a fictitious enterprise with no legitimainte business or OTT service of any kind.

320. Federman's, Johnson's, Guthrie's, Tech CXO's, Kostensky's, Su's, Cascade's and GMC's agreement amongst and between them all to abandon their fiduciary duties proximately caused plaintiffs to lose their entire investment in the

fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

321. As a result, plaintiffs have been and will continue to be damaged.

## COUNT V

### (Aiding and Abetting Breach of Fiduciary Duty as to Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC)

322. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 13, 18, 19, 21, 22, 23, Paragraph 47 through Paragraph 296, Paragraph 317 to Paragraph 319, Paragraph 296 to Paragraph 314, and Paragraph 316 to Paragraph 320 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

323. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su and Cascade were at all times of plaintiffs' investment corporate officers and/or directors of GMC charged with specific duties to plainiffs, including a duty of loyalty, care and disclosure.

324. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC were fully aware of the existence of one another's breaches of fiduciary duty at all times described in this Complaint, and fully aware of the agreement between and among all of them to ignore and abandon their fiduciary duties of care, loyalty and disclosure to plaintiffs.

325. Federman, Johnson, Guthrie, Tech CXO, Kostensky, Su, Cascade and GMC substantially assisted one another in the commission of one another's breaches of fiduciary duty of care, loyalty and disclosure as outlined in the fact alleged in this Count.

326. Federman's, Johnson's, Guthrie's, Tech CXO's, Kostensky's, Su’s, Cascade’s and GMC's aiding and abetting of one another’s breaches of fiduciary duties proximately caused plaintiffs to lose their entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

327. As a result, plaintiffs have been and will continue to be damaged.

**COUNT VI**

**(Conversion & Civil Theft of Plaintiffs' Investment Monies by Federman, Johnson, Kostensky, Su and Cascade)**

328. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 18, 19, 21, Paragraph 47 through Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, and Paragraph 282 through 290 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

329. Federman, Johnson, Kostensky, Su and Cascade each exercised unlawful/wrongful control and dominion over plaintiffs’ investment proceeds, and illegally used/received plaintiffs’ proceeds for defendants’ own personal purposes,

uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

330. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Federman took plaintiffs funds intended for the GMC/VIDGO business and diverted them to himself for his own personal use, personal lifestyle and for the financing of Federman's unrelated business interests without. Federman provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

331. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Johnson took plaintiffs funds intended for the GMC/VIDGO business and diverted them to himself for his own personal use, personal lifestyle and for the financing of Johnson's unrelated business interests. Johnson provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

332. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Kostensky took plaintiffs funds intended for the GMC/VIDGO business and diverted them to himself for his own personal use, personal lifestyle and for the financing of Kostensky's unrelated business interests. Kostensky provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

333. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Su took plaintiffs funds intended for the GMC/VIDGO business and diverted them to himself for his own personal use, personal lifestyle and for the financing of Su's unrelated business interests. Su provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

334. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Cascade took plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for his own personal use, and for the financing of Cascade's unrelated business interests. Cascade provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

335. As a result, plaintiffs have been and will continue to be damaged.

## COUNT VII

**(Conspiracy to Commit Conversion & Civil Theft of Plaintiffs' Investment Monies by Federman, Johnson, Kostensky, Su and Cascade)**

336. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 18, 19, 21, Paragraph 47 through Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 through 290, and Paragraphs 329 through Paragraph 335 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

337. Federman, Johnson, Kostensky, Su and Cascade engaged in an agreement amongst all of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and to illegally use/receive plaintiffs' proceeds for defendants' own personal and business purposes, uses and benefits unrelated to GMC or the VIDGO business facade to the detriment of plaintiffs.

338. Federman, Johnson, Kostensky, Su and Cascade engaged in an agreement among two or more of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally use/receive plaintiffs' proceeds for defendants' own personal and business purposes, uses and benefits unrelated to GMC or the VIDGO business façade to the detriment of plaintiffs.

339. As a result, plaintiffs have been and will continue to be damaged.

## COUNT VIII

**(Aiding & Abetting Conversion & Civil Theft of Plaintiffs' Investment Monies by Federman, Johnson, Kostensky, Su and Cascade)**

340. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 18, 19, 21, Paragraph 47 through Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to

Paragraph 278, Paragraph 282 through 290, Paragraph 329 through Paragraph 335, and Paragraph 338 to Paragraph 339 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

341. Federman, Johnson, Guthrie, Su and Cascade were fully aware of the existence of one another's conversion of plaintiffs' funds at all times described in this Complaint.

342. Federman, Johnson, Guthrie, Su and Cascade substantially assisted one another in the commission of each others' conversion of plaintiffs' funds.

343. Federman's, Johnson's, Kostensky's, Su's, Cascade's aiding and abetting of one another's conversion so as to divert plainitffs' investment proceeds to these defendants behind the GMC/VIDGO façade proximately caused plaintiffs to lose their entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

344. As a result, plaintiffs have been and will continue to be damaged.

**COUNT IX**

**(Conversion & Civil Theft of Plaintiffs' Investment Monies by Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC)**

345. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, 15, 16, 17, 20, 39, 40, 44, 45, 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph

277 to Paragraph 278, and Paragraph 282 to Paragraph 287 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

346. Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC each individually exercised unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used/received plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

347. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Johnson took/received plaintiffs funds intended for the GMC/VIDGO business and diverted them to himself for his own personal use, personal lifestyle and for the financing of Johnson's unrelated business interests. Johnson provided nothing of value to GMC/VIDGO or plainitffs for his diversion and theft of those funds.

348. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Poole took/received plaintiffs funds intended for the GMC/VIDGO business and diverted them to herself for his own personal use, personal lifestyle and for the financing of her husband's unrelated business interests. Poole provided

nothing of value to GMC/VIDGO or plainitffs for her diversion and theft of those funds.

349. Specifically, Poole purported to serve as the bookkeepr for GMC, yet provided/performed absolutely no bookkeeping functions for GMC. Nevertheless, she knowingly took and received plaintiffs funds through Johnson and GMC for no reason or basis whatsoever.

350. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Winsonic Holdings (through Johnson) took/received plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Winsonic Holdings provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

351. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, WDMG took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. WDMG provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

352. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, WDCSN took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use,

and for the financing of its unrelated business interests. WDCSN provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

353. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, 1094 Digital took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. 1094 Digital provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

354. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, 2496 Digital took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. 2496 Digital provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

355. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Ashcraft took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to herself for her own personal use, personal lifestyle and for the financing of her personal lifestyle, personal finances and unrelated business interests. Ashcraft provided nothing of value to GMC/VIDGO or plainitffs for her diversion and theft of those funds.

356. Specifically, Ashcraft purported to serve as the accountant and bookkeepr for GMC, yet provided/performed absolutely no accounting or bookkeeping functions for GMC. Nevertheless, Ashcraft knowingly received plaintiffs funds through Johnson and GMC for no reason or basis whatsoever.

357. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, BC LLC took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use and unrelated business interests. BC LLC provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

358. Specifically, BC LLC purported to serve as the accountant and bookkeepr for GMC, yet provided/performed absolutely no accounting or bookkeeping functions for GMC. Nevertheless, it knowingly received plaintiffs funds through Johnson and GMC for no reason or basis whatsoever.

359. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, AOA LLC took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use and unrelated business interests. AOA LLC provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

360. Specifically, AOA LLC purported to serve as the accountant and bookkeepr for GMC, yet provided/performed absolutely no accounting or

bookkeeping functions for GMC. Nevertheless, it knowingly received plaintiffs funds through Johnson and GMC for no reason or basis whatsoever.

361. As a result, plaintiffs have been and will continue to be damaged.

**COUNT X**

**(Conspiracy to Commit Conversion & Civil Theft of Plaintiffs' Investment Monies by Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC)**

362. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, 15, 16, 17, 20, 39, 40, 44, 45, 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 to Paragraph 287, and Paragraph 346 to Paragraph 360 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

363. Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC all engaged in an agreement amongst all of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

364. Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC all engaged in an agreement among two or more of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

365. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XI

### (Aiding and Abetting Conversion & Civil Theft of Plaintiffs' Investment Monies by Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC)

366. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, 15, 16, 17, 20, 39, 40, 44, 45, 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 to Paragraph 287, Paragraph 346 to Paragraph 360, and Paragraph 363 to Paragraph 364 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

367. Johnson, Poole, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC were fully aware of the existence of

one another's conversion of plaintiffs' funds at all times described in this Complaint.

368. Johnson, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC substantially assisted one another in the commission of each others' conversion of plaintiffs' funds.

369. Specifically, Johnson and Ashcraft, on behalf of these defendants as principals, investors, officers and/or directors of these specific defendant companies, arranged and coordinated the diversion of plainitffs' investment proceeds through GMC to Johnson, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC.

370. In turn, Johnson, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC knowingy and actively facilitated and accepted receipt and used those proceeds in a manner totally unrelated to any business of GMC or VIDGO, while knowingly providing/performing absolutely no services or products of any kind for GMC or plainitffs.

371. Rather, Johnson, Winsonic Holdings, WDMG, WDCSN, 1094 Digital, 2496 Digital, Ashcraft, BC LLC & AOA LLC received plainitffs' monies for services and products that these defendants provided to unrelated third-parites and/or the defenants entities owned by Johnson that are named in this lawsuit,

and/or used these investment proceeds for these defendants' personal lifestyles and expenditures.

372. Johnson's, Winsonic Holdings, WDMG's, WDCSN's, 1094 Digital's, 2496 Digital's, Ashcraft's, BC LLC's & AOA LLC's aiding and abetting of one another's conversion proximately caused plaintiffs to lose their entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

373. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XII

**(Conversion & Civil Theft of Plaintiffs' Investment Monies by Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC)**

374. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraph 12, Paragraph 30 to Paragraph 38, Paragraphs 41, 44, 45 and 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 to Paragraph 287, Paragraph 346 to Paragraph 347, and Paragraph 355 to Paragraph 360 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

375. Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International,

Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC all exercised unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

376. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, 2251 LPI took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. 2251 LPI provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

377. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Doc Movies took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Doc Movies provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

378. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, DMM Expendables took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. DMM

Expendables provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

379. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Maandi International took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Maandi International provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

380. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Maandi MPD took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Maandi MPD provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

381. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Maandi Park took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Maandi Park provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

382. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Maandi Entertainment took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Maandi Entertainment provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

383. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Maandi Media took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Maandi Media provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

384. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, Kimberlyte took/received (through Johnson) plaintiffs funds intended for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. Kimberlyte provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

385. While fully aware of the fictious and non-existnent nature of GMC and VIDGO, SST Swiss took/received (through Johnson) plaintiffs funds intended

for the GMC/VIDGO business and diverted them to itself for its own personal use, and for the financing of its unrelated business interests. SST Swiss provided nothing of value to GMC/VIDGO or plainitffs for its diversion and theft of those funds.

386. Ashcraft, AOA LLC and BC LLC themselves specifically performed accounting and bookkeeping services, as well as corporate officer/executive staffing services, for 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1094 Digital and SST Swiss having nothing to do with GMC or VIDGO, yet knowingly took and received plaintffs' investment proceeds for those unrelated accounting, bookkeeping and/or executive officer staffing services from GMC and plaintiffs through Johnson.

387. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XIII

**(Conspiracy to Commit Conversion/Civil Theft of Plaintiffs' Investment Monies by Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC)**

388. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraph 12, Paragraph 30 to Paragraph 38, Paragraphs 41, 44, 45 and 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 to Paragraph

287, Paragraph 346 to Paragraph 347, Paragraph 355 to Paragraph 360, and Paragraph 375 to Paragraph 386 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

389. Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC engaged in an agreement amongst all of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally use plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

390. Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC engaged in an agreement among two or more of themselves for a common objective, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally use plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

391. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XIV

**(Aiding & Abetting Conversion/Civil Theft of Plaintiffs' Investment Monies by Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, & SST Swiss, Ashcraft, BC LLC, AOA LLC)**

392. Plantiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraph 12, Paragraph 30 to Paragraph 38, Paragraphs 41, 44, 45 and 46, Paragraph 47 to Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 to Paragraph 287, Paragraph 346 to Paragraph 347, Paragraph 355 to Paragraph 360, Paragraph 375 to Paragraph 386, and Paragraph 389 to Paragraph 390 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

393. Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC were fully aware of the existence of one another's conversion of plaintiffs' funds at all times described in this Complaint, and in particulalr since Johnson and/or Ashcraft controlled all of these companies as principals, investors, officers and/or directors of these specific defendant companies.

394. Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International,

Kimberlyte, SST Swiss, Ashcraft, BC LLC and AOA LLC substantially assisted one another in the commission of each others' conversion of plaintiffs' funds by coordinating the diversion and transfer of plaintiffs' investment proceeds through GMC and into their repective accounts and businesses -through Johnson and Ashcraft.

395. These defendants in aiding and abetting of one another's conversion proximately caused plaintiffs to lose plaintiffs' entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

396. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XV

### (Conversion/Civil Theft of Plaintiffs' Investment Monies by RHI and Clippard)

397. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraph 42 to Paragraph 43, Paragraph 47 to Paragraph 225, Paragraph 236(l), Paragraph 249 to Paragraph 250, Paragraph 258 to Paragraph 260, and Paragraph 282 to Paragraph 287 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

398. RHI was engaged by Johnson to provide RHI temporary staffing to Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM

Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss.

399. RHI provided its following temporary staffers (the "RHI Employees") to Johnson to temporarily work for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss:

Alfreda Whitlock – Controller
Ralph Pollifrone – Project Manager
Clifford Martin – Project Manager
Roopali Saxena – Financial Reporting Manager
Daniel Howard – Mobile Device Developer
Tamela Walker – User Experience Designer
Heather Clippard – Scope of Work Unknown

400. According to publicly filed records and RHI's records records though, RHI falsely claims to have temporarily "staffed" these RHI Employees with GMC. Specifically, RHI billing, payroll and invoicing records confirm RHI exclusively billed GMC for temporarily staffing the RHI Employees with Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss during the relevant time period.

401. RHI was paid Johnson using plaintiffs' GMC investment proceeds for providing the RHI Employees to Winsonic Holdings, WDMG, WDCSN, 2251

LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss.

402. The RHI Employees and RHI knew at all times that they were exclusively performing work for these other unrelated defendant companies owned by Johnson to the detriment of plaintiffs, and knew they were performing work having nothing to do with GMC's VIDGO business or OTT internet cable television service/broadcasting.

403. Additionally, neither RHI nor their RHI Employees ever disclosed to plaintiffs, GMC management, GMC corporate counsel and/or the public authorities, etc. that RHI and the RHI Employees were exclusively performing work for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss, despite: (i) billing GMC for this staffing; and (ii) despite being paid with plainitffs' funds diverted through GMC and intended for the VIDGO service.

404. Moreover, the RHI Employees were knowingly utilized by Federman and Johnson to pretend to be GMC employees when plaintiffs and/or plainitffs agents/represenatives visited the GMC Campus in Georgia on various occasions between March 2016 and April 2017 to review and inspect the status, progress and business of the VIDGO service, and held themselves out (along with Federman and

Johnson) during those visits as employees of GMC working on the VIDGO service - when in fact the RHI Employees and RHI were not perfomirng any work for GMC.

405. None of the RHI Employees or RHI ever ever disclosed these fraudulent circumstances to the appropriate parties involved in GMC, or to plaintiffs. Plaintiffs therefore assert counts against RHI for RHI's vicarious liability as to these RHI Employees for conversion, unjust enrichment, fraud, and negligent hiring/supervision/retention, etc.

406. RHI exercised unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used plaintiffs' proceeds for RHI's own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

407. RHI is vicariously liable for its RHI Employees' theft of plaintiffs' funds while performing not work/providing no value of any kind for plaintiffs or GMC.

408. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XVI

### (Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Shaw & Rickshaw)

409. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 24 through Paragraph 25, Paragraph 47 to Pragraph 225, Paragraph

236(d), (e) and (f), and Paragraph 291 to Paragraph 293 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

410. Federman, Shaw and Rickshaw exercised unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally diverted and used plaintiffs' proceeds for these defendants' own personal/business purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

411. Federman, Shaw and Rickshaw provided absolutely no products or services to GMC or plaintiffs, and had no right to any of plainitffs' investment proceeds given Rickshaw's music-based nature of Rickshaw's business having nothing to do with OTT cable television.

412. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XVII

**(Conspiracy to Commit Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Shaw & Rickshaw)**

413. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 24 through Paragraph 25, Paragraph 47 to Pragraph 225, Paragraph 236(d), (e) and (f), Paragraph 291 to Paragraph 293, and Paragraph 410 to Paragraph 411 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

414. Federman, Shaw and Rickshaw engaged/entered into an agreement amongst themselevs for a common objective to convert plaintiffs' investment proceeds in order to advance their/Rickshaw's music production business having nothing to do with GMC's VIDGO business, and undertook actions in furtherance of the objective with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally use plaintiffs' proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

415. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XVIII

**(Aiding & Abetting Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Shaw & Rickshaw)**

416. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 24 through Paragraph 25, Paragraph 47 to Pragraph 225, Paragraph 236(d), (e) and (f), Paragraph 291 to Paragraph 293, Paragraph 410 to Paragraph 411, and Paragraph 414 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

417. Federman, Shaw and Rickshaw were fully aware of the existence of one another's conversion of plaintiffs' funds at all times described in this Complaint.

418. Federman, Shaw and Rickshaw substantially assisted one another in the commission of each others' conversion of plaintiffs' funds by Federman diverting plainitffs' investment proceeds to Rickshaw with Shaw's and Rickshaw's knowledge, assistance and acquiescene, and then using those converted funds to advance Rickshaw's business and to pay Rickshaw's business expenses.

419. Federman, Shaw and Rickshaw in aiding and abetting of one another's conversion proximately caused plaintiffs to lose plaintiffs' entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

420. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XIX

### (Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Arthur & Megatone)

421. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 26 through Paragraph 27, Paragraph 47 to Pragraph 225, Paragraph 236(d), (e) and (f), and Paragraph 294 to Paragraph 296 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

422. Federman, Arthur and Megatone exercised unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally used plaintiffs'

proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

423. Federman, Arthur and Megatone provided absolutely no products or services to GMC or plaintiffs, and had no right to any of plainitffs' investment proceeds given Megatone's music-based nature of Megatone's business having nothing to do with OTT cable television.

424. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XX

**(Conspiracy to Commit Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Arthur & Megatone)**

425. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 26 through Paragraph 27, Paragraph 47 to Paragraph 225, Paragraph 236(d), (e) and (f), Paragraph 294 to Paragraph 296 and Paragraph 422 to Paragraph 423 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

426. Federman, Arthur and Megatone engaged/entered into an agreement among themselves for a common objective to convert plaintiff's funds, and undertook actions in furtherance of the objective in order to advance their/Megatone's music production business having nothing to do with GMC's VIDGO business, with full knowledge, to exercise unlawful/wrongful control and dominion over plaintiffs' investment proceeds, and illegally use plaintiffs'

proceeds for defendants' own personal purposes, uses and benefits unrelated to GMC or the VIDGO business to the detriment of plaintiffs.

427. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXI**

**(Aiding & Abetting Conversion/Civil Theft of Plaintiffs' Investment Monies by Federman, Arthur & Megatone)**

428. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 26 through Paragraph 27, Paragraph 47 to Paragraph 225, Paragraph 236(d), (e) and (f), Paragraph 294 to Paragraph 296, Paragraph 422 to Paragraph 423, and Paragraph 426 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

429. Federman, Arthur and Megatone were fully aware of the existence of one another's conversion of plaintiffs' funds at all times described in this Complaint.

430. Federman, Arthur and Megatone substantially assisted one another in the commission of each others' conversion of plaintiffs' funds by Federman diverting plaintiffs' investment proceeds to Megatone with Arthur's and Megatone's knowledge, assistance and acquiescene, and then using those converted funds to advance Megatone's business and to pay Megatone's business expenses.

431. Federman, Arthur and Megatone in aiding and abetting of one another's conversion proximately caused plaintiffs to lose plaintiffs' entire investment in the fictional GMC and VIDGO enterprise, and these losses were reasonably foreseeable to these defendants.

432. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXII

### (Conversion/Civil Theft of Plaintiffs' Investment Monies by Thurman & KTC)

433. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 11, 12, 18, 19, 21, Paragraph 47 through Paragraph 225, Paragraph 236, Paragraph 244 through Paragraph 266, Paragraph 275, Paragraph 277 to Paragraph 278, Paragraph 282 through 290, and Paragraph 267 to Paragraph 281 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

434. KTC and/or Thurman provided absolutely no products, benefits, assistance or services of any kind to GMC or plaintiffs to entitle or justify KTC's and/or Thurman's receipt of any of plaintiffs' funds through GMC.

435. Rather, KTC and/or Thurman only provided unrelated services for the deceptive "betas" that were used to induce plaintiffs to invest into GMC, and to continue investing into GMC.

436. Any and all services and products provided by KTC and/or Thurman were for the benefit of Johnson's, Winsonic Holdings', WDMG's, WDCSN's IPTV and KTC's network business endeavor, and KTC's/Thurman's joint ventures with those defendants to construct a new expanded and updated IPTV system and network.

437. Nevertheless, KTC and Thurman received, diverted and used plaintiffs' funds through Johnson and GMC through her collaboration with Johnson, Winsonic Holdings, WDMG, WDCSN to themselves without any justification or legal right, to the detriment of plaintiffs.

438. As a result, plainitffs have been and will continue to be damaged.

## COUNT XXIII

**(Breach of Common Stock Purchase Agreements as to GMC and Federman)**

439. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 13, Pargraph 47 to Paragraph 225, Paragraph 233 to Paragraph 237, Paragraph 240, Paragraph 244 to Paragraph 266, and Paragraph 267 to Paragraph 290 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

440. GMC and Federman materially breached the Common Stock Purchase Agreements by never delivering plaintiffs' stock certificates for plaintiffs' common stock interests in GMC.

441. GMC and Federman materially breached the Common Stock Purchase Agreements by selling a fictitious enterprise interests to plaintiffs possessing no value since none of the material misrepresentations Federman and GMC made to plaintiffs about GMC and its alleged VIDGO live linear OTT service were true, since GMC and VIDGO were a totally fabricated fiction and since GMC had no viable business or business plan of any kind.

442. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXIV

**(Breach of Gotham Media Corporation Subscription Agreements for Convertible Notes as to GMC and Federman)**

443. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 13, Pargraph 47 to Paragraph 225, Paragraph 233 to Paragraph 237, Paragraph 240, Paragraph 244 to Paragraph 266, and Paragraph 267 to Paragraph 290 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

444. GMC and Federman materially breached the GMC Subscription Agreements regarding plaintiffs' convertible note interests in GMC by failing and/or refusing to pay any principal and interest due on those convertible notes, and by defaulting on the payment terms for those convertilble notes.

445. GMC and Federman materially breached the GMC Subscription Agreements regarding plaintiffs' convertible note interests in GMC by selling a

fictitious enterprise interests to plaintiffs possessing no value since none of the material misrepresentations Federman and GMC made to plaintiffs about GMC and its alleged VIDGO live linear OTT service.

446. GMC and Federman materially breached the Gotham Media Corporation Subscription Agreements regarding plaintiffs' convertible note interests in GMC by selling a fictitious enterprise interests/provising security to plaintiffs possessing no value since none of the material misrepresentations Federman and GMC made to plaintiffs about GMC and its alleged VIDGO live linear OTT service were true, since GMC and VIDGO were a totally fabricated fiction and since GMC had no viable business or business plan of any kind.

447. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXV**

**(Violation of 1934 Securities Exchange Act § 10(b) as to GMC, Federman, Kostensky, Johnson, Su, Cascade, Thurman & KTC, Guthrie/Tech CXO, Ashcraft, AOA LLC and BC LLC)**

448. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19, 21, 22, 23, 28 and 29, and Paragraph 59 to Paragraph 290 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

449. Plaintiffs' purchase of common stock and/or convertible notes from GMC between December 2015 through August 2017 constitutes the purchase or sale of securities as defined under the 1934 Securities Exchange Act.

450. In late 2015 and early 2016, GMC, Federman, Johnson and Kostensky each made intentionally false statements directly to plaintiffs over the telephone and in person claiming that GMC had OTT content and licensing rights for many of the most popular "cable channel broadcasters" such as TNT, TBS, Discovery, AMC, ESPN, Fox News, CNN, CNBC, A&E, USA, etc.

451. In late 2015 and early 2016, GMC, Federman, Kostensky and Johnson each made intentionally false statements directly to plaintiffs over the telephone and in person that GMC had secured and executed agreements, and implemented network and technology based solutions, capable of broadcasting all traditional

"local" channels and the Public Broadcasting Network ("PBS") throughout all United States local markets.

452. In late 2015/early 2016, GMC, Federman, Kostensky and Johnson each made intentionally false statements directly to plaintiffs directly over the telephone and in person that GMC's purported content and broadcasting capabilities were the result of "Gotham's" business strategy, technology and specifically developed network, programming and network partnerships, computer encoding software programs created by Federman, the location of the "Gotham" networks integration into the most critical national network highway locations, classification of its network, existing contractual partnerships with third-party vendors, agreements with broadcast networks/studios and secured regulatory approvals and licensing.

453. In late 2015/early 2016, GMC, Federman, Kostensky and Johnson each directly made intentionally false statements directly to plaintiffs over the telephone and in person that GMC's would soon be introducing an OTT live linear television service that would include local channels, sports entertainment channels, video-on-demand and premium cable channels and the ability for consumers to "build [their] own programming packages."

454. In early January 2016, GMC, Federman, Johnson and Kostensky directly disseminated knowingly and intentionally false statements to the public,

the media, the television broadcast industry and directly to plaintiffs both orally, on the telephone and in writing that the VIDGO service would: (i) contain all local channels such as CBS, ABC, NBC, Fox and PBS in all local U.S. markets; (ii) contain content from Disney/ABC, Discovery, ESPN and NFL Network; (iii) that the service packages would allow for multiple simultaneous device streams to a subscriber's various OTT devices; (iv) have a cloud DVR; and (v) be available on OTT-type platforms such as Roku, Amazon Fire TV, Apple TV, PCs, Apple iOS and Android devices.

455. In early January 2016, GMC, Federman, Johnson and Kostensky further made intentionally false statements directly to plaintiffs orally, on the telephone and in writing that GMC would: (i) be launching this OTT pay television service in the first half of 2016; (ii) would not require annual contracts from subscribers; (iii) would be contract-free and self-installable; (iv) would be initially available in fifteen (15) total U.S. markets; and (v) that the service would be nationwide by the end of the year.

456. In early January 2016, GMC, Federman, Johnson and Kostensky made intentionaly false statements directly to plaintiffs on the telephone, in person and in writing by publication that the "VIDGO," that the service was in "beta testing," and that VIDGO would offer the most live OTT linear broadcasting content compared to any other OTT service.

457. GMC, Federman, Johnson and Kostensky issued the early January 2016 Business Wire press release that they forwarded to plaintiffs containing intentionally false statements that: (i) VIDGO was created by industry experts; (ii) there were no fees for equipment, no credit check and no contracts; (iii) all consumers could qualify for service; (iv) VIDGO contained live streaming services with live television and VOD; (v) VIDGO was the "lowest cost solution among competitors while delivering the most expansive catalog of live linear television and VOD to all devices and connected televisions"; (vi) that its programming included live linear premium, sports, movies, music, local and international content; and (vii) that VIDGO would launch in 15 markets in the US in the first half of 2016, with full coverage throughout the U.S. by Q4 2016.

458. Each of these statements above made by Federman, Kostensky and Johnson to plaintiffs were intentionally and knowingly false, and were designed to induce plaintiffs to invest into GMC so that Federman, Johnson and Kostensky could steal plainitffs' funds using the VIDGO scheme and artifice.

459. The above intentionally false statements were materially false and made directly and indirectly towards plaintiffs by mail, email, telephone and digital interstate press release dissemination by Federman, Johnson and Kostensky to induce plaintiffs to invest in GMC.

460. These statements were materially false because GMC did not even remotely have any of the digitial rights, content rights, licensing rights, broadcast rights, network capabilities, contractual rights, minimum monetary guaranty deposits, security requirements, technology, partnerships, personel, expertise, requisite OTT streamling software and/or hardware necessary to to stream, disseminate or broadcast any live premium OTT content.

461. Plaintiffs reasonably and materially relied upon the above intentionaly false statements by Federman, Johnson, Kostensky and GMC because the content and capabilities advertised were all critical and necessary to: (i) establish and launch an OTT internet cable service; (ii) compete with traditional cable systems (iii) attract a significant cable viewing subscriber base comprised of a broad spectrum of the cable viewership in the country; and (iv) to generate revenue for any new OTT live linear interest cable company.

462. In late 2015/January 2016, and with specific intent to fraudulently induce plaintiffs to "invest" in the VIDGO fiction, Federman, Johnson, Su, Cascade, Thurman and KTC illegally utilized IPTV temporary software licenses from Minerva Networks and/or Vubiquity to illegally transmit premium channel content interstate in IPTV form to plaintiffs' OTT type devices, such as plaintiffs' cell phones.

463. Using those "trial keys only authorized and licensed for transmitting IPTV cable programming content, Federman, Johnson, Su, Cascade, Thurman and KTC used their digital and technological expertise/knowhow to orchestrate and coordinate this deceptive and illegal broadcasting of IPTV signals interstate directly to plaintiffs mobile devices/phones/tablets containing locals channels and the most popular cable channels.

464. Federman, Johnson and Kostensky directly stated to plaintiffs over the telephone at this late 2015/early 2016 timeframe that GMC's illegal transmission of IPTV cable and local programming to plaintiffs' cell phones was legitimate licensed OTT service demonstrating the VIDGO service.

465. Federman, Johnson, Su and Cascade also contemporaneously utilized Comcast Cable service that they personally received through "set top boxes," coupled with their technological knowhow, to illegally re-transmitting that cable programming signal interstate to plaintiffs' cell phones and tablets, while directly and falsely stating to plaintiff on the phone with intent that GMC was broadcasting VIDGO.

466. Federman, Johnson, Kostensky, Su, Cascade, Thurman and KTC intentionally enacted and created these deceptive, manipulative and phony betas for plaintiffs' viewership to fraudulently induce plaintiffs to "invest" in GMC by reasonably making plaintiffs believe GMC had the capability, licensing and

content rights to broadcast these highly popular cable channels via OTT transmission to the public.

467. Plaintiffs reasonably relied upon the above intentionaly deceptive and manipulative "betas" to invest in GMC because the "betas" reasonably made it appear to plaintiffs that GMC did in fact have an OTT live linear cable broadcast capability to stream premium cable and local channel content to mobile devices, particularly when coupled with the intentionally false statements by Federman, Johnson, Kostensky and GMC that plaintiffs also reaaonbly relied upon.

468. Plaintiffs reasonably relied upon the above intentionally false statements and decetive "beta" trials to invest their initial round of contributions into GMC in exchange for common shares in GMC at $2.00 per share.

469. In January 2016, Kostensky and Johnson intentionally made false statements to plaintiffs in person and on the telephone that these two defendants allegedly "showcased" the VIDGO service to industry leaders, the industry press, broadcasters and vendors/partners.

470. Kostensky and Johnson also made intentionaly false statement directly to plaintiffs in person and by telephone that the meetings were a "huge success" since there was never a legitimate VIDGO service to demonstrate to anyone.

471. In or about March 2015, Kostensky and Federman intentionally and falsley advised plaintiffs in writing that GMC was “finalizing our programming packages and launch strategies for 2nd quarter [2016].”

472. On March 25, 2016, Federman wrote his intentionally false and misleading "investor update" to plaintiffs falsely claiming that: (i) GMC was making “great progress:; (ii) tha GMC’s programming had been “validated with our preferred aggregator and will be loaded onto the VIDGO platform starting April 1 [2016]”; (iii) GMC was “greenlighted” launch by “the powers-that-be”; (iv) that GMC could “now support Apple TV”; (v) GMC was “in the process of updating a new beta to include the remaining channels and the on screen guide”; and (vi) congratulating plaintiffs for their GMC investment since VIDGO was “the first product to fully take advantage of OTT television and nothing can prevent us from launching now.”

473. Around March 2016, Federman, Johnson, Su, Cascade, Thurman and KTC created another manipulative and decetive “beta” demonstration intended for plaintiffs’ viewing to allegedly demonstrate GMC's “readiness" to “launch" VIDGO.

474. Once again, Johnson, Federman, Su, Cascade, Thurman and KTC illegally manipulated Minerva and/or Vubiquity IPTV temporary licenses to stream

IPTV cable signals and television guide interfaces via interstate transmission to plaintiffs' mobile devices, cell phones, and televisions via Amazon Firesticks.

475. The Amazon Fire Sticks in reality only broadcast IPTV cable programming signals that were non-licensed for OTT use or distribution over GMC's own private network to OTT-type devices. Rather, the Amazon Fire Sticks contained Minerva and/or Vubiquity IPTV live cable programming and local channel streams via "turn keys" that Federman, Johnson, Su, Cascade, Thurman and KTC paid for using plaintiffs' money. This decetive "beta" demonstration actually broadcasted a Minerva and/or Vubiquity IPTV cable channel lineup and user guide over Minerva's/Vubiquity's own network illegally to the Amazon Fire Sticks.

476. When plaintiffs and other investor received and plugged the Amazon Fire Sticks into their television's HDMI ports from Federman, Johnson and Kostensky, they were able to view all of the traditional and most popular cable programming channels, coupled with most local channels described above, and as originally seen in the January 2016 "beta" demonstrations that originally induced plaintiffs' investments into GMC.

477. Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC intentionally created this additional deceptive andf manipulative "beta" for plaintiffs viewing so that plaintiffs would reasonably believe they were watching

licensed and authorized OTT cable channel/local channel transmissions streaming over the VIDGO network to their mobile devices.

478. This Fire Stick "beta" demonstration occurred over interstate lines, and was designed and intended to make plaintiffs and others believe the VIDGO service was a real live linear OTT cable service with an actual dedicated network as Federman, Johnson and Kostensky had directly stated to plaintiffs and other third-parties, and to make plaintiffs believe GMC was an actual and legitimate business when it not.

479. In June 2016, Federman, Kostensky and Johnson again announced, advertised and disseminated to the public, the media, the television broadcast industry and directly to plaintiffs on the telephone and in writing, as well as in person, that the VIDGO service would include the features defendants previously promised as outlined above.

480. These press releases were intentionally false and designed by Federman, Kostensky and Johnson to continue misleading plaintiffs about VIDGO so plaintiffs would continue investing in the GMC scheme.

481. At this juncture in time, GMC, Federman, Johnson, Su, Cascade, Thurman and KTC were fully aware GMC would not ever launch an OTT live cable service, or ever deliver on Federman's March 25, 2016 intentionally false update.

482. Nevertheless, Federman, Johnson, Su, Cascade, Thurman and KTC began working on yet another fraudulent technological artifice and scheme in May/June 2016 to conceal the VIDGO sham, while hoping to induce plaintiffs to invest more into GMC.

483. In April 2016, Johnson, Kostensky and Federman made intentionally false press release to the public, the media, the television broadcast industry and to plaintiffs directly through Business Wire claiming "Gotham Media Corporation and Winsonic Digital Cable Systems Network, Ltd. deployed the new Minerva 10 platform to offer advanced television services, and that the next generation VIDGO TV service would be offered to new subscribers in Atlanta, Los Angeles, and New York City, and all remaining areas later in the year.

484. The press release also contained intentionally false statements by Federman, Johnson and Kostensky that GMC was now "able to offer a full range of premium features including network DVR, Video on Demand, Pay-per-View, Catch-Up TV, Restart TV and an extensive HD channel lineup across a multi-screen platform."

485. Around April/May 2016, Johnson, Federman, Su, Cascade, Thurman and KTC created yet another fraudulent VIDGO "beta" demonstration to continue intentionally deceiving plaintiffs about GMC's purported imminent launch of VIDGO.

486. Johnson, Federman, Su, Cascade, Thurman and KTC again deceptively manipulated Minerva and/or Vubiquity IPTV licenses and accounts to activate IPTV cable television packages for broadcast transmission to plaintiffs' HDMI port devices using additional Amazon Fire Sticks, and mailed those Firesticks to plaintiffs over interstate lines.

487. Plaintiffs viewed the live streaming signals on those Firesticks on their televisons and devices having an HDMI port reasonably believing the Firesticks were broadcasting OTT live premium content.

488. Directly before and after plaintiffs received the Firesticks and viewed them, Federman, Johnson and Kostensky made intentionaly false statement to plaintiffs in person, by email and over the telephone that the transmissions plaintiffs were receiving and watching on their computer devices were live linear OTT cable programming transmissions streaming live over the “VIDGO network.”

489. These “beta” demonstrations were transmitted over interstate lines and again contained all of the leading and most popular cable channel programming typically found in traditional cable lineups such as ESPN, AMC, TNT, TBS, Fox News, NFL Network, Disney, FX, CNN, etc., as well as all local channels (ABC, NBC, CBS and Fox).

490. Johnson's, Federman's, Su’s, Cascade’s, KTC’s and Thurman’s creation of these Minerva/Vubiquity “beta” demonstrations were intentionally held

out by Johnson, Federman, Kostensky and Su over the telephone to plaiintiffs as licensed and authorized live OTT cable programming transmissions by GMC through GMC's capabilities.

491. Kostensky also travelled to New Jersey to meet Craig Clifford and other plaintiffs to demonstrate the VIDGO service on his Apple iPad. While in New Jersey, Kostensky proceeded at a restaurant to demonstrate the VIDGO "beta" demonstration to plaintiffs and a room full of other restaurant employees and patrons in the dining room – while holding out the "beta" demonstration as true OTT live linear cable/local television programming from GMC, when it was an IPTV transmission streaming brilliantly and clearly over interstate lines from the Georgia Campus on his iPad live. Kostensky falsely held out this "beta" demonstration as licensed and authorized OTT "core" cable content streamed by GMC over its "VIDGO network."

492. On or about July 1, 2016 after plaintiffs had tested this latest "beta" demonstration with a user interface (television guide), Federman sent another intentionally false investor update to plaintiffs making the following intentionally false statements: (i) that the final build of the VIDGO network would be completed over the next few weeks; (ii) outlining purported imminent remaiing stages of launching VIDGO; (iii) that GMC was still capitalized but projected to need some additional capital to meet operating requirements a small additional capitalization;

(iv) the next and "final" round of capital raise was dedicated to necessary "programming deposits, some additional hardware, marketing and operations"; and (v) that the next raise would be the final one before launch.

493. None of the "betas" broadcast a single channel of licensed OTT content, and all of the broadcast were intentionally and falsely held out to plaintiffs by GMC, Johnson, Kostensky and Federman as OTT live premium content being broadcast.

494. The above statements made to plaintiffs by GMC, Johnson, Federman or Kostensky above were intentionally false because GMC did not have any of the intellectual property, licensing, contractual requirements, technology, hardware, software, expertise, personnel, minimum guarantee deposits and/or capabilities to broadcase any OTT live cable television content through the internet to mobile devices.

495. Based upon all of the additional foregoing deceptive additional "beta" demonstrations and the additional statements directly made by Federman, Kostensky and Johnson to plaintiffs about the legitimacy of the VIDGO service, and those presented to plaintiffs before their intial purchase of common stock in GMC, plaintiffs reasonably relied upon those intentionally deceptive statements and artifices to purchase additional common stock in GMC at $2.00 per share in and around late July 2016, when VIDGO was a non-existent service.

496. In or around August/September 2016, Federman, Johnson, Su, Cascade, Thurman and KTC created yet another deceptive and manipulative “beta” demonstration for plaintiffs to view comprised of IPTV licenses signals, in order to continuing making plaintiffs reasonably believe VIDGO was a real OTT service about to launch.

497. This time, Federman, Johnson, Su, Cascade, Thurman and KTC re-enacted the identical deceptive “beta” configuration utilized in January 2016 to fraudulently induce plaintiffs' initial investment in GMC.

498. Specifically, Federman, Johnson, Su, Cascade, Thurman and KTC again illegally utilized temporary IPTV software licenses from Minerva Networks and/or Vubiquity and transmitted those "cable signals" over interstate lines to plaintiffs' OTT type devices (cell phones, computer tablets, internet sticks, laptops, etc.).

499. This illegal transmission of IPTV television signal content over interstate lines was again stated to plaintiffs, through telephone and by email, by Federman, Johnson, Su and Kostensky as a demonstration of the VIDGO’s OTT live cable service , and again included the broadcast of the most popular cable channels watched by viewers such as ESPN, AMC, USA Network, Fox News, HGTV, TBS, TNT, Discovery, History Channel, Nickelodeon, FX, CNN, Disney

Channel, Bravo, Telemundo, NFL Network, etc., and all “local” channels such as CBS, NBC, ABC and Fox.

500. The above "beta" VIDGO demonstration was falsely and intentionally held out to plaintiffs by Federman, Johnson and Kostensky as licensed legitimate OTT cable and local programming broadcast over the alleged (but non-existent) "Gotham Network," and was activated via the download of an application, and use of a username and password, by plaintiffs provided to them by Federman, Su and Johnson.

501. This latest illegal IPTV broadcasting over interstate lines as purported legitimate “OTT” signals to plaintiffs, while Federman, Johnson and Kostensky falsely told plaintiffs these signals were OTT content signals transmitted over GMC’s own privately built OTT network utilizing software compression and encoding technology created by Federman, was an intentionally deceptive scheme created by Federman, Johnson, Kostensky, Su, Cascade, KTC, and Thurman to continue reasonably misleading plaintiffs into believing GMC had a real OTT cable service comprised of premium content - when in fact GMC had none - so that plainitffs would continue investing in GMC.

502. In or around November 2016, Federman, Johnson and Kostensky circulated written and graphic marketing materials to plaintiffs captioned “VIDGO Next Gen TV.” The materials intentionally continued making the same

intentionally false claims about the VIDGO service outlined above, despite these defendants knowing the statements were false.

503. The marketing materials also included claimed VIDGO had high-definition streaming of live local broadcast, national content and sports on streaming devices like Roku, Amazon Fire TV, iOS, Android and desktop.

504. The marketing materials also included claimed three (3) packages under $49 per month; (ii) live linear local channels in select initial markets – ABC, CBS, FOX, NBC, PBS; (iii) national content providers - Scripps, Disney-ABC, Discovery; (iv) Sports – ESPN, NFL Network, live local content, MLB Network; (v) video on demand, including first-run title movies; (vi) button-less cloud DVR, which automatically records 30 days of content; (vii) favorites menu bar for quickly accessing your most watched channels; (viii) access to full programming lineup on-the-go or at home via WiFi or 4G connection; and (ix) each package includes multiple simultaneous device streams.

505. The marketing materials falsely claimed that GMC: (i) had 250-plus channels of live for delivery via OTT; (ii) was Apple TV and iOS compatible; (iii) would have capability for five (5) viewers to simultaneously view different programming content under each account; (iv) allowed mobility of device use for subscribers; and (v) had custom package building (a.k.a. "a la carte" or "build your own bundle").

506. The market materials further falsely claimed in a chart comparison of the VIDGO service to the competitive Sling TV, Playstation Vue, Hulu and DirectTV Now OTT services that VIDGO offered more OTT channels, full scale live locals and custom packaging (that the other OTT services allegedly did not).

507. The marketing materials falsely claimed "VIDGO will be the first [OTT] provider to offer live local channels!," and that would possess the following content: (i) ABC, CBS, FOX, NBC & PBS 12 local markets; (ii) Expand 5-10 local markets each month; (iii) expand to 30+ local markets by end of September [2017]. The marketing materials further listed the following twelve (12) markets as the initial twelve markets for VIDGO's launch: New York City, Los Angeles, Chicago, Washington DC/Baltimore, Miami/Ft. Lauderdale/West Palm Beach, Dallas/Ft. Worth, San Francisco/San Jose/Oakland, Houston, Atlanta, Philadelphia, Cleveland and Raleigh/Durham.

508. The marketing materials falsely claimed that VIDGO's OTT delivery service supported "all devices," including Smart TVs, streaming media players, game consoles, set top boxes, Blu-Ray players, smart phones and tablets and PCs/laptops.

509. Every single representation made in these marketing materials was intentionally false, and was made designated for plaintiffs through their creation and dissemination by Federman, Johnson and Kostensky to intentionally mislead

and deceive plaintiffs into continuing to believe VIDGO was a legitimate OTT service so that plaintiffs would continue investing.

510. On November 9, 2016, Federman sent his intentionally false "investor update" to plaintiffs: (i) making phony excuses for the delay of VIDGO's launch; (ii) falsely claiming GMC was officially recognized as a Managed Service Provider Network (MSPN) to allow GMC to market comprehensive channel lineup with "local channels" at a very attractive price in all markets; (iii) that GMC would be "the first to roll out OTT locals in all markets"; (iv) VIDGO was engaging in a brand new technology, delivery and pricing model for OTT being offered to MSPs and telecom carriers only; and (v) that VIDGO had unique competitive advantages to offer customer discounts on wireless and internet services.

511. The November 9, 2016 "investor update" also intentionally and falsely claimed that GMC: (i) had a network that achieved "certification," when GMC had neither a network or certification; (ii) the VIDGO needed additional capital to purchase equipment and middleware when this shortage when it did not; (iii) that additional requirements were made by the content partners to enable VIDGO to deliver programming to consumers; (iv) that final testing of the network ("soaking") would finish in December 2016; (v) that heavy lifting has been done and GMC was now building a redundant network in Atlanta and implementing a billing system; (vi) that GMC had its "programming agreements secured"; (vii)

that GMC was "ready to launch our state of the art OTT engine and Managed Service Provider Network; and (viii) that GMC's team "was working around the clock and being fiscally responsible with capital invested to make sure VIDGO" would successfully launch.

512. Moreover, the November 9, 2016 "investor update" also intentionally and falsely claimed the VIDGO project was "a massive enterprise, with a tremendous amount of legal and technological requirements from the studios," and falsely claimed GMC was one of "only a few players (the carriers) being allowed to enter and remain competitive in this space."

513. The November 9, 2016 "investor update" also intentionally and falsely claimed that GMC had "no choice but to build and roll this out in accordance with our content partners, who are all extremely enthusiastic and supportive of VIDGO."

514. Literaly every single representation Federman made in the above November 9, 2016 "investor update" and the marketing materials was intentional false, and designed to mislead plaintiffs, to induce them into making additional investments into GMC for defendants' theft and personal use.

515. At the time of the November 9, 2016 investor update was made, GMC had absolutely no OTT service or product in development, had no contractual agreements for any OTT content licensing or broadcast rights, was not building out

any OTT network for the VIDGO service, was not testing any OTT network, had no legal rights to broadcast local channels in any manner via OTT stream signal, and had all of plaintiffs' funds being used to advance Federman's, Johnson's and Kostensky's lifestyles and personal expenses, and Federman's and Johnson's unrelated named defendants' business interests.

516. Shortly after the Trump Administration was voted into office in November 2016, Federman, Kostensky and Johnson spoke on the telephone directly with plaintiffs in mid/late-December 2016 to discuss why the VIDGO service had not yet launched.

517. During those phone calls, Johnson, Kostensky and Federman falsely and intentionally told plaintiffs that due to new changes in the Trump Administration's interpretation and enforcement of existing FCC laws and regulations, GMC was required in build out and install additional equipment and technology requirements for its network in order to broadcast the OTT content GMC had secured from the content providers.

518. Every single representations made by Federman, Kostensky and Johnson to plaintiffs on the telephone regarding the "Trump Administration" was intentionally false and designed to mislead plaintiffs and conceal defendants' fraudulent scheme.

519. Contemporaneously, to continue fraudulently raising money from plaintiffs and other investors, GMC, Federman, Johnson and Kostensky offered a convertible note round to existing common shareholders and/or their representatives. In exchange, plaintiffs and other investors would receive an percent (8%) interest and conversion of those notes to common stock by a "conversion date" at $2.00 per share.

520. These convertible note loans would lend money to GMC for the purported purposes of completing GMC's alleged network "build out."

521. Based upon the above intentionally false and misleading statements made by Federman, Kostensky, GMC and Johnson the marketing materials plainitffs reviewed, and all of the previous fraudulent "beta" demonstrations, plaintiffs reasonably relied upon those direct statements, materials and betas in purchasing a portion of the convertible note offering.

522. In or about February 2017, based upon the same intentionally false statements and betas concering the VIDGO service outlined above, plaintiffs purchased additional portions of the convertible note round made available to them.

523. Plaintiffs relied upon the aforementioned intentionally false and deceptive direct statements, betas and materials because those false representations created the perception that VIDGO was a very real and legitimate OTT live linear

cable service imminently launching with the most popular cable programming needed to be a successful endeavor.

524. In late March 2017, Kostensky, Federman and Johnson verbally and in writing advised plaintiffs that GMC had twenty one (21) channels "up and running on the VIDGO network […] the studios are stress testing the network so far we are doing very well."

525. None of these twenty one (21) channels were channels previously represented as included in the VIDGO service, and none were "core" or popular cable channels contained in any of the previous "beta" demonstrations and/or marketing materials.

526. These channels were unfamiliar and/or startup channels not contained in traditional cable service programming packages, and not commonly known to the public.

527. These bogus twenty one (21) channels were "white labeled" by Thurman and KTC to GMC at plaintiffs' expense and cost so Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC could continue duping plaintiffs into believing the VIDGO service was an actual OTT service launching imminently, despite GMC having no such service whatsoever.

528. In or about March 2017, Federman, Kostensky, Johnson, Su, Cascade, Thurman and KTC coordinated yet another fraudulent "beta" demonstration for

these twenty one (21) channels whereby they provided live streaming of these channels to plaintiffs' cell phones, mobile devices and tablets with a user guide. They did so using a username and password for a "VIDGO" application downloaded from a link emailed to plaintiffs and other investors.

529. This final beta was designed and used by these defendants to again fraudulent induce plaintiffs into believing the intentionally false statements that GMC, Federman, Johnson, Kostensky, KTC, Thurman, Su and Cascade had been making to plaintiffs about VIDGO.

530. These twenty one (21) channels were again either IPTV signal channels illegally broadcast to plaintiffs' mobile devices and/or free content never intended or represented at any point in time to be what plaintiffs were investing it and/or what the VIDGO service's programming lineup was to contain.

531. During the final week of April 2017, Kostensky, Johnson and Federman attended the NAB show in Las Vegas while telling plaintiffs over the telephone that these defendants were promoting the fictional VIDGO to "studios and networks," industry leaders, the press, network partners and other third-parties.

532. At this time, GMC had no actual OTT cable service to launch, no content rights, no licensing or broadcast rights, no OTT network, no billing or back-office infrastructure, no minimum deposits to secure OTT content, no user

interface or billing system, none of the local or premium content promised to plaintiffs, and ability to create an OTT live service.

533. Kostensky even claimed in a subsequent email directly to plaintiffs that the event was a "huge success," despite GMC having no actual OTT service to even offer the public.

534. In April 2017, plaintiffs asked to review GMC's financial statements to ascertain the company's financial state of affairs.

535. In April 2017, Federman, Johnson and Kostensky, with the assistance of Ashcraft, BC LLC, AOA LLC and Tech CXO/Guthrie, contemporaneously prepared and organized intentionally false and misleading financial statements (including totally false profit and loss statements and totally false balance sheets for 2016 and 2017) intended for presentation to plaintiffs, in order to reinforce the perception and fictional narrative that GMC had an alleged OTT internet cable service imminently launching, and to again induce plaintiffs' investment.

536. Federman, Johnson and Kostensky specifically directly advised Ashcraft, BC LLC, AOA LLC and Tech CXO/Guthrie that plaintiffs needed to see prepared financial records: (i) evidencing that GMC actually had used plaintiffs investment funds for assets, technology, hardware, software, licenses and products needed to launch and create an OTT television service; (ii) evidencing that GMC had a solid balance sheet showing GMC had millions of dollars in assets over and

above it liabilities; (iii) concealing all of the personal exenditures of Johnson, Federman and their unrelated defendant companies; (iv) concealing all of the personal exenditures of Johnson/Poole and Federman on their personal lifestyles; (v) concealing all diverisons of plainitffs' monies out of GMC for use by the various defendant companies owned and controlled by Federman, Johnson and Ashcraft; and (vi) to convince plaintiffs that GMC was so strong financially after the expenditure of those funds on critical and unique hardware and technology that plaintiffs would invest additional funds into GMC.

537. In response, Ashcraft, AOA LLC, BC LLC and Guthrie/Tech CXO prepared knowingly false and deceptively misleading financial statements for GMC for 2016 and 2017 per the directives of Johnson, Federman and Kostensky.

538. On or about April 27, 2017, Federman, Johnson and Kostensky prepared and forwarded to plaintiffs by email an "Investor Pack" package of information, which contained the knowingly false and misleading GMC financial statements prepared by Ashcraft, AOA LLC, BC LLC and Guthrie/Tech CXO.

539. All of these "Investor Pack" materials were intentionaly designed to continue the VIDGO fiction, and to again fraudulently induce plaintiffs "investments."

540. These April 27, 2017 "Investor Pack" materials were digitized by Federman, Johnson, Kostensky, Ashcraft and Guthrie, and were sent to plaintiffs by way of an April 27, 2017 email from GMC that included:

(a) a knowingly false declaration that an investment group known as the "Spellman Group" (who was a major investor in WDMG, Winsoninc Holdings and/or WDCSN never disclosed to plaintiffs in the update) would be investing $1,200,000 (600,000 shares at $2.00 per share) in that current proposed round;

(b) GMC's purported financial statements for 2016 and 2017 (profit and loss and balance sheets) prepared and maintained by Ashcraft, BC LLC, AOA LLC and Tech CXO/Guthrie falsely stating that GMC had net total assets and liabilities of approximately $8,387,000 as of March 31, 2017, while omitting numerous material entries from these financial statements regarding Federman's, Johnson's and their defendant companies' misappropriation of plaintiffs' funds;

(c) a knowingly false and ficitous GMC cash requirements spreadsheet timeline and analysis through July 28, 2017 prepared by Ashcraft, BC LLC, AOA LLC and Guthrie/Tech CXO for a fictional VIDGO product launch;

(d) a completely and intentionally false and misleading investor update letter from Federman outlined in Paragraph 155 above to plaintiffs making intentionally false statements about GMCs balance sheet and net worth, the status

of the fictional VIDGO service, the viability of the VIDGO service, the purported imminent launch in coming weeks that would put the company into revenue and other intentional falsities about GMC and VIDGO; and

(e) a deceptive video of GMC's server cage allegedly located in Los Angeles at One Wilshire (a.k.a. Coresite) containing alleged equipment purchased with plaintiffs' funds, which was actually leased equimentt that GMC was renting monthly for Winsonic Holdings', WDMG, WDCSN's and KTC's use for an IPTV system;

541. These "Investor Pack" materials and the statements contained in them were all intentionally false and forwarded to plaintiffs on or about April 27, 2017 hoping plainitiffs would reasonably rely on those materials to make investments into GMC.

542. The entire April 27, 2017 Investor Update outlined in Paragrah 155 above was intentionally and knowingly false since GMC never even commenced the research, development, expenditures, business scopes of work, licensing, etc. necessary to even remotely launch an OTT internet cable system.

543. The entire April 27, 2017 Investor Update outlined in Paragrah 155 above was created and disseminated by Federman, Johnson, Kostensky, Tech CXO/Guthrie, AOA LLC, BC LLC and Ashcraft so that plaintiffs would rely upon those intentional misrepresentations to invest additional monies into GMC to

finance Federman's, Thurman’s, Ashcraft’s and Johnson's defendant business ventures, their partnerships and lifestyles, and Kostensky’s position and pay.

544. While the GMC balance sheet as of March 31, 2017 intentionally contained inaccurate, false and misleading information claiming GMC had $8,387,799.20 in total assets and liabilities, GMC was actually insolvent and had liabilities far in excess of any GMC assets due to defendants’ thievery and squandering of funds.

545. The balance sheet contained items booked as “assets” when such purported “assets” were merely operating expenses and/or non-existent assets. It also omitted third-party related transactions involving Federman and Johnson with specific third-party defendant entities and individuals to conceal all of these defendants’ misappropriation of millions in investor funds.

546. The “Investor Pack” also contained a “Channel Lineup” falsely claiming that GMC that secured all the rights and authorizations to broadcast approximately 300 channels of the most popular and watched “core” cable channels via OTT to subscribers’ various devices, including but not limited to critical “core” channels that are the most popular among viewers and necessary to obtain any volume of subscriber base in the cable television marketplace.

547. Plaintiffs reviewed all of the deceptive and manipulative Investors Pack materials.

548. Plaintiffs also has direct telephone discussion with Johnson, Federman and Guthrie in April 2017 to discuss the accuracy, legitimacy and details about Investors Update information provided. During those calls, Johnson, Federman and Guthrie all individually confirmed the purported accuracy of the Investor Pack materials, despite being fully aware the entire Investor Pack as a scheme and artifice intentionally designed to mislead investors.

549. Plainitffs reasonably relied upon the Investor Pack materials and all direct communications with Federman, Johnson, Kostensky and Guthrie into believing VIDGO was still a legitimate OTT service about to launch, and as a result plaintiffs purchased an additional convertible note interest in GMC in reliance upon the intentionally false financial records, phony betas and decetive Investor Update.

550. Had it not been for the intentionally false and materially misleading "beta" demonstrations, defendants' false verbal, telephone and written statements, the intentionally false and misleading materials presented to plaintiffs at various times from 2015 through 2017, the false press releases, false marketing materials, the phony Investors Pack materials, and the intentionally false investor updates, plaintiffs would never have purchased securities in GMC or invested any additional monies into GMC between late 2015 and April 2017, or any monies into GMC to begin with.

551. The defendants referenced in this Count engaged in intentional misrepresentations/omissions and conduct constituting violations of the 1934 Securities Exchange Act § 10(b) & SEC Rule 10b-5, in that these defendants engaged in fraudulent actions and conduct to sell the unregistered GMC common stock and convertible notes to plaintiffs.

552. The Count XXIV defendants violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud plaintiffs; (ii) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or: (iii) engaged in acts practices and a course of business that operated as a fraud or deceit upon plaintiff in connection with the securities of GMC.

553. The Count XXIV defendants further failed and/or refused to file Form-D with the Securities & Exchange Commission ("SEC") regarding the subject securities offered and sold to plaintiffs, and failed and/or refused to file the statutorily required notice with the State of Georgia concerning the securities defendants offered and sold to plaintiffs.

554. The Count XXIV defendants also violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 by using instrumentalities of

interstate commerce such as mail and wire to commit their fraud and deceit upon plaintiffs in connection with these defendants' sale of the unregistered GMC common stock and convertible note securities to plaintiffs.

555. Defendants in this Count engaged in manipulative and deceptive trade practices by employing fraudulent schemes, devices and artifices, while making intentionally false and materially misleading statements to plaintiffs regarding the unregistered securities sold to plaintiffs, and while engaging in a course of conduct and business dealing, to enact a fraud and deceit upon plaintiffs in the sale of the unregistered GMC securities sold to plaintiffs.

556. The above fraudulent actions and materially misleading statements and omissions were intentionally made by these defendants, and plaintiffs reasonably relied upon those material and intentional misrepresentations and omissions in purchasing the unregistered securities.

557. As a result of the complete VIDGO fiction presented to plaintiffs at the above various points in time by Federman, Johnson, Kostensky, Su, Cascade, Thurman, KTC, Tech CXO/Guthrie, AOA LLC, BC LLC and Ashcraft, the value of plaintiffs entire purchase of securities in GMC was lost given the VIDGO fiction.

558. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXVI

**(Violation of SEC Rule 10b-5 as to GMC, Federman, Kostensky, Johnson, Su, Cascade, Thurman & KTC, Guthrie/Tech CXO, Ashcraft,**

**AOA LLC and BC LLC)**

559. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19, 21, 22, 23, 28 and 29, Paragraph 59 to Paragraph 290, and Paragraph 449 to Paragraph 557 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

560. Federman's, Johnson's, Kostensky's, Su's, Cascade's, Thurman's, KTC, Tech CXO's/Guthrie's, AOA LLC's, BC LLC's and Ashcraft's actions, conduct and omissions set forth in this Count constitute a violation of Rule 10b-5 of the regulations implementing and enforcing the 1934 Securites Exchange Act.

561. As a result, plaintiff have been and will continue to be damaged.

## COUNT XXVII

**(Unjust Enrichment as to All Defendants)**

562. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 296, Paragraphs 329, 330, 331, 332, 333, 334, 335, 336, 337, 338, 341, 342, and 343, Paragraph 346 to Paragraph 360, Paragraph 363 to Paragraph 364, Paragraph 367 to Paragraph 372, Paragraph 375 to Paragraph 386, Paragraph 389 to Paragraph 390, Paragraph 393 to Paragraph 395, Paragraph 398 to Paragraph 407, Paragraph 410 to Paragraph 411, and Paragraphs 414, 417, 418, 419, 422, 423, 426, 429 and

431 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

563. All of the defendants' actions, omissions and conduct constitute unjust enrichment for these defendants' benefit at the expense of plaintiffs.

564. Plaintiffs have a claim of unjust enrichment against all defendants since there is no legal contract between defendants and plaintiffs for the funds/benefit/value that plaintiffs conferred upon all defendants.

565. Plaintiffs are entitled to the equitable return of their investment proceeds from defendants and/or compensation for those funds.

566. Defendants offered absolutely no value or benefit whatsoever in exchange for the monies that plaintiffs invested in GMC, that were then misappropriated, diverted, received and/or used by defendants for their various personal uses, businesses and benefit and to plaintiffs' detriment.

567. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXVIII**

**(Negligent Hiring, Supervision & Retention of Employees as to RHI)**

568. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraph 42 to Paragraph 43, Paragraph 47 to Paragraph 225, Paragraph 236(l), Paragraph 249 to Paragraph 250, Paragraph 258 to Paragraph 260, Paragraph 282 to Paragraph 287, and Paragraph 398 to Paragraph 408 into this Count as outlined

above with the same force and effect as if more fully set forth at length in this Count.

569. RHI created a foreseeable risk to plaintiffs and other third-party investors by hiring unqualified, incapable, unsuitable, poorly vetted, untrustworthy and incompetent employees to staff them at GMC for monetary consideration.

570. In particular, the RHI Employees were completely unknowledgeable and unsuitable in the areas of live digital video distribution over the internet, live broadcast television technology, networking of digital live OTT programming content, live linear OTT cable television, content rights, transport rights, licensing and programming, software and other technology required to create, implement and operate live linear OTT cable television systems.

571. RHI knew and/or should have known through ordinary exercise of care that the RHI Employees were completely unsuitable, incapable, incompetent and unqualified to perform any hardware, software and/or technology related tasks and requirements necessary for the establishment and launch of an OTT live linear cable television system distributing traditional cable programming and local channels, and would not/could not perform such functions at GMC.

572. RHI knew and/or should have known through ordinary exercise of care that the RHI Employees were actually exclusively working for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi

MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss, rather than GMC.

573. RHI knew and/or should have known that plaintiffs as investors and lenders to GMC would lose their investment if the RHI Employees were receiving funds from GMC to pay for RHI Employees performing unrelated work for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and/or SST Swiss, rather than GMC

574. RHI made no efforts and failed to take reasonable care to supervise or monitor its RHI Employees engaged in the above referenced wrongful conduct while being paid using plaintiffs' funds. Meanwhile, plaintiffs funds were stolen and used to pay RHI and these RHI employees while the RHI Employees proceeded to only perform work for Winsonic Holdings, WDMG, WDCSN, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and SST Swiss.

575. As a result, RHI is vicariously liable through respondeat superior for the wrongful actions that the RHI Employees engaged in to steal plaintiffs' funds by knowing they were not working for GMC towards launching the VIDGO service, but rather working for other defendant companies unreated to GMC or any OTT business endeavor/project while being paid using plaintiffs' funds.

576. Moreover, pursuant to O.C.G.A. 51-12-5.1(b), plaintiffs are entitled to punitive damages from RHI for RHI's and its RHI Employee's willful misconduct, malice, fraud, conscious indifference and want of care

577. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXIX**

**(Alter-Ego Liability as to Federman, Johnson, Kostensky and GMC)**

578. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraph 21, Paragraph 47 to Paragraph 225, Paragraph 229 to Paragraph 236, Paragraph 244 to Paragraph 296, Paragraph 328 to Paragraph 335, Paragraph 397 to Paragraph 407, Paragraph 433 to Paragraph 437, and Paragraph 464 to Paragraph 467 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

579. Federman, Johnson and Kostensky were all common stock owners and executives of GMC during the time in controversy between late 2016 and August 2017.

580. Federman, Kostensky and Johnson compeletely disregarded the corporate form and veil of GMC by pretending and advertising to plaintiffs and the public that GMC had a legitmate business in the form of the VIDGO service.

581. Meanwhile, Federman, Johnson and Kostensky utilized GMC as a conduit and funnel for the intentional and pre-planned diversion, theft and transfer

of plaintiffs' funds through GMC into these defendants' separate and unrelated defendant businesses and/or for these defendants' personal lifestyle and living expenses.

582. GMC was not set up for payroll, had no employees, assets and/or product or service, possessed no intellectual property or digital content rights, possessed no OTT broadcast or distribution rights, had no viable or legitimate business, never filed state, federal and/or local taxes, never filed with the Georgia Department of Labor, never sold a single product or service and never utilized any of plaintiffs funds to pursue an OTT live linear cable television service.

583. Federman's, Johnson's and Kostensky's actions and omission set forth in this Count demonstrate GMC merely served as an alter ego or conduit of Federman, Kostensky and Johnson to financially benefit them and their defendant companies, and themselves personally.

584. Federman's, Johnson's and Kostensky's disregard of GMC's corporate veil made GMC their mere instrumentality for the transaction of their own personal and unrelated businesses affairs, so that no unity of interest and ownership separated the personalities of the GMC from these defendants, and in a manner where GMC no longer existed.

585. Federman, Johnson and Kostensky used the corporate veil of GMC to defeat justice, perpetuate fraud and/or to evade contractual or tort responsibility to plaintiffs and others.

586. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXX**

**(Alter-Ego Liability as to Johnson, Ashcraft, Thurman, Winsonic Holdings, WDMG & WDMG)**

587. Plaintiffs specifically incorporate Paragraph 4 through 10, Paragraph 12, Paragraphs 15, 16, 17 and 44, Paragraph 47 to Paragraph 225, Paragraph 47 to Paragraph 225, Paragraph 232 to Paragraph 237, Paragraph 244 to Paragraph 290, Paragraph 345 to Paragraph 360, Paragraph 375 to Paragraph 386, Paragraph 433 to Paragraph 437, and Paragraph 464 to Paragraph 467.

588. Johnson, Ashcraft and Thurman are/were both common stock owners and executives of Winsonic Holdings, WDCSN and WDMG during the time in controversy between late 2016 and August 2017.

589. Johnson, Ashcraft and Thurman compeletely disregarded the corporate form and veil of Winsonic, WDCSN and WDMG by pretending and advertising to plaintiffs and the public that these three defendants are a legitmate business in the form of assisting in the building out of the VIDGO service for GMC.

590. Meanwhile, Johnson, Ashcraft and Thurman utilized the access to GMC funds to use Winsonic, WDCSN and WDMG as conduits and funnels for the intentional and pre-planned diversion, theft and transfer of plaintiffs' funds out of GMC and into these three (3) defendant companies for Johnson's, Thurman's and Ashcraft's personal lifestyle, unrealted business and living expenses.

591. The bank accounts for Winsonic Holdigns, WDCSN and WDMG are all one and the same or non-existent, and their funds and plaintiffs' investment proceeds were intermingled by and with Johnson, Thurman and Ashcraft for the financial benefit of Johnson's, Thurman's and Ashcraft's personal lifestyles, living expenses and/or unrelated businesses.

592. Winsonic Holdings, WDMG and WDCSN never sold a single product or service to GMC, never provided any benefit to GMC and never utilized any of plaintiffs funds to pursue an OTT live linear cable television service, were not set up for payroll, had no employees, assets and/or product or service, possessed no intellectual property or digital content rights, possessed no OTT broadcast or distribution rights, had no viable or legitimate business, never filed state, federal and/or local taxes, and never filed with the Georgia Department of Labor, despite diverting plaintffs' investment proceeds out of GMC and into Winsonic Holdings, WDMG and WDCSN for Johnson's, Thurman's and Ashcraft's unrelated use.

593. Winsonic Holdings, WDMG and WDCSN all operated out of GMC's Georgia Campus, yet never paid a single penny of rent or carrying expenses to GMC or plaintiffs.

594. Johnson's, Thurman's and Ashcraft's actions and omission set forth in this Count demonstrate Winsonic Holdings, WDMG and WDCSN merely served as an alter ego or conduit of Johnson, Thurman and Ashcraft to financially benefit them and their defendant companies, and themselves personally.

595. Johnson's, Thurman's and Ashcraft's disregard of Winsonic Holdings', WDCSN's and WDMG's corporate veil made these three (3) companies a mere instrumentality for the transaction of their own personal and unrelated businesses affairs, so that no unity of interest and ownership separated the personalities of Winsonic Holdings, WDCSN and WDMG from Johnson, Thurman or Ashcraft, and in a manner where these three (3) companies no longer separately existed.

596. Johnson, Thurman and Ashcraft used the corporate veils of Winsonic Holdings, WDCSN and WDMG to defeat justice, perpetuate fraud and/or to evade contractual or tort responsibility to plaintiffs and others.

597. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXI**

**(Alter-Ego Liability as to Johnson, 2496 Digital and 1094 Digital)**

598. Plaintiffs specifically incorporate Paragraph 4 through 10, Paragraph 12, Paragraph 39 and 40, Paragraph 47 to Paragraph 225, Paragraph 47 to Paragraph 225, Paragraph 232 to Paragraph 237, Paragraph 244 to Paragraph 290, Paragraph 345 to Paragraph 360, Paragraph 375 to Paragraph 386, Paragraph 433 to Paragraph 437, and Paragraph 464 to Paragraph 467.

599. Johnson is/was the common stock owner and executive of both 1094 Digital and 2496 Digital during the time in controversy between late 2016 and August 2017.

600. Johnson compeletely disregarded the corporate form and veil of 1094 Digital and 2496 Digtial by pretending and advertising to plaintiffs and the public that these two (2) defendants were legitmate business in the form of assisting in the building out of the VIDGO service for GMC.

601. Meanwhile, Johnson utilized his access to GMC funds to use 1094 Digital and 2496 Digital as conduits and funnels for the intentional and pre-planned diversion, theft and transfer of plaintiffs' funds through GMC into these two (2) defendant companies and/or for Johnsons' personal lifestyle and living expenses.

602. The bank accounts for Winsonic Holdings, WDCSN and WDMG are either the same or non-existent, and their funds and plaintiffs' investment proceeds were intermingled by Johnson for the financial benefit of Johnson's personal lifestyles, living expenses and/or unrelated businesses.

603. 1094 Digital and 2496 Digital never sold a single product or service to GMC, and never utilized any of plaintiffs funds to pursue an OTT live linear cable television service, were not set up for payroll, had no employees, assets and/or product or service, possessed no intellectual property or digital content rights, possessed no OTT broadcast or distribution rights, had no viable or legitimate business, and never filed state, federal and/or local taxes, despite diverting plaintffs' investment proceeds out of GMC and into 1094 Digtial and 2496 Digital for Johnson's unrelated use.

604. 1094 Digital and 2496 Digital both operated out of GMC's Georgia Campus, yet never paid a single penny of rent or carrying expenses to GMC or plaintiffs.

605. Johnson's actions and omission set forth in this Count demonstrate 1094 Digital and 2496 Digital merely served as an alter ego or conduit of Johnson to financially benefit them and their defendant companies, and themselves personally.

606. Johnson's disregard of 1094 Digital's and 2496 Digital's corporate veil made them a mere instrumentality for the transaction of their own personal and unrelated businesses affairs, so that no unity of interest and ownership separated the personalities of them from Johnson and in a manner where GMC no longer exists.

607. Johnson used the corporate veil of GMC to defeat justice, perpetuate fraud and/or to evade contractual or tort responsibility to plaintiffs and others.

608. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXII**

**(Alter-Ego Liability as to Federman and GMS)**

609. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 14, Paragraph 47 to Paragraph 225, Paragraph 229 to Paragraph 236, Paragraph 244 to Paragraph 296, Paragraph 328 to Paragraph 335, Paragraph 397 to Paragraph 407, Paragraph 433 to Paragraph 437 and Paragraph 464 to Paragraph 467 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

610. Federman was a common stock owner and executive of GMS during the time in controversy between late 2016 and August 2017.

611. Federman compeletely disregarded the corporate form and veil of GMS by pretending and advertising to plaintiffs and the public that GMS' bank

account was actualy the bank account of GMC, so that plaintiffs would wire their initial investment proceeds into the GMS for Federman's converson rather than GMC.

612. Meanwhile, Federman utilized GMS as a conduit and funnel for the intentional and pre-planned diversion, theft and transfer of plaintiffs' funds through GMS into his unrelated defendant businesses and/or for his personal lifestyle and living expenses.

613. GMS was not set up for payroll, had no employees, assets and/or product or service, possessed no intellectual property or digital content rights, possessed no OTT broadcast or distribution rights, had no viable or legitimate business, never filed state, federal and/or local taxes, never filed with the Georgia Department of Labor and never sold a single product or service to GMC and never utilized any of plaintiffs funds to pursue an OTT live linear cable television service.

614. Federman's actions and omission set forth in this Count demonstrate GMS merely served as an alter ego or conduit of Federman to financially him and his defendant companies, and himself personally.

615. Federman's disregard of GMS's corporate veil, even after plaintiffs' executed the the "ITEA Agreements, made GMS his mere instrumentality for the transaction of his own personal and unrelated businesses affairs, so that no unity of

interest and ownership separated the personalities of the GMS and Federman, and in a manner where GMS no longer existed.

616. Federman used the corporate veil of GMS to defeat justice, perpetuate fraud and/or to evade contractual or tort responsibility to plaintiffs and others.

617. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXIII**

**(Alter-Ego Liability as to Johnson, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, SST Swiss)**

618. Plaintiffs specifically incorporate Paragraph 4 through 10, Paragraph 12, Paragraph 39 and 40, Paragraph 47 to Paragraph 225, Paragraph 47 to Paragraph 225, Paragraph 232 to Paragraph 237, Paragraph 244 to Paragraph 290, Paragraph 345 to Paragraph 360, Paragraph 375 to Paragraph 386, Paragraph 433 to Paragraph 437, and Paragraph 464 to Paragraph 467 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

619. Johnson is/was the membership interest owner, managing member and executive of 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte and SST Swiss (the "Hollywood Defendants") during the time in controversy between late 2016 and August 2017.

620. Johnson compeletely disregarded the corporate form and veil of the Hollywood Defendants by utilizing his access to GMC funds to funnel and divert plaintiffs' investment proceeds into these Hollywood Defendants for Johnson's intentional and pre-planned diversion, theft and transfer of plaintiffs' funds through GMC into these Hollywood Dedendants and their businesses, and/or for Johnsons' personal lifestyle and living expenses.

621. The bank accounts for these Hollywood Defendants are either the same or non-existent, and their funds and plaintiffs' investment proceeds were intermingled by Johnson for the financial benefit of Johnson's personal lifestyles, living expenses and/or unrelated businesses.

622. The Hollywood Defendants never sold a single product or service to GMC, and never utilized any of plaintiffs funds to pursue an OTT live linear cable television service, were not set up for payroll, had no employees, assets and/or product or service, possessed no intellectual property or digital content rights, possessed no OTT broadcast or distribution rights, had no viable or legitimate business, and never filed state, federal and/or local taxes, despite diverting plaintffs' investment proceeds out of GMC and into the Hollywood Defendants for Johnson's unrelated use.

623. Every single Hollywood Defendants all operated out of GMC's Georgia Campus, yet never paid a single penny of rent or carrying expenses to GMC or plaintiffs.

624. Johnson's actions and omission set forth in this Count demonstrate the Hollywood Defendants merely served as an alter ego or conduit of Johnson to financially benefit them and their defendant companies, and Johnson personally.

625. Johnson's disregard of the Hollywood Defendants' corporate veil made them a mere instrumentality for the transaction of their own personal and unrelated businesses affairs, so that no unity of interest and ownership separated the personalities of them from Johnson and in a manner where the Hollywood Defendants no longer existed.

626. Johnson used the corporate veil of the Hollywood Defendants to defeat justice, perpetuate fraud and/or to evade contractual or tort responsibility to plaintiffs and others.

627. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXIV**

**(Violation of Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Federman, Johnson, Su, Cascade, Kostensky and GMC)**

628. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19 and 21, Paragraph 57 to Paragraph 290, Paragraph 329 to

Paragraph 334, Paragraphs 337, 338, 341, 342 and 343, and Paragraphs 578 to Paragraph 585 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

629. Pursuant to O.G.C.A.16-14-4(a), it is "unlawful for any person, through a pattern of racketeering activity or proceeds derived therefrom, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."

630. Under Georgia law O.G.C.A.16-14-3(9)(A)(i)-(xl), a "racketeering activity" is also known as a "predicate act," and is the commission of, the attempt to commit and/or the solicitation and coercion of another to commit "a crime which is chargeable indictment" under one of forty (40) categories of offenses.

631. Pursuant to O.G.C.A.16-14-3(8)(A), a "pattern of racketeering" constitutes at least two "predicate acts" that are inter-related and committed within less than a two (2) year period of time, and that were done "in furtherance of one or more indictments, schemes or transactions."

632. GMC was an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq. and was a fictitious business entity operated and controlled by Federman, Johnson, Su, Cascade, Kostensky to enrich themselves individually and as co-conspirators at the expense of plaintiffs.

633. These defendants acquired, maintained an interest in and/or obtained control in GMC as a result of their "pattern of racketeering."

634. These defendants willfully and knowingly engaged in a pattern of racketeering activity involving an “enterprise” and “association in fact” in the form of GMC.

635. Defendants agreed and conspired by participating, directly or indirectly, in the conduct of the affairs of GMC, through a pattern of racketeering activity, by continuing to represent to plaintiffs that GMC and its VIDGO service were actually a real business, when they were in actuality a fraudulent scheme to defraud plaintiffs.

636. These defendants utilized GMC as a vehicle for diverting and transferring plaintiffs' investment proceeds to their own unrelated defendant companies and individual accounts, thereby stealing plaintiffs' investment proceeds.

637. These defendants' predicate acts constituting a pattern of racketeering including, but were not limited to, forgery, theft of plaintiffs’ funds through various defendant accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs’ stolen property and investment proceeds, re-producing and re-

transmitting copyrighted materials and works without authorization across state lines, securities violations of SEC Rule 10b-5 and the 1934 Securities Act, credit card fraud, computer crimes, mail fraud and wire fraud, transmission of numerous fraudulent OTT "beta" demonstrations over interstate lines violating copyright laws, and their creation, forwarding and transmission over interstate lines by mail and electronic means of intentionally false documents, correspondence and emails, and other predicate acts.

638. The predicate acts committed by Federman, Johnson, Su, Cascade and Kostensky through their control and interest in GMC cited above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3, since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017.

639. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXV

**(Conspiracy to Violate Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Federman, Johnson, Su, Cascade, Kostensky and GMC)**

640. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19 and 21, Paragraph 57 to Paragraph 290, Paragraph 329 to Paragraph 334, Paragraphs 337, 338, 341, 342 and 343, Paragraphs 578 to

Paragraph 585, and Paragraph 629 to 638 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

641. Federman, Johnson, Su, Cascade, Kostensky and GMC all agreed to join the GMC enterprise and all contemporaneously agreed to commit the predicate acts set forth herein to the detriment of plaintiffs.

642. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXVI

**(Violation of Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Federman and GMS)**

643. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 11, Paragraph 14, Paragraph 57 to Paragraph 290, Paragraph 330, Paragraph 343, Paragraph 578 to Paragraph 585, and Paragraph 629 to Paragraph 631 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

644. GMS was an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq. and was a fictitious business entity operated and controlled by Federman to enrich himself individually at plaintiffs' expense.

645. Federman acquired, maintained an interest in and/or obtained control in GMS as a result of his "pattern of racketeering."

646. Federman willfully and knowingly had plaintiffs wire their initial investment proceeds into the GMS account rather than the GMC account more

than twice in late 2015/early 2016 in order to illegally and improperly receive plaintiffs' monies for his personal use, thereby involving GMS in these predicate acts as an "enterprise" and "association in fact."

647. Federman used GMS as a vehicle for diverting and transferring plaintiffs' investment proceeds to himlef by stealing plaintiffs' investment proceeds.

648. These predicate acts constituting a pattern of racketeering, including, theft of plaintiffs' funds through various accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs' stolen property and investment proceeds, mail fraud and wire fraud as to the GMS wiring instructions falsely held out as GMC's account transmitted over interstate lines by mail and electronic means to each plaintiff, and other predicate acts.

649. The predicate acts committed by Federman, above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3 since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017.

650. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXVII

**(Violation of Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Johnson, Winsonic Holdings, WDMG, WDCSN, Thurman, KTC, Ashcraft, BC LLC and AOA LLC)**

651. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, 15, 16, 17, 28, 29, 44, 45 and 46, Paragraph 57 to 225, Paragraph 236, Paragraph 244 through Paragraph 287, Paragraph 346 to Paragraph 353, Paragraph 355 to Paragraph 360, Paragraph 363 to Paragraph 364, Paragraph 367 to Paragraph 372, and Paragraph 629 to Paragraph 631 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

652. Winsonic Holdings is/was an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq. and was a fictitious business entity operated and controlled by Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC to enrich themselves individually and as co-conspirators at the expense of plaintiffs.

653. WDMG is/was an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq. and was a fictitious business entity operated and controlled by Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC to enrich themselves individually and as co-conspirators at the expense of plaintiffs.

654. WDCSN is/was an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq. and was a fictitious business entity operated and controlled by

Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC to enrich themselves individually and as co-conspirators at the expense of plaintiffs.

655. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC acquired, maintained an interest in and/or obtained control in Winsonic Holdings as a result of their "pattern of racketeering."

656. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC willfully and knowingly engaged in a pattern of racketeering activity involving an “enterprise” and “association in fact” in the form of Winsonic Holdings.

657. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC agreed and conspired by participating, directly or indirectly, in the conduct of the affairs of Winsonic Holdings, through a pattern of racketeering activity, by diverting plaintiffs’ investment proceeds into Winsonic Holdings using the decepive VIDGO artifice and scheme when VIDGO was not a real business, but rather a façade to assist these defendants in creating and financing an IPTV network.

658. These defendants utilized Winsonic Holdings as a vehicle for diverting and transferring plaintiffs' investment proceeds to their own unrelated defendant companies and individual accounts, thereby stealing plaintiffs' investment proceeds.

659. These defendants' predicate acts constituting a pattern of racketeering including, but were not limited to, forgery, theft of plaintiffs’ funds through

various defendant accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs' stolen property and investment proceeds, re-producing and re-transmitting copyrighted materials and works without authorization across state lines, securities violations of SEC Rule 10b-5 and the 1934 Securities Act, credit card fraud, computer crimes, mail fraud and wire fraud, transmission of numerous fraudulent OTT "beta" demonstrations over interstate lines violating copyright laws, their creation, forwarding and transmission over interstate lines by mail and electronic means of intentionally false documents, correspondence and emails, and other predicate acts.

660. The predicate acts committed by Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC through their control and interest in Winsonic Holdings cited above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3 since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017.

661. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC acquired, maintained an interest in and/or obtained control in WDMG as a result of their "pattern of racketeering."

662. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC willfully and knowingly engaged in a pattern of racketeering activity involving an "enterprise" and "association in fact" in the form of WDMG.

663. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC agreed and conspired by participating, directly or indirectly, in the conduct of the affairs of WDMG, through a pattern of racketeering activity, by diverting plaintiffs' investment proceeds into WDMG using the decepive VIDGO artifice and scheme when VIDGO was not a real business, but rather a façade to assist these defendants in creating and financing an IPTV network.

664. These defendants utilized WDMG as a vehicle for diverting and transferring plaintiffs' investment proceeds to their own unrelated defendant companies and individual accounts, thereby stealing plaintiffs' investment proceeds.

665. These defendants' predicate acts constituting a pattern of racketeering including, but were not limited to, forgery, theft of plaintiffs' funds through various defendant accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs' stolen property and investment proceeds, re-producing and re-transmitting copyrighted materials and works without authorization across state

lines, securities violations of SEC Rule 10b-5 and the 1934 Securities Act, credit card fraud, computer crimes, mail fraud and wire fraud, transmission of numerous fraudulent OTT "beta" demonstrations over interstate lines violating copyright laws, their creation, forwarding and transmission over interstate lines by mail and electronic means of intentionally false documents, correspondence and emails, and other predicate acts.

666. The predicate acts committed by Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC through their control and interest in WDMG cited above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3 since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017.

667. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC acquired, maintained an interest in and/or obtained control in WDCSN as a result of their "pattern of racketeering."

668. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC willfully and knowingly engaged in a pattern of racketeering activity involving an "enterprise" and "association in fact" in the form of WDCSN.

669. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC agreed and conspired by participating, directly or indirectly, in the conduct of the affairs of WDCSN, through a pattern of racketeering activity, by diverting plaintiffs'

investment proceeds into WDCSN using the decepive VIDGO artifice and scheme when VIDGO was not a real business, but rather a façade to assist these defendants in creating and financing an IPTV network.

670. These defendants utilized WDCSN as a vehicle for diverting and transferring plaintiffs' investment proceeds to their own unrelated defendant companies and individual accounts, thereby stealing plaintiffs' investment proceeds.

671. These defendants' predicate acts constituting a pattern of racketeering including, but were not limited to, forgery, theft of plaintiffs’ funds through various defendant accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs’ stolen property and investment proceeds, re-producing and re-transmitting copyrighted materials and works without authorization across state lines, securities violations of SEC Rule 10b-5 and the 1934 Securities Act, credit card fraud, computer crimes, mail fraud and wire fraud, transmission of numerous fraudulent OTT “beta” demonstrations over interstate lines violating copyright laws, their creation, forwarding and transmission over interstate lines by mail and electronic means of intentionally false documents, correspondence and emails, and other predicate acts.

672. The predicate acts committed by Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC through their control and interest in WDCSN cited above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3 since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017.

673. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXVIII

**(Conspiracy to Violate Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Johnson, Winsonic Holdings, WDMG, WDCSN, Thurman, KTC, Ashcraft, BC LLC and AOA LLC)**

674. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, 15, 16, 17, 28, 29, 44, 45 and 46, Paragraph 57 to 225, Paragraph 236, Paragraph 244 through Paragraph 287, Paragraph 346 to Paragraph 353, Paragraph 355 to Paragraph 360, Paragraph 363 to Paragraph 364, Paragraph 367 to Paragraph 372, Paragraph 629 to Paragraph 631, and Paragraph 652 to Paragraph 672 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

675. Johnson, Thurman, KTC, Ashcraft, BC LLC and AOA LLC all agreed to join the WDCSN, WDMG and Winsonic Holdings enterprises, and all contemporaneoulys agreed to commit the predicate acts on behalf of and with each such entity set forth herein to the detriment of plaintiffs.

676. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXIX

**(Violation of Georgia State Racketeer Influenced & Corrupt Organizations Act ("RICO"), O.G.C.A.16-14-1 et. seq. as to Johnson, 2496 Digital, 1094 Digital, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte & SST Swiss)**

677. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 12, Paragraph 30 to Paragraph 41, Paragraph 57 to 225, Paragraph 236, Paragraph 244 through Paragraph 287, Paragraph 346 to Paragraph 353, Paragraph 355 to Paragraph 360, Paragraph 363 to Paragraph 364, Paragraph 367 to Paragraph 372, Paragraph 375 to Paragraph 386, Paragraph 389 to Paragraph 390, Paragraph 393 to Paragraph 395, and Paragraph 629 to Paragraph 631 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

678. 2496 Digital, 1094 Digital and the Hollywood Defendants are/were an "enterprise" within the meaning of O.G.C.A.16-14-1 et. seq., and are all alter-egos of one another and of Johnson operated and controlled by Johnson to enrich themselves individually at the expense of plaintiffs.

679. Johnson, acquired, maintained an interest in and/or obtained control in 2496 Digital, 1094 Digital and the Hollywood Defendants as a result of their "pattern of racketeering."

680. Johnson willfully and knowingly engaged in a pattern of racketeering activity involving an “enterprise” and “association in fact” in the form of 2496 Digital, 1094 Digital and the Hollywood Defendants.

681. Johnson participated, directly or indirectly, in the conduct of the affairs of 2496 Digital, 1094 Digital and the Hollywood Defendants, through a pattern of racketeering activity, by diverting plaintiffs’ investment proceeds into 2496 Digital, 1094 Digital and the Hollywood Defendants using the decepive VIDGO artifice and scheme, when VIDGO was not a real business, but rather a façade to assist these defendants in creating and financing Hollywood and media entertainment businesses Johnson ran through 2496 Digital, 1094 Digital and the Hollywood Defendants.

682. Johnson utilized these defendant entities as a vehicle for diverting and transferring plaintiffs' investment proceeds to these unrelated defendant companies and individual accounts, thereby stealing plaintiffs' investment proceeds.

683. These defendants' predicate acts constituting a pattern of racketeering including, but were not limited to, forgery, theft of plaintiffs’ funds through various defendant accounts, money laundering of plaintiffs funds through the various defendant business entities, financial institution fraud, engaging in monetary actions with property derived from unlawful activities, receiving plaintiffs’ stolen property and investment proceeds, re-producing and re-

transmitting copyrighted materials and works without authorization across state lines, securities violations of SEC Rule 10b-5 and the 1934 Securities Act, credit card fraud, computer crimes, mail fraud and wire fraud, transmission of numerous fraudulent OTT "beta" demonstrations over interstate lines violating copyright laws, their creation, forwarding and transmission over interstate lines by mail and electronic means of intentionally false documents, and improper payments of plaintiffs' stolen funds, correspondence and emails, and other predicate acts.

684. The predicate acts committed by Johnson through his control and interest in 1094 Digital, 2496 Digital and the Hollywood Defendants cited above constitute "racketeering activity" as defined by O.G.C.A.16-14-3, as well as a "pattern of racketeering" as defined by O.G.C.A.16-14-3 since these predicate acts constituted more than two (2) acts between January 1, 2016 and August 1, 2017 as to each Hollywood Defendant, as to 2496 Digtial distinctly and as to 1094 Digital distinctly.

685. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXX**

**(Negligence as to Ashcraft, AOA LLC and BL LLC)**

686. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 44, 45, 46, Paragraph 141 through Paragraph 225, Paragraph 236(m), Paragraph 236(n) and Paragraph 244 through Paragraph 253 into this Count as

outlined above with the same force and effect as if more fully set forth at length in this Count

687. Ashcraft is a certified public account licensed under Georgia law practicing accounting through BC LLC and AOA LLC.

688. Leading up to the April 27, 2017 Investor Pack containing GMC's purported financial statements through March 31, 2017, plaintiff and other third-party investors demanded review of GMC's balance sheet and profit and loss statements to determine whether plaintiffs/other investors would make any additional investment into GMC.

689. In response and in order to induce plaintiffs and other investors to make such additional investments, Federman, Johnson and Kostensky directed Ashcraft (through her BC LLC and AOA LLC firms) to prepare a balance sheet and profit and loss statement for GMC through March 2017 in order to present it to plaintiffs so as to encourage plaintiffs for their review, to make further investments into GMC.

690. Ashcraft, AOA LLC and BC LLC then prepared a very inaccurate balance sheet and profit and loss statement for GMC through March 31, 2017 for presentation to plaintiffs' to encourage additional investment from them into GMC. These defendants did so fully aware plaintiffs would rely upon those highly

inaccurate financial statements to determine whether to make any additional investments into GMC.

691. The balance sheet and profit and loss statements prepared by these defendants were intentionally and completely inaccurate, and did not even remotely reflect the true financial picture and condition of GMC. They also failed to disclose the fraud and theft that Federman, Johnson and Kostensky had engaged in as outlined in this Count, and did not comport with the GMC general ledger.

692. In particular, then GMC balance sheet through March 31, 2017 stated that GMC's net asset value was $8,387,799.20. In reality though, the company was insolvent and owed money to third-party vendors, suppliers, etc.

693. The financial statements these defendants created were intentionally designed to make plaintiffs rely upon the positive net asset value of GMC and positive financial position, and act upon such reliance, which plaintiffs did in investing additional funds into the GMC fiction and non-existing VIDGO service.

694. These defendants' preparation and dissemination of such inaccurate and misleading financial statements created the reasonably foreseeable risk that plaintiffs and other third-parties would reply upon these financial statements to their detriment in investing in GMC, and these defendants failed to take reasonable care to ensure that these financial statements did not contain such inaccurate and misleading financial statements.

695. Ashcraft and her defendant companies in particular had a pecuniary interest in WDMG, WDCSN and Winsonic, and was their accountant. She therefore should never have prepared and supplied such financial statements to plaintiffs since she was fully aware plaintiffs' funds were being improperly utilized to fund companies she had an ownership and financial interest. Ashcroft also serves/served as the CFO, Vice-President of Finance and Financial Controller for Winsonic Holdings, WDMG, 2251 LPI, Doc Movies, DMM Expendables, Maandi MPD, Maandi Entertainment, Maandi Media, Maandi Park, Maandi International, Kimberlyte, 2496 Digital, 1096 Digital and SST Swiss, and to protect those financial interests prepared and forwarded the misleading and inaccurate financial records to plaintiffs to review.

696. Due to these defendants' negligence and failure to take reasonable care, plaintiffs relied upon the GMC financial statements in investing more funds into GMC given the net asset value stated for the company in those report.

697. As a result, plaintiffs have been and will continue to be damaged.

**<u>COUNT XXXXI</u>**

**(Intentional Misrepresentation as to Ashcraft, AOA LLC and BL LLC)**

698. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 10, Paragraphs 44, 45, 46, Paragraph 141 through Paragraph 225, Paragraph 236(m), Paragraph 236(n), Paragraph 244 through Paragraph 253, Paragraph 501 to

Paragraph 510, and Paragraph 687 to Paragraph 696 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

699. The financial statements and balance sheet that Ashcraft, AOA LLC and BC LLC created for plaintiffs' review were intentionally falsified by Ashcraft to reflect an over $8,000,000 asset value, and to conceal Federman's and Johnson's theft of plaintiffs' funds. Plaintiffs justifiably and reasonably relied upon these intentionally misleading and inaccurate financial statements that Ashcraft, AOA LLC and BC LLC each created for plaintiffs' review in determining whether plaintiffs would make additional investment into GMC for purposes of allegedly "completing the build out to launch VIDGO."

700. Plaintiffs justifiably and reasonably relied upon these financial statements in making their additional investments, and had specifically requested these doucments for their review before making such an additional investment.

701. Plaintiffs review of these intentionally falsified financial statements and records reasonably induced and convinced plaintiffs to make additional investments into the GMC fiction based upon the very strong GMC balance sheet that was provided by Ashcraft, AOA LLC and BC LLC to plaintiffs specifically prepared for their review.

702. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXXII

**(Legal Fraud as to GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman & KTC)**

703. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19 and 21, Paragraph 28 to Paragraph 29, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 296, Paragraphs 329, 330, 334, 337 and 338, Paragraph 341 to Paragraph 343, Paragraph 434 to Paragraph 437, and Paragraph 449 to Paragraph 550 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

704. Federman made and presented intentionally false and material misrepresentations and artifices to plaintiffs regarding VIDGO with the intent that plaintiffs rely upon those material misrepresentatons and invest their money in GMC.

705. Federman's intentionally false and material misrepresentations and artifices made plaintiffs believe that GMC had constructed, implemented and designed a legitimate and viable OTT live linear interest cable service that would imminently launch and compete in the marketplace for viewers and subscribers.

706. Between late 2015 and April 2017, Federman also intentionally failed and/or refused to disclose to plaintiffs that: (i) he had diverted plaintiffs' initial investment proceeds in late 2015/early 2016 to GMS, and then to his personal

account for personal use; (ii) that all of his "Investor Updates," all GMC press releases and all GMC marketing materials were intentionally and knowingly false and misleading in perpetuating the false VIDGO narrative; (iii) that GMC never had/would never have an OTT live linear interne cable service; (iv) GMC had absolutey no intellectual property, licensing rights, broadcast rights and/or transmission rights of any kind to broadcast necessary core OTT content to the public; (v) that plaintiffs' monies were being used to build an IPTV network rather than an OTT network; (vi) that Federman had been using plaintiffs' monies for his Rickshaw and Megatone business, and to finance his personal lifestyle and expenses; and (vii) that all of the "betas" broadcast to plaintiffs were IPTV signals illegal transmitted to OTT devices.

707. Plaintiffs reasonably relied upon Federman's intentionally false and material misrepresentations and artifices, and material omisisons, in investing their monies into GMC at the various stages they did between late 2015 through April 2017 while reasonably believeing VIDGO was a reality.

708. Plaintiffs consequently purchased common stock and convertible note interests in GMC that were absolutely worthless at all times from the inception of such purchases by plaintiffs until GMC's administrative dissolution.

709. Kostensky made and presented intentionally false and material misrepresentations and artifices to plaintiffs regarding VIDGO with the intent that

plaintiffs rely upon those material misrepresentatons and invest their money in GMC.

710. Kostensky's intentionally false and material misrepresentations and artifices made plaintiffs believe that GMC had constructed, implemented and designed a legitimate and viable OTT live linear interest cable service that would imminently launch and compete in the marketplace for viewers and subscribers.

711. Between late 2015 and April 2017, Kostensky also intentionally failed and/or refused to disclose to plaintiffs that: (i) all of the "Investor Updates," all GMC press releases and all GMC marketing materials were intentionally and knowingly false and misleading in perpetuating the false VIDGO narrative; (ii) that GMC never had/would never have an OTT live linear interne cable service; (iii) that GMC had absolutey no intellectual property, licensing rights, broadcast rights and/or transmission rights of any kind to broadcast necessary core OTT content to the public; (iv) that plaintiffs' monies were being used to build an IPTV network rather than an OTT network; and (v) that all of the "betas" broadcast to plaintiffs were IPTV signals illegal transmitted to OTT devices.

712. Plaintiffs reasonably relied upon Kostensky's intentionally false and material misrepresentations and artifices, and material omisisons, in investing their monies into GMC at the various stages they did between late 2015 through April 2017 while reasonably believeing VIDGO was a reality.

713. Plaintiffs consequently purchased common stock and convertible note interests in GMC that were absolutely worthless at all times from the inception of such purchases by plaintiffs until GMC's administrative dissolution.

714. Johnson made and presented intentionally false and material misrepresentations and artifices to plaintiffs regarding VIDGO with the intent that plaintiffs rely upon those material misrepresentatons and invest their money in GMC.

715. Johnson's intentionally false and material misrepresentations and artifices made plaintiffs believe that GMC had constructed, implemented and designed a legitimate and viable OTT live linear interest cable service that would imminently launch and compete in the marketplace for viewers and subscribers, while Johnson himself was actually constructing an IPTV cable system and intentionally failed to disclose this to plaintiffs.

716. Between late 2015 and April 2017, Johnson also intentionally failed and/or refused to disclose to plaintiffs that: (i) he had been diverting plaintiffs' initial investment proceeds out of GMC and into all of the defendant companies that Johnson owned and controlled; (ii) had been diverting plaintiffs' investment proceeds into his personal account for personal use; (iii) that all of his "Investor Updates," all GMC press releases and all GMC marketing materials were intentionally and knowingly false and misleading in perpetuating the false VIDGO

narrative; (iv) that GMC never had/would never have an OTT live linear internet cable service; (iv) that GMC had absolutey no intellectual property, licensing rights, broadcast rights and/or transmission rights of any kind to broadcast necessary core OTT content to the public; (v) that Johnson had been using plaintiffs' monies to finance his personal lifestyle and expenses; and (vi) that all of the "betas" broadcast to plaintiffs were IPTV signals illegal transmitted to OTT devices and not licensed/authorized OTT content.

717. Plaintiffs reasonably relied upon Johnson's intentionally false and material misrepresentations and artifices, and material omisisons, in investing their monies into GMC at the various stages they did between late 2015 through April 2017 while reasonably believeing VIDGO was a reality.

718. Plaintiffs consequently purchased common stock and convertible note interests in GMC that were absolutely worthless at all times from the inception of such purchases by plaintiffs until GMC's administrative dissolution.

719. Su and Cascade made and presented intentionally false and material misrepresentations and artifices in the form of the deceptive and manipulative "betas" to plaintiffs regarding VIDGO with the intent that plaintiffs rely upon those material misrepresentatons and invest their money in GMC.

720. Su's and Cascade's intentionally false and material misrepresentations and artifices employed in the form of the "betas" made plaintiffs believe that GMC

had constructed, implemented and designed a legitimate and viable OTT live linear interest cable service that would imminently launch and compete in the marketplace for viewers and subscribers. Notably, Su and Cascade were paid for consulting and creating the "betas" while serving as a GMC executive.

721. Between late 2015 and April 2017, Su and Cascade also intentionally failed and/or refused to disclose to plaintiffs that: (i) he had taken plaintiffs' investment proceeds to purchase and pay themselves for IPTV turnkeys from Minerva/Vubiquity that Su and Cascade then used to broadcast IPTV signal "betas" to plaintiffs OTT devices; (ii) all of the "betas" were actualy IPTV signals and unlicensed/unauthorized for broadcast to plaintiffs' OTT devices; (iii) that GMC never had/would never have an OTT live linear internet cable service; (iv) GMC had absolutey no intellectual property, licensing rights, broadcast rights and/or transmission rights of any kind to broadcast necessary, popular or core OTT content to the public; (v) that plaintiffs' monies were being used to build an IPTV network rather than an OTT network; and (vi) that all of the "betas" broadcast to plaintiffs were IPTV signals illegal transmitted to OTT devices.

722. Plaintiffs reasonably relied upon Su's and Federman's intentionally false and material misrepresentations and artifices, and material omisisons, in investing their monies into GMC at the various stages they did between late 2015 through April 2017 while reasonably believeing VIDGO was a reality.

723. Plaintiffs consequently purchased common stock and convertible note interests in GMC that were absolutely worthless at all times from the inception of such purchases by plaintiffs until GMC's administrative dissolution.

724. Thurman and KTC made and presented intentionally false and material misrepresentations and artifices in the form of the "betas" to plaintiffs regarding the VIDGO fiction, with the intent that plaintiffs rely upon those material misrepresentatons and invest their money in GMC.

725. Thurman's and KTC's intentionally false and material misrepresentations and artifices made plaintiffs believe that GMC had constructed, implemented and designed a legitimate and viable OTT live linear interest cable service that would imminently launch and compete in the marketplace for viewers and subscribers, while Johnson, KTC and Thruman were actually constructing an IPTV cable system and intentionally failed to disclose this to plaintiffs.

726. Thurman and KTC were not only a part of, and instrumental in, the creation and design of phony "betas" disseminated and broadcast to plaintiffs, but Thurman and KTC also purported to serve as consultants to GMC, while also President of "Winsonic", in an effort to secure OTT content rights for GMC, and were paid for consulting, creating and broadcasting the "betas."

727. Meanwhile, Thurman and KTC exclusively and clandestinely worked on obtaining IPTV content and distribution rights for KTC, Winsonic Holdings,

WDMG and WDCSN using plaintiffs' funds, in order to advance their joint venture/intended merger with Winsonic Holdings, WDMG and WDCSN, and without disclosing these material facts to plaintiffs who were viewing the "betas" and reasonably believing GMC had a real, authorized and viable live linear OTT cable service.

728. Between late 2015 and April 2017, Thurman and KTC intentionally failed and/or refused to disclose to plaintiffs that: (i) they had taken plaintiffs' investment proceeds to purchase and pay themselves for IPTV turnkeys from Minerva/Vubiquity that Su and Cascade then used to broadcast IPTV signal "betas" to plaintiffs OTT devices; (ii) all of the "betas" were actualy IPTV signals and unlicenses/unauthorized for broadcast to plaintiffs' OTT devices; (iii) that GMC never had/would never have an OTT live linear interne cable service; (iv) GMC had absolutey no intellectual property, licensing rights, broadcast rights and/or transmission rights of any kind to broadcast necessary core OTT content to the public; (v) that plaintiffs' monies were being used to build an IPTV network rather than an OTT network; and (vi) that all of the "betas" broadcast to plaintiffs were IPTV signals illegal transmitted to OTT devices.

729. Plaintiffs reasonably relied upon Thurman's and KTC's intentionally false and material misrepresentations, omissions and artifices, and material omisisons, in investing their monies into GMC at the various stages they did

between late 2015 through April 2017 while reasonably believeing VIDGO was a reality based on these intentional misrepresentations and omissions.

730. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXXIII**

**(Conspiracy to Commit Legal Fraud as to GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman & KTC)**

731. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19 and 21, Paragraph 28 to Paragraph 29, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 296, Paragraphs 329, 330, 334, 337 and 338, Paragraph 341 to Paragraph 343, Paragraph 434 to Paragraph 437, Paragraph 449 to Paragraph 550, and Paragraph 704 to Paragraph 724 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

732. GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC engaged in an agreement among two or more of them for a common objective, and undertook actions in furtherance of the objective, with full knowledge, to engage in the aforementioned fraudulent schemes, artifices and devices to defraud plaintiffs through these defendants' use of the fictional GMC front and the fictional VIDGO business venture.

733. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXXIV

### (Aiding & Abetting Legal Fraud as to GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman & KTC)

734. Plaintiffs specifically incorporate Paragraph 4 through Paragraph 13, Paragraphs 18, 19 and 21, Paragraph 28 to Paragraph 29, Paragraph 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 296, Paragraphs 329, 330, 334, 337 and 338, Paragraph 341 to Paragraph 343, Paragraph 434 to Paragraph 437, Paragraph 449 to Paragraph 550, Paragraph 704 to Paragraph 724, and Paragraph 732 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

735. GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC were fully aware of the existence of one another's and their coordinated fraudulent schemes, conduct, devices and artifices all times described in this Count.

736. GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC substantially assisted one another in the commission of one another's fraudulent schemes, conduct, devices and artifices.

737. GMC, Federman, Johnson, Su, Cascade, Kostensky, Thurman and KTC aided and abetted in one another's fraudulent schemes, conduct, devices and

artifices that proximately caused plaintiffs to lose their entire investment in the fictional GMC, and these losses were reasonably foreseeable to these defendants.

738. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXXV**

**(Legal Fraud as to Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC)**

739. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 10, Paragraphs 12, 15, 16, 17, 28, 29, 44, 45 and 46, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 290, Paragraph 346 to Paragraph 360, Paragraph 363 to Paragrah 364, Paragraph 367 to Paragraph 372, Paragraph 449 to Paragraph 550, Paragraph 714 to Paragraph 718, Paragraph 724 to Paragraph 729, and Paragraph 732 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

740. In addition to the facts incorporated into this Count, Johnson between April 2016 and April 2017 directly stated to plaintiffs by telephone on numerous occasions while serving as CTO of GMC that Winsonic Holdings, WDCSN and WDMG were collaborating and working for GMC as independent consultants in order to assist GMC in finalizing and launching the VIDGO service.

741. Johnson intentionaly omitted disclosing to plaintiffs while he served as CTO of GMC and made those statements to plaintiffs that Johnson was also the

principal shareholder, officer and director of Winsonic Holdings, WDCSN and WDMG, and that his efforts at GMC with these three (3) companies were exclusively geared towards creating an IPTV network for himself, Winsonic Holdings, WDCSN and WDMG using plaintiffs' investment proceeds intended for GMC and on OTT service.

742. Had Johnson disclosed his true purpose as CTO of GMC or that he was actually constructing and developing an IPTV network for GMC and himself/his companies rather than an OTT network, none of the plaintiffs would have invested in GMC.

743. Johnson made the foregoing material misrepresetnations and omissions intentionally to plaintiffs, and on behalf of his companies Winsonic Holdings, WDMG and WDCSN as their officer, director and shareholder, in order to ensure plaintiffs would continue investing their funds into GMC so that Johnson and these defendant companies could finance their IPTV network strategy and Winston's personal lifestyle and expenses.

744. Ashcraft and her companies AOA LLC and BC LLC intentionally created and presented intentionally false and misleading financial statements, profit and loss statements and balance sheets to plaintiffs for the GMC 2016 and 2017 years, and with the knowledge and intent that plaintiffs were going to be reviewing those financials to determine whether to invest additional funds in GMC.

745. Ashcraft and her companies AOA LLC and BC LLC intentionally created those financial statements at the request of Federman, Johnson and Kostensky to intentionally mislead plaintiffs into believing reasonably that GMC had over $8,000,000 in assets with little liabilities in hopes that misleading information would placate plaintiffs into believing GMC was very sound financially with millions in net asset value, and to induce them into investing additional monies to GMC for inappropriate use by Federman/Johnson and their various defendant entities.

746. Plaintiffs reasonably relied upon the intentionally false and misleading financial statements Ashcraft and her companies AOA LLC and BC LLC prepared specifically for plaintiffs' review, and such review induced plaintiffs to make additional investments into GMC that they lost based upon the strong financial position set forth in those financial records.

747. Asa result, plainitffs have been and will continue to be damaged.

**COUNT XXXXVI**

**(Conspiracy to Commit Legal Fraud as to Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC)**

748. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 10, Paragraphs 12, 15, 16, 17, 28, 29, 44, 45 and 46, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 290, Paragraph 346 to Paragraph 360, Paragraph 363 to Paragrah 364, Paragraph 367 to

Paragraph 372, Paragraph 449 to Paragraph 550, Paragraph 714 to Paragraph 718, Paragraph 724 to Paragraph 729, Paragraph 732, and Paragraph 740 to Paragraph 746 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

749. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC engaged in an agreement among two or more of them for a common objective, and undertook actions in furtherance of the objective, with full knowledge, to engage in the aforementioned fraudulent schemes, artifices and devices to defraud plaintiffs through these defendants' use of the fictional GMC front and the fictional VIDGO business venture.

750. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXXVII**

**(Aiding & Abetting Legal Fraud as to Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC)**

751. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 10, Paragraphs 12, 15, 16, 17, 28, 29, 44, 45 and 46, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 290, Paragraph 346 to Paragraph 360, Paragraph 363 to Paragrah 364, Paragraph 367 to Paragraph 372, Paragraph 449 to Paragraph 550, Paragraph 714 to Paragraph 718, Paragraph 724 to Paragraph 729, Paragraph 732, Paragraph 740 to Paragraph 746,

and Paragraph 749 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

752. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC were fully aware of the existence of one another's and their coordinated fraudulent schemes, conduct, devices and artifices all times described in this Count.

753. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC substantially assisted one another in the commission of one another's fraudulent schemes, conduct, devices and artifices.

754. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC aided and abetted in one another's fraudulent schemes, conduct, devices and artifices that proximately caused plaintiffs to lose their entire investment in the fictional GMC, and these losses were reasonably foreseeable to these defendants.

755. As a result, plaintiffs have been and will continue to be damaged.

## COUNT XXXXVIII

### (Conspiracy to Commit Legal Fraud as to Federman, Kostensky, Johnson, Ashcraft, BC LLC and AOA LLC)

756. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 12, Paragrahs 21, 44, 45 and 46, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 296, Paragraph 346 to

Paragraph 360, Paragraph 363 to Paragrah 364, Paragraph 367 to Paragraph 372, Paragraph 449 to Paragraph 550, Paragraph 714 to Paragraph 718, Paragraph 724 to Paragraph 729, Paragraph 732, Paragraph 740 to Paragraph 746, and Paragraph 749 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

757. Between December 2015 and August 2017, Ashcraft was a shareholder, officer and director of Winsonic Holdings, WDMG and WDCSN, and specifically served as the Controller and/or CFO for those defendant companies individually and through her defendant companies AOA LLC and BC LLC.

758. Regarding the April 2017 "Investor Pack" and creation of intentionally and knowingly false financial statements and records, Federman, Kostensky, Johnson, Ashcraft, BC LLC and AOA LLC engaged in an agreement among themselves and/or two or more of themselves for a common objective of intentionally misleading plaintiffs about the financial confitons and value of GMC, and about the past use of plainitffs' investment proceeds, and undertook actions in furtherance of the objective to intentional distort and conceal what was actually going on within the GMC enterprise financially, with full knowledge, to engage in the aforementioned fraudulent schemes, artifices and devices to defraud plaintiffs through these defendants' use of the fictional GMC front and the fictional VIDGO business venture.

759. As a result, plaintiffs have been and will continue to be damaged.

**COUNT XXXXIX**

**(Aiding & Abetting Legal Fraud as to Federman, Kostensky, Johnson, Ashcraft, BC LLC and AOA LLC)**

760. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 12, Paragrahs 21, 44, 45 and 46, Paragraphs 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragrah 281, Paragraph 288 to Paragraph 296, Paragraph 346 to Paragraph 360, Paragraph 363 to Paragrah 364, Paragraph 367 to Paragraph 372, Paragraph 449 to Paragraph 550, Paragraph 714 to Paragraph 718, Paragraph 724 to Paragraph 729, Paragraph 732, Paragraph 740 to Paragraph 746, and Paragraph 749 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

761. Federman, Kostensky, Johnson, Ashcraft, BC LLC and AOA LLC were fully aware of the existence of one another's and their coordinated fraudulent schemes, conduct, devices and artifices all times described in this Count.

762. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC substantially assisted one another in the commission of one another's fraudulent schemes, conduct, devices and artifices.

763. Johnson, Winsonic Holdings, WDMG, WDCSN, Ashcraft, BC LLC and AOA LLC aided and abetted in one another's fraudulent schemes, conduct, devices and artifices that proximately caused plaintiffs to lose their entire

investment in the fictional GMC, and these losses were reasonably foreseeable to these defendants.

764. As a result, plaintiffs have been and will continue to be damaged

## COUNT L

### (Legal Fraud as to Johnson, Federman, RHI and Clippard)

765. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 12, Paragraph 42 to Paragraph 43, Paragraph 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragraph 287, Paragraph 397 to Paragraph 407, Paragraph 568 to Paragraph 576, and Paragrah 563 to Paragraph 565 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

766. In addition to the other allegations incorporated into this Count, and at the requests for Johnson and Federman, the RHI Employees intentionally pretended to serve as GMC employees when plaintiffs and their representatives visited GMC's Georgia Campus at various times to assess GMC and the company during the time period between March 2017 and April 2017.

767. During those visits, the RHI Employees pretended to serve as GMC employees so that plainitffs and their representatives would believe and perceive that GMC was an actual and legitimate business with employees working on the

VIDGO service to imminently launch an OTT live linear cabel television service, and that GMC was using plaintiffs' funds towards that specific business purpose.

768. Federman and Johnson also had the RHI Employees carry out this scheme and artifice when other investors and potential investors visited the Georgia Campus to assess GMC and its work and facility behind on the VIDGO fiction.

769. Meanwhile, the RHI emlpoyees were knowingly and actually performing work for the Holywood Defendants, Winsonic Holdings, WDMG and WDCSN, despite RHI being paid using plainitffs' investment proceeds removed from GMC.

770. When one RHI Employee, Tamela Walker, discovered the fraudulent scheme that RHI, Federman and Johnson were carrying out using the RHI Employees to dupe GMC investors/potential investors and questioned why the other RHI Employees were not working on anything pertaining to an OTT live linear television service, Federman and Johnson isolated – and terminated – Walker to continue the fraudulent scheme and use of the RHI Employees with RHI.

771. Plaintiffs reasonably relied upon this scheme perpetuated by Federman, Johnson, RHI and Clippard into believing that GMC actually had real employees being paid using plaintiffs' investment proceeds to advance, finance

and launch the VIDGO service, and as a result invested additional monies into GMC due to this scheme and artifice.

772. Despite seeing and knowing that plaintiffs and plaintiffs' representatives were actual shareholder in GMC during these specific visits, all of the RHI Employees intentionally omitted disclosing to plaintiffs at those visits that the RHI Employees were actually performing work for the Hollywood Defendants, Winsonic, WDMG and WDCSN, despite GMC and plainitffs' monies being used to pay RHI for the use and staffing of the RHI Employees – so as to avoid plaintiffs discoverying that the RHI Employees were not working on anything having to do with GMC or VIDGO, but were rather working on Johnson's and Federman's other businesses and projects.

773. RHI is vicariously liable for the actions of its RHI Employees in carrying out this fraudulent scheme while actually performing work for the non-GMC defendant companies, and is charged with full knowledge, supervision and liability for the actions of its RHI Employees.

774. Since VIDGO was a total fiction and GMC was never a real company working on a live OTT platform or service, plaintiffs lost their entire investment in GMC, including the funds invested due to the actions and omissions of RHI and its RHI Employees.

775. As a result, plaintiffs have been and will continue to be damaged.

## COUNT LI

**(Conspiracy to Commit Legal Fraud as to Johnson, Federman, RHI and Clippard)**

776. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 12, Paragraph 42 to Paragraph 43, Paragraph 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragraph 287, Paragraph 397 to Paragraph 407, Paragraph 568 to Paragraph 576, Paragraph 563 to Paragraph 565, and Paragraph 766 to Paragraph 774 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

777. Johnson, Federman, RHI and Clippard engaged in an agreement among themselves and/or two or more of themselves for a common objective of intentionally misleading plaintiffs about GMC's employees, the use of plainitffs' investment proceeds and the reality of the non-existent VIDGO service, and undertook actions in furtherance of the objective to intentional distort and conceal what was actually going on within the GMC enterprise financially, with full knowledge, to engage in the aforementioned fraudulent schemes, artifices and devices to defraud plaintiffs through the fictional GMC front and fictional VIDGO.

778. As a result, plaintiffs have been and will continue to be damaged.

## COUNT LI

### (Aiding & Abetting Legal Fraud as to Johnson, Federman, RHI and Clippard)

779. Plaintiffs specifically incorporate Paragraph 4 to Paragraph 12, Paragraph 42 to Paragraph 43, Paragraph 57 to Paragraph 225, Paragraph 236, Paragraph 244 to Paragraph 287, Paragraph 397 to Paragraph 407, Paragraph 568 to Paragraph 576, Paragraph 563 to Paragraph 565, Paragraph 766 to Paragraph 774, and Paragraph 777 into this Count as outlined above with the same force and effect as if more fully set forth at length in this Count.

780. Johnson, Federman, RHI, Clippard and the other RHI Employees were fully aware of the existence of one another's and their coordinated fraudulent schemes, conduct, devices and artifices all times described in this Count, and substantially assisted one another in the commission of one another's fraudulent schemes, conduct, devices and artifices.

781. Johnson, Federman, RHI, Clippard and the other RHI Employees aided and abetted in one another's fraudulent schemes, conduct, devices and artifices that proximately caused plaintiffs to lose their entire investment in the fictional GMC, and these losses were reasonably foreseeable to these defendants.

782. As a result, plaintiffs have been and will continue to be damaged.

**WHEREFORE**, plaintiffs demand judgment against all kdefendants as follows:

(a) direct, consequential and actual damages;

(b) treble damages pursuant to Georgia RICO Act, O.G.C.A.16-14-1 et. seq.;

(c) attorneys' fees and costs of suit pursuant to Georgia RICO Act, O.G.C.A.16-14-1 et. seq.;

(d) attorneys' fees and costs pursuant to Rule 10b-5/1934 Securities Act;

(e) piercing the corporate veils of all defendants companies owned and/or controlled by Federman, Johnson, Thurman and Ashcraft that these defendants used to carry out the aforementioned wrongful acts;

(f) punitive damages;

(g) pre-judgment and post-judgment interest; and

(h) any other relief the Court deems equitable and proper

**BRACH EICHLER LLC**
Attorneys for Plaintiffs

/s/ Bob Kasolas, Esq.
Bob Kasolas, Esq. *Pro Hac Vice*
Carl J. Soranno, Esq. *Pro Hac Vice*
101 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: 973-228-5700
bkasolas@bracheichler.com
csoranno@bracheichler.com

Dated: April 23, 2019

**ROUNTREE & LEITMAN, LLC**

/s/ Hal J. Leitman, Esq.
Hal J. Leitman, Esq.
Georgia Bar No. 446246
William A. Rountree, Esq.
Georgia Bar No. 616503
David S. Klein, Esq.
Georgia Bar No. 183389
Attorneys for Plainttiff
2800 North Druid Hills Road
Building B, Suite 100
Atlanta, Georgia 30329
(404) 584-1229
hleitman@randlaw.com
wrountree@randlaw.com
dklein@randlaw.com

Attorneys for Plaintiffs

## LOCAL RULE 5.1 CERTIFICATION

By signature below, counsel certifies that the foregoing pleading was prepared in Times New Roman, 14-Point Font in compliance with Local Rule 5.1(c).

**BRACH EICHLER LLC**

/s/ Bob Kasolas, Esq.
BOB KASOLAS, ESQ.

Dated: April 23, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2019, I electronically filed the foregoing FIRST AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing and a copy of same to all attorneys of record.

**BRACH EICHLER LLC**

/s/ Bob Kasolas, Esq.
Bob Kasolas, Esq.
*Pro Hac Vice*

Carl J. Soranno, Esq.
*Pro Hac Vice*

101 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: 973-228-5700